1   Melinda Jane Steuer (State Bar No. 216105)
    LAW OFFICES OF MELINDA JANE STEUER
2   928 Second Street, Ste. 302
    Sacramento, CA 95814
3   Telephone:    (916) 930-0045
    Facsimile:    (916) 314-4100
4
    Attorneys for Plaintiff
5

6

7                     UNITED STATES DISTRICT COURT

8                     EASTERN DISTRICT OF CALIFORNIA

9

10
    JOHN MARSHALL, an individual          Case No.  2:17-cv-00820-KJM-CKD
11
              Plaintiff,                   **DECLARATION OF JOHN**
12                                         **MARSHALL IN OPPOSITION TO**
         vs.                               **DEFENDANT WILLIAM**
13                                         **BROOKSBANK'S MOTION TO**
    DANIEL P. GALVANONI, an individual;    **DISMISS FOR LACK OF PERSONAL**
14  DPG INVESTMENTS, LLC, a foreign        **JURISDICTION**
    limited liability company; DPG GOLDEN
15  EAGLE, LLC, a foreign limited liability
    company; SPRING TREE LENDING, LLC     Date:        July 14, 2017
16  a foreign limited liability company; SPRING   Time:   10:00 AM
    TREE HOLDINGS, LLC; SPRING TREE
17  FINANCIAL, LLC; SKIBO HOLDINGS,
    LLC, a foreign limited liability company;   Hon. Kimberly Mueller
18  GERALD T. HUDSPETH, an individual;
    JEROME L. JOSEPH, an individual;
19  WILLIAM J. BROOKSBANK, an
    individual; and DOES 1 - 100, inclusive,
20
              Defendants.
21  _____/

22        I, John Marshall declare:

23        1.    I am the plaintiff herein.

24        2.    I have resided in the State of California during the entire time period relevant to

25  this case.

26  //

27

28
    _____

3.    William Brooksbank ("Brooksbank") knew, from the emails that we exchanged, that I resided in the State of California at all relevant times.

4.    I first became aware that Brooksbank was in a managerial position with respect to the Skibo group of companies into which I made the investments at issue ("Skibo"), on or about March 5, 2015.  Attached hereto as Exhibits 1 & 2, respectively, is a true and correct copy of two emails from Brooksbank providing information regarding Skibo, which Daniel Galvanoni ("Galvanoni") forwarded to me on March 5, 2015 and March 6, 2015, respectively.

5.    On or about April 8, 2015, I was provided with a mezzanine loan proposal to invest in Skibo which was created by Brooksbank.  In this proposal, Brooksbank represented that an investment in Skibo would provide a total annual return of 28% a year.  Brooksbank also identified himself as a managing director of DPG investments LLC ("DPG") in his email that was forwarded to me on April 8, 2015.  A true and correct copy of Brooksbank's proposal and the email by which it was forwarded to me is attached hereto as Exhibit 3.

6.    On April 30, 2015, and May 1, 2015, Brooksbank sent me a proposed investment agreement, as well as a profit and loss forecast and an investor return model.  In this email, Brooksbank represented that the 3% warrants in Skibo that were proposed in the agreement would be worth $784,000 in four years, that the 4.25% warrants in Skibo that were proposed in the agreement would be worth $1,100,000.00 in four years, and that my internal rate of return would be 108%.  Brooksbank identified himself as a managing director of DPG in both of those emails.  A true and correct copy of these emails (without the attachments) is attached hereto as Exhibit 4.

7.    On or about June 15, 2015, before I made my initial investment in Skibo, Galvanoni introduced me to Brooksbank via a telephone conference call.

8.    I made my first investment into Skibo on June 18, 2015.  Between June 18, 2015 and June 29, 2015, I invested $175,000.00 into Skibo.

//

//

1    9.    On June 28, 2015, Brooksbank emailed me with a proposed memorandum which

2    he indicated explained the investment opportunity with Skibo.   A true and correct copy of this

3    email (without the attachment) is attached hereto as Exhibit 5.

4    10.    On or about August of 2015, I learned that DPG's managers had discovered

5    problems with Skibo's books and its management.   Thereafter, I attended several telephone

6    conference calls in which Brooksbank was present and discussed the problems that had been

7    uncovered with respect to Skibo, and the due diligence he had done previously with respect to

8    Skibo.

9    11.    On or about August of 2016, I was forwarded an email which Brooksbank had

10    sent to Galvanoni on July 28, 2016. In this email, Brooksbank detailed the work he had done

11    with respect to Skibo/Spring Tree (Skibo was renamed Spring Tree in the fall of 2015), and my

12    investment therein.   In this email, Brooksbank stated that he had performed the following work:

13    1) he drafted and/or revised 18 term sheets for prospective investors in Skibo/Spring Tree; 2) he

14    drafted 17 investor summaries for investors in Skibo/Spring Tree; 3) he prepared automobile

15    loan models for the investor summaries with respect to Skibo/Spring Tree; 4) he prepared the

16    financial models for Skibo/Spring Tree with numerous updates and revisions and comments;

17    5) he handled the financial planning and financial models for the investments in Skibo/Spring

18    Tree; 6) he drafted virtually all of the loan agreements with respect to Skibo/Spring Tree; 7) he

19    did the estimates of the individual investor returns with respect to Skibo/Spring Tree; 8) he had

20    numerous meetings with investors in Skibo/Spring Tree; 9) he drafted the investment agreements

21    for my investments in Skibo/Spring Tree that were sent to me; and 10) he prepared numerous

22    spreadsheets and accountings relating to investor loans and company performance with respect to

23    Skibo/Spring Tree.  A true and correct copy of Brooksbank's email of July 28, 2016, in which he

24    represented that he had engaged in the foregoing work with respect to Skibo/Spring Tree, is

25    attached hereto as Exhibit 6.

26    12.    The proposals, term sheets, investor summaries, financial models, investment

27    agreements, and spreadsheet updates referenced in Brooksbank's email of July 28, 2016, which is

28

1  attached hereto as Exhibit 6, were all provided to me.   I relied upon those documents and their

2  accuracy in making my initial decision to invest in Skibo, in making my subsequent decisions to

3  invest additional monies into Skibo/Spring Tree, and in deciding to remain invested in

4  Skibo/Spring Tree. I also relied upon Brooksbank to confirm what Galvanoni had stated to me in

5  emails as to which Brooksbank was copied and/or in our telephone communications during

6  which Brooksbank was present, and to inform me if Galvanoni had misstated anything or if I had

7  misunderstood anything in connection with those communications.  In particular, I relied upon

8  Brooksbank to inform me if my monies were not fully secured.  Brooksbank never did so.  I

9  believe that my reliance on Brooksbank was reasonable because he represented himself as being

10  a managing director of DPG and its affiliates, and because of his extensive involvement in

11  preparing the investment proposals, compiling financial information, and conducting due

12  diligence with respect to Skibo/Spring Tree.

13  I declare under penalty of perjury under the laws of the State of California and the United

14  States of America that the foregoing is true and correct of my own personal knowledge.

15

16

17

18  Dated: 6/26/17                                    JOHN MARSHALL

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

**Melinda Steuer**

| | |
|---|---|
| **From:** | Daniel Galvanoni <dan@dpginvestments.com> |
| **Sent:** | Thursday, March 5, 2015 7:45 PM |
| **To:** | John Marshall |
| **Subject:** | Fwd: TSA- DPG: Response to Shelly |

Begin forwarded message:

**Subject: TSA- DPG: Response to Shelly**
**From:** Daniel Galvanoni <dan@dpginvestments.com>
**Date:** March 4, 2015 at 5:44:13 PM PST
**Cc:** Jerry Hudspeth <jerry@dpginvestments.com>, Bill Brooksbank
<bill@dpginvestments.com>, Dan Galvanoni <dan@dpginvestments.com>
**To:** Shelly Ginsburg <ltlginz@gmail.com>

Shelly,

Thanks for the questions you raised on TSA and JADCO.

The answers we were able to get from Jim Duryea, owner and
CEO, are as follows:

**Wells Fargo Loan** – there was/is no Wells Fargo Loan.  TSA has
a deposit account control agreement with Wells Fargo.  This
account is the clearing account for the current lender (Hudson
Cove) relationship.  In the event of default, Hudson Cove could
access the account.  Their payments to Hudson Cove are
currently disbursed via this account.

**Management Fee** -  Any monies received by JADCO were given
to TSA Financial as a management fee.  Jim Duryea and Rob
Smith were paid salaries by TSA ($150K per year each)  Jim
indicates this was a way to provide  money to TSA to assist with
financing.  Note:  100% of TSA and JADCO are owned by
Jim.  He has no issues with combining them when appropriate for
all involved.

**Current Lender Agreeable to Any Necessary Waivers** - Jim
states that his current lender has no interest in providing further
financing and would be pleased to sign a waiver to that
effect.  The lender has a pre-payment penalty in their agreement
with TSA but has agreed to waive that fee (about $68K) for a

1

payoff in March. Jim also indicates that Hudson Cove would have no problem with signing a waiver for the collateral on the bridge loan whereby the bridge lender has first lien on JADCO's assets including the 80 new auto loans to be funded with the proceeds. Hudson Cove will also sign a waiver on the right of first refusal on the bridge loan.

**Four Seasons** – Four Seasons was a loan that Jim had that was secured by real estate. The real estate was sold and the loan retired at the end of 2014. No involvement with TSA or TSA operations.

Note: There are three (3) LLC's that are 100%owned by Jim that interact. They are:

TSA Financial Group  - Subprime auto operating company that originates and purchases loans.

JADCO – provides consulting to prime and nonprime auto groups and banks. Any revenue generated is moved to TSA to support overhead and new originations (see management fee)

SkiBo – SkiBo provides and manages auto recovery, reconditioning and sales for TSA Financial

Although the above LLC structures serve the overall TSA business model well, Jim has no objection to restructuring to accommodate the investor. He is also available to discuss any of the above at investor convenience.

Please let us know if you have any additional questions and we will get the answers promptly.

Best regards,
Bill, Dan and Your friend Jerry.

EXHIBIT 2

## Melinda Steuer

| | |
|---|---|
| **From:** | Daniel Galvanoni <dan@dpginvestments.com> |
| **Sent:** | Friday, March 6, 2015 7:35 PM |
| **To:** | John Marshall |
| **Subject:** | Fwd: Response to Shelly's Questions of 3/5/15 |

John, I will call you tomorrow to explain per your call and VM.....

see below, shelly is an investor that will fund the mezz for us, 82 40mm in cash and a forsensic accountant so he digs deep and street smart.

sold the 2nd largest time share company in US to wind....see below my friend, we are money good here.

**From:** Bill Brooksbank [mailto:bill@dpginvestments.com]
**Sent:** Friday, March 06, 2015 1:24 PM
**To:** 'Dan Galvanoni'
**Cc:** Jerry Hudspeth; Westley Anderson
**Subject:** Response to Shelly's Questions of 3/5/15

Dan,

Please send the response below with the attachment to Shelly:

-----------

Shelly,

On the 9/30/14 Consolidated Balance Sheet for SkiBo Holdings, you noticed a line item entitled "Long Term Mortgage Wells Fargo" for $3,079,437 under the 4 Seasons' column.

SkiBo Holdings owns SkiBo Auto Sales, Jadco, TSA and 4 Seasons Storage. Citigroup Global Markets Realty Corp. was the original lender of $3,250,000 to 4 Seasons for the purchase of a public storage lot. Citigroup sold this loan into a securitization and Wells Fargo was the Master Servicer. The storage lot was sold in December, 2014 and proceeds were paid to satisfy the remaining balance on the loan (see attached release from the attorney for Wells Fargo).

Hudson Cove is the current lender to TSA. Hudson Cove will waive the prepayment fee of $68,000 on their loan. Hudson Cove will also waive their right to first refusal on any new TSA Financial Group Funding. In addition, Hudson Cove will acknowledge/ that they have no claim on Jadco or any Jadco assets.

JADCO is the borrower for the bridge loan so that the bridge lender can have first lien on all of Jadco's assets. JADCO will subordinate the Management Fee and keep all cash in Jadco until the bridge loan is paid off. Hudson Cove will also sign an agreement that grants the bridge lender first lien on Jadco's assets.

1

With the bridge loan, approximately 80 auto loans will be originated and signed as quickly as possible (probably less than a week) but not immediately with the receipt of funds. Jadco  could do this concurrent with the loan if we give them an exact time for funding of the bridge.  Jadco is not unable to commit to fund new deals until we give them a date.

Regarding a lockbox – if the lender wants a lock box structure, it can easily be done.  It is not typical with a short term bridge because money will be received monthly from the new originations and the bridge is expected to be paid off within a short period of time at closing of the $2 million mezzanine loan to TSA.  We could establish a lockbox and associated procedures and keep it for the final funding.

# EXHIBIT 3

So it looks like they lend money to a company that in turn lends money to people with marginal credit to buy cars. If the people with bad credit default on the car loans, they would have some problems. It looks like they are buying the loans at 75 cents on the dollar so there is a bit of a cushion. Yield looks attractive and it is partially secured, but again, it goes back to the ability of the borrowers to pay the high yield on the car loans. Golden Eagle is going to try to turn a profit between the interest they are paying the investors and yield they can collect on the debt they lend out to the borrowers. My general conclusion is that it can work in a good, stable economic environment, but would be very risky if the economy suddenly went south. I'm not an expert in investing or doing what you do. I'm not even sure I'm correct on what Golden Eagle is doing. However, I trust you and relay on your expertise.

So how much should I invest? How is my money going to be secured? What risk is our money at? When will we receive our money back plus our profit? What profit are we looking at? What equity position will we get? What is the downside? I have to be careful, I am paying for my children's education and I can't lose my money. So let me know?


Thank you,


*John Marshall, J.D. CIC*
<image001.png>
Armstrong & Associates Insurance Services
License No. 0B50501
**916-960-9196** Mobile Phone - Call 24/7
800-632-2777 Toll Free
530-668-2779 Fax
jmarshall@armstrongprofessional.com

Physical address: 1860 Howe Ave. Suite 240 Sacramento CA 95825
Mailing address: 239 W. Court St, Woodland, CA 95695

**From:** Daniel Galvanoni [mailto:dan@dpginvestments.com]
**Sent:** Wednesday, April 08, 2015 12:18 PM
**To:** John Marshall
**Cc:** John Marshall
**Subject:** Golden Eagle - mezz loan proposal

John,
after much labor, here is the memo and deal we are going to fund into

see below and attached...I have been traveling and on a flight to PA.

28% cash on cash which doesn't include the exit which would be 5-8times cash flows,

factoring in the absolute returns with the cash flows, we will do extremely well.

after we fund the 5mm senior and 2mm mezzanine loan the company in totality will have 10.5mm in loans and face value of 13-14mm

this makes it easier to do a  growth deal as portfolio will have some size, we than can move into a 10mm-12mm senior credit faciliyt than refinance out into a Market rate LOC shortly thereafter.

The revised mezz loan proposal is attached.

14% coupon to investor.

The waterfall on distributions from the SPE is based on total additional returns to the investor.  Based on refinancing the debt at 4% after 12 months,  the investor would earn an additional $989,480 over 4 years.  This would increase his total annual return to over 28%/year.

All the best,

Bill Brooksbank
Managing Director  |  DPG Investments LLC

office 480.513.3733  |  bill@dpginvestments.com  |  www.dpginvestments.com
mobile 480.225.3128
Confidentiality/Disclaimer Statement
The information contained in this electronic message is attorney privileged and confidential information intended only for the use of the owner of the email address listed as the recipient of this message. If you are not the intended recipient, or the employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any disclosure, dissemination, distribution, or copying of this communication is strictly prohibited.

.

# EXHIBIT 4

## Melinda Steuer

| | |
|---|---|
| **From:** | Bill Brooksbank <bill@dpginvestments.com> |
| **Sent:** | Friday, May 1, 2015 9:39 AM |
| **To:** | 'John Marshall' |
| **Subject:** | FW: John Marshall - Investment and Fee Agreement |
| **Attachments:** | Marshall_DPG_Investment Agreement for Golden Eagle Lending.pdf; Golden Eagle P&L Forecast.pdf; Golden Eagle Investor Returns.pdf |

All the best,

Bill Brooksbank
Managing Director  |  DPG Investments LLC

office 480.513.3733  |  bill@dpginvestments.com  |  www.dpginvestments.com
mobile 480.225.3128

Confidentiality/Disclaimer Statement
The information contained in this electronic message is attorney privileged and confidential information intended only for the use of the owner of the email address listed as the recipient of this message. If you are not the intended recipient, or the employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any disclosure, dissemination, distribution, or copying of this communication is strictly prohibited.

**From:** Bill Brooksbank [mailto:bill@dpginvestments.com]
**Sent:** Thursday, April 30, 2015 4:20 PM
**To:** 'Dan Galvanoni'
**Cc:** 'Westley Anderson'; 'Jerry Hudspeth'
**Subject:** John Marshall - Investment and Fee Agreement

A draft of the Investment and Fee Agreement for John Marshall is attached.

Please review.

The attached P&L Forecast shows Net Operating Income in Year #4 of $5.2 million.  Valuing the company at 5X NOI gives a valuation of $26 million at the end of Year #4.  At that time, John's 3% warrants would be worth $784,000. His 4.25% warrants would be worth $1.1 million.

The attached investor return model shows John's annual cash flow and indicates an IRR of 108% in either case.

All the best,

1

Bill Brooksbank

Managing Director  |  DPG Investments LLC

office 480.513.3733  |  bill@dpginvestments.com  |  www.dpginvestments.com
mobile 480.225.3128

Confidentiality/Disclaimer Statement

The information contained in this electronic message is attorney privileged and confidential information intended only for the use of the owner of the email address listed as the recipient of this message. If you are not the intended recipient, or the employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any disclosure, dissemination, distribution, or copying of this communication is strictly prohibited.

# EXHIBIT 5

## Melinda Steuer

| | |
|---|---|
| **From:** | Bill Brooksbank <bill@dpginvestments.com> |
| **Sent:** | Sunday, June 28, 2015 12:25 PM |
| **To:** | John Marshall |
| **Cc:** | Dan Galvanoni; Jerry Hudspeth; Westley Anderson |
| **Subject:** | SkiBo Holdings / Golden Eagle Lending investor memo |
| **Attachments:** | DPG Golden Eagle_SkiBo_5MM equity.pdf |

John,

We are using the attached investor memo to explain the opportunity to prospective investors.

It does not include terms so you can negotiate them with each individual.

We can create different series of Preferred Equity depending on the size of the investment.

Dan thought you might offer a 10% cumulative preferred coupon payable when SkiBo becomes sufficiently profitable.  I suggest you discuss the possible range of terms for each investor with Dan.


All the best,

Bill Brooksbank
Managing Director  |  DPG Investments LLC

office 480.513.3733  |  bill@dpginvestments.com  |  www.dpginvestments.com
mobile 480.225.3128

Confidentiality/Disclaimer Statement
The information contained in this electronic message is attorney privileged and confidential information intended only for the use of the owner of the email address listed as the recipient of this message. If you are not the intended recipient, or the employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any disclosure, dissemination, distribution, or copying of this communication is strictly prohibited.

# EXHIBIT 6

From: Bill Brooksbank <bill@dpginvestments.com>
Date: Thursday, July 28, 2016 at 11:07 AM
To: Dan Galvanoni <dan@dpginvestments.com>
Subject: RE: Jerry and DPG compensation plan....thoughts?

Dan,

We should discuss one-on-one when you are available.

My thoughts are as follows:

Our plan has always been to structure a deal, finance it, hire good people to run the day-to-day operations and go on to the next deal.

We have all been working for a share of the fees plus a share in the carried interest in each deal not dependent on how much of the routine day-to-day operations of the funded business each of us handles.

Current assignments for Spring Tree are:

Dan – Capital Markets & Investor Relations

Jerry – Chairman

Phil – employee currently auditing the underwriting of loans along with various assignments from Jerry

Joe – accounting on interest and principal owed to investors

Craig – Administrator for software (this involves controlling who has access to the software – Quick Books and AutoPal)

Bill – Financial Planning (including monthly and annual budgets, the financial projection and model updated as new capital is raised)

Salaries and Management Fees that Spring Tree can pay will depend on how much capital actually comes in. We can increase salaries and Management Fees as we continue to increase our capital and cash profit. The budget and financial plan that I am updating now will show what Spring Tree can afford. I'm not sure yet that Spring Tree can afford the payments you list below.

Jerry and I have worked on Spring Tree for 19 months in expectation of significant compensation as the business grows including a share of the carried interest. We need to determine the amount of the carried interest at some point in the near future. Then, after that, we all get diluted pro rata if we sell more equity.

I don't think you understand how much work I have put into Spring Tree over the past 19 months (working for free so far). This is described below. My share of the fees should be much more than Joe or Craig who are new to the Spring Tree effort and have limited assignments.

By the way, my earnings from my work with DPG have been only $9,845 YTD while Corporate Finance has brought in revenue of $157,500 YTD.

Starting with the proposal to TSA Financial in January, 2015, my work over the past 19 months on Spring Tree includes:

1) 18 revised term sheets in the negotiations on SkiBo

2) 17 Investor Summaries – constant updates as we got new data

   3) Auto Loan Model for Investor Summary  - needed to simplify the auto loan business model for investors

   4) Financial Model for the business with numerous updates and revisions needed for investor presentations

        a. Lengthy discussions with Jim Duryea and Jerry to build the model

        b. This work continues as I continue to handle the Financial Planning & Financial Model

   5) Drafting virtually all of the loan agreements and estimating individual investor returns – 31 agreements drafted;

6) Numerous meetings with investors

   7) Drafted Pref Equity Agreement for John Marshall with recall provision on 5% of DPG Golden Eagle for $100,000 pref equity loan. This saves 5% ownership when pref equity is called and repaid (Marshall had received 10% warrants in SkiBo for his initial investment of $125,000 in Pref Equity in June, 2015).

   8) Numerous spreadsheet updates on cap table (16), principal and interest owed (6) sent to Wes. The latest updates were sent to Joe last week.

9)   Set up Wes to continue the accounting on investor loans and cap table.

10)   Now, together with Wes, I have set up Joe to continue the accounting on investor loans and cap table.

11)   Recall that I brought GemCap to DPG initially in August, 2013 for CTSL tires & Lloyd Ward. I networked with Patrick Moody of Sun Trust Bank to get to Richard Ellis, Owner. Then, we met with him in Long Beach in Sept, 2013. I hope we can close on the line of credit offer from GemCap.

Like you, I am always happy to delegate routine tasks to others who can handle them. This has always been our plan and should not affect my share of the fees and carried interest which is earned on the front end.

I am meeting with Joe and Wes this afternoon to give Joe further guidance on continuing the accounting on investor interest and principal obligations. Jim Snodgrass, my recommended IT consultant, will also be at the meeting for a time to get an understanding of what is needed to transition our IT systems in Scottsdale and Atlanta.

All the best,

Bill Brooksbank

Managing Director  |  DPG Investments LLC

office 480.513.3733  |  bill@dpginvestments.com  |  www.dpginvestments.com

mobile 480.225.3128

Confidentiality/Disclaimer Statement

The information contained in this electronic message is attorney privileged and confidential information intended only for the use of the owner of the email address listed as the recipient of this message. If you are not the intended recipient, or the employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any disclosure, dissemination, distribution, or copying of this communication is strictly prohibited.