# EXHIBIT "A"

CONDENSED

## In the Matter Of:

## JOHN MARSHALL vs DANIEL GALVANONI

2:17-CV-00820-KJM-CKD

---

# JOHN MARSHALL

*March 14, 2019*

---



ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

**Page 1**

```
 1            UNITED STATES DISTRICT COURT
 2            EASTERN DISTRICT OF CALIFORNIA
 3
 4   JOHN MARSHALL, an individual,
 5          Plaintiff,
 6      vs.            CASE NO. 2:17-CV-00820-KJM-CKD
 7   DANIEL P. GALVANONI, an individual;
     DPG INVESTMENTS, LLC, a foreign
 8   limited liability company; DPG GOLDEN
     EAGLE, LLC, a foreign limited liability
 9   company; SPRING TREE LENDING, LLC, a
     foreign limited liability company;
10   SPRING TREE HOLDINGS, LLC, a foreign
     limited liability company; SPRING TREE
11   FINANCIAL, LLC, a foreign limited liability
     company; SKIBO HOLDINGS, LLC, a foreign
12   limited liability company; GERALD T.
     HUDSPETH, an individual; JEROME L. JOSEPH,
13   an individual; WILLIAM J. BROOKSBANK, an
     individual; AND DOES 1-100, inclusive,
14
            Defendants.
15   ------------------------------------------
16         VIDEOTAPED DEPOSITION OF
17              JOHN MARSHALL
18
19             March 14, 2019
20               9:05 a.m.
21
22
23            2151 River Plaza Drive
                  Suite 300
24            Sacramento, California
25   JENNIFER SCHUMACHER, CSR No. 9763
```

**Page 2**

```
 1          APPEARANCES OF COUNSEL
 2
 3   For the Plaintiff JOHN MARSHALL:
 4      LAW OFFICES OF MELINDA JANE STEUER
        BY:  MELINDA JANE STEUER, Esq.
 5      928 2nd Street, Suite 302
        Sacramento, California 95814
 6      (916) 930-0045
        Msteuer@californiainvestoradvocate.com
 7
 8   For the Defendants DANIEL P. GALVANONI; DPG INVESTMENTS,
     LLC; DPG GOLDEN EAGLE, LLC; SPRING TREE LENDING, LLC;
 9   SPRING TREE HOLDINGS, LLC; SPRING TREE FINANCIAL, LLC;
     and SKIBO HOLDINGS, LLC:
10
        KAUFMAN & FORMAN
11      BY:  ALEX B. KAUFMAN, Esq.
        8215 Roswell Road, Building 800
12      Atlanta, Georgia 30350
        (770) 390-9200
13      abk@kauflaw.net
14
        CLARK HILL
15      BY:  BRADFORD G. HUGHES, Esq.
        1055 West Seventh Street, 24th Floor
16      Los Angeles, California 90017
        (213) 417-5107
17      Bhughes@clarkhill.com
18
     Also Present:
19
        Daniel Galvanoni
20      Warren Nguyen, Videographer
21               --oOo--
22
23
24
25
```

**Page 3**

```
 1            INDEX OF EXAMINATIONS
 2   WITNESS: JOHN MARSHALL
 3   EXAMINATION                              PAGE
 4   By Mr. Kaufman                            11
 5   By Mr. Hughes                            214
 6
 7
 8               ---oOo---
 9
10
```

**Page 4**

```
 1            INDEX TO EXHIBITS
 2   Exhibit      Description              Page
 3   Exhibit 1    Notice of Taking Deposition   13
 4   Exhibit 2    Corporate Structure           17
 5   Exhibit 3    John Marshall Personal        20
 6                Financial Statement, 7/1/15
 7   Exhibit 4    Diagram Graphic               31
 8   Exhibit 5    Emails, Brooksbank/Hudspeth,  51
 9                Re: Marriott El Paseo,
10                6/5/15, JM171-187
11   Exhibit 6    DPG Investments Investment    58
12                and Fee Agreement,
13                JM5324-5325
14   Exhibit 7    DPG Investments Amended and   67
15                Restated Investment and Fee
16                Agreement, JM5321-5323
17   Exhibit 8    Emails, Galvanoni/Galvanoni,  70
18                6/17/15, JM299-300
19   Exhibit 9    Emails, Galvanoni/Marshall,   74
20                6/17/15, JM321-323
21   Exhibit 10   emails, Galvanoni/Hudspeth,   79
22                6/18/15, JM325-327
23   Exhibit 11   Bank of America Funds         82
24                Transfer Request
25                Authorization, JM6202
```



**Page 5**

INDEX TO EXHIBITS (CONT.)

| Exhibit | Description | Page |
|---|---|---|
| Exhibit 12 | Patelco Domestic Outgoing Wire Transfer Authorization and Agreement, JM6209 | 85 |
| Exhibit 13 | Email, Anderson/Marshall, 6/17/15, JM6201-6210 | 87 |
| Exhibit 14 | Patelco Domestic Outgoing Wire Transfer Authorization and Agreement, JM6203 | 90 |
| Exhibit 15 | Email, Galvanoni/Duryea, 8/9/15, JM884-885 | 93 |
| Exhibit 16 | Patelco Domestic Outgoing Wire Transfer Authorization and Agreement, JM6204 | 95 |
| Exhibit 17 | DPG - John Marshall Loan Agreement, JM5324-5326 | 96 |
| Exhibit 18 | Limited Liability company Operating Agreement of Spring Tree Financial, LLC | 103 |
| Exhibit 19 | Amended and Restated Limited Liability Company Operating Agreement of DPG Golden Eagle, LLC | 105 |

**Page 6**

INDEX TO EXHIBITS (CONT.)

| Exhibit | Description | Page |
|---|---|---|
| Exhibit 20 | Emails, Galvanoni/Marshall, 9/14/15, JM1437-1441 | 107 |
| Exhibit 21 | Emails, Galvanoni/Marchall, 9/18/15, JM1578-1581 | 112 |
| Exhibit 22 | Emails, Hartwell/Marshall, 1/13/16, JM2560-2563 | 114 |
| Exhibit 23 | Emails, Hudspeth/Marshal, 1/20/16, JM2583-2585 | 117 |
| Exhibit 24 | Emails, Galvanoni/Marshall, 1/13/16, JM2521-2523 | 118 |
| Exhibit 25 | KPG Investments Preferred Equity Agreement Between DPG Golden Eagle LLC and John Marshall, JM5327-5328 | 122 |
| Exhibit 26 | Emails, Galvanoni/Anderson, 2/11/16, JM6350-6353 | 126 |
| Exhibit 27 | Patelco Domestic Outgoing Wire Transfer Authorization and Agreement, JM6205 | 130 |
| Exhibit 28 | Patelco Domestic Outgoing Wire Transfer Authorization and Agreement, JM6207 | 131 |

**Page 7**

INDEX TO EXHIBITS (CONT.)

| Exhibit | Description | Page |
|---|---|---|
| Exhibit 29 | Patelco Domestic Outgoing Wire Transfer Authorization and Agreement, JM6208 | 132 |
| Exhibit 30 | Patelco Domestic Outgoing Wire Transfer Authorization and Agreement, JM6210 | 133 |
| Exhibit 31 | Emails, Marshal/Galvanoni, 7/8/16, JM6355-6357 | 135 |
| Exhibit 32 | Emails, Anderson/Marshall, 10/19/16, JM5534-5535 | 140 |
| Exhibit 33 | Tyler Marshall Resume and Letter of Recommendation, JM6251-6254 | 142 |
| Exhibit 34 | Amazon WorkMail Email, 7/31/16, JM6598 | 143 |
| Exhibit 35 | Email, Anderson/Marshall, 8/3/16 with JPGs | 146 |
| Exhibit 36 | Email, Marshall/Anderson, 12/6/16 with UCC-1, JM6236-6251 | 150 |
| Exhibit 37 | Emails, Marshall/Marshall, 12/16/16 | 158 |

**Page 8**

INDEX TO EXHIBITS (CONT.)

| Exhibit | Description | Page |
|---|---|---|
| Exhibit 38 | Emails, Marshall/Haakenson, 3/4/17, JM6690-6692 | 188 |
| Exhibit 39 | Emails, Marshall/Paulin, 2/4/17, JM86008606 | 196 |
| Exhibit 40 | Email, Marshal/Paulin, 2/4/17, JM8607-8608 | 201 |
| Exhibit 41 | Emails, Marshall/Paulin, 2/6/17, JM65946595 | 206 |
| Exhibit 42 | Emails, Galvanoni/Brooksbank, 8/10/15, JM883-884 | 241 |
| Exhibit 43 | Emials, Galvanoni/Marshall, 9/24/15, JM2434 | 248 |
| Exhibit 44 | Marshall Letter with Envelope, JM6010-6014 | 249 |
| Exhibit 45 | Patelco Domestic Outgoing Wire Transfer Authorization and Agreement, JM8116 | 252 |
| Exhibit 46 | Patelco Domestic Outgoing Wire Transfer Authorization and Agreement, with Handwriting, JM8117 | 253 |
| Exhibit 47 | Emails, Marshall/Haakenson, JM8097-8100 | 254 |



JOHN MARSHALL
JOHN MARSHALL vs DANIEL GALVANONI

March 14, 2019
9–12

Page 9

|   | INDEX TO EXHIBITS (CONT.) | | |
|---|---|---|---|
| Exhibit | Description | Page |
| Exhibit 48 | Email, IT Email/Johnson, 3/3/17, JM6093 | 257 |
| Exhibit 49 | Emails, Marshall/Paulin, 2/4/17, JM7982-7989 | 259 |
| Exhibit 50 | John Marshall Schedule of Real Estate, JM1031 | 266 |
| Exhibit 51 | Emails, Hudspeth/Galvanoni, 9/13/15, JM1533-1534 | 268 |
| Exhibit 52 | Email, Galvanoni/Marshall, 9/26/15, JM1755 | 274 |
| Exhibit 53 | Email, Galvanoni/Galvanoni, 10/28/15, JM2069 | 292 |

---o0o---

Page 10

DEPOSITION OF JOHN MARSHALL

March 14, 2019

--o0o--

JOHN MARSHALL,

having been first duly sworn, testified as follows:

VIDEO OPERATOR:  This is tape No. 1 of the videotaped deposition of John Marshall in the matter John Marshall versus Daniel Galvanoni, et al., being heard in the United States District Court, Eastern District of California, Case No. 2:17-CV-00820-KJM-CKD. Today is March 14th, 2019, and the time is 9:04 a.m.

This deposition is taking place at 2151 River Plaza Drive in Sacramento, California.  My name is Warren Nguyen, and I'm the videographer.  The court reporter is Jennifer Schumacher.  Would counsel please state your appearances.

MS. STEUER:  Melinda Steuer, appearing for plaintiff.

MR. KAUFMAN:  Alex Kaufman on behalf of the defense.

MR. HUGHES:  Bradford Hughes also on behalf of the defense.

VIDEO OPERATOR:  Would the court reporter please swear in the witness.

Page 11

(Whereupon the witness was sworn in by the court reporter.)

EXAMINATION

BY MR. KAUFMAN:

Q.  Good morning, Mr. Marshall.  My name is Alex Kaufman.  You and I have met, I think, twice; once in San Francisco and once in Arizona.  This is your deposition.  People today are relying upon what you're going to say, including counsel, as well as the Court. So if there's anything that is unclear in my questioning or something, a word I use that you don't understand, please let me know, otherwise I'm going to assume that you understand.

Additionally, if you need to take a break, all I ask is that if there's a question on the table for you to answer it, and then I'll let you have your break. It's not a marathon, but obviously, we've been dealing with this case for a few years now, we all want to be pretty thorough.  So with that, I'll begin.

Have you ever been deposed before?

A.  Yes.

Q.  When?

A.  I'm not exactly sure.

Q.  Okay.  How many times have you been deposed?

A.  I'm not exactly sure.

Page 12

Q.  More than five?

A.  No, I don't think so.

Q.  Okay.  Were they -- your depositions, were you a party in that lawsuit?

A.  Yes.

Q.  Okay.  How many times have you been in a lawsuit where you're a party?

A.  Let me think.  There were two car accidents that I was a party in that I think I did a deposition. And let me think what else.  There might have been three to four actions, maybe, that I was in a lawsuit with.

Q.  Okay.  And were those actions all in the state of California?

A.  Yes.

Q.  Okay.  And you were divorced as well, correct?

A.  Yes.

Q.  And were you deposed in your divorce?

A.  Yes, I was.

Q.  And as part of that divorce, did you file a financial affidavit with the court?

A.  I believe so.

Q.  And are you under the influence of any drugs or alcohol or anything that would impair your ability to tell the truth or your memory today?

A.  No.



## Page 1

```
1              UNITED STATES DISTRICT COURT
2              EASTERN DISTRICT OF CALIFORNIA
3
4    JOHN MARSHALL, an individual,
5              Plaintiff,
6              vs.            CASE NO. 2:17-CV-00820-KJM-CKD
7    DANIEL P. GALVANONI, an individual;
     DPG INVESTMENTS, LLC, a foreign
8    limited liability company; DPG GOLDEN
     EAGLE, LLC, a foreign limited liability
9    company; SPRING TREE LENDING, LLC, a
     foreign limited liability company;
10   SPRING TREE HOLDINGS, LLC, a foreign
     limited liability company; SPRING TREE
11   FINANCIAL, LLC, a foreign limited liability
     company; SKIBO HOLDINGS, LLC, a foreign
12   limited liability company; GERALD T.
     HUDSPETH, an individual; JEROME L. JOSEPH,
13   an individual; WILLIAM J. BROOKSBANK, an
     individual; AND DOES 1-100, inclusive,
14
             Defendants.
15   ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
16          VIDEOTAPED DEPOSITION OF
17               JOHN MARSHALL
18
19              March 14, 2019
20               9:05 a.m.
21
22
23            2151 River Plaza Drive
                  Suite 300
24            Sacramento, California
25       JENNIFER SCHUMACHER, CSR No. 9763
```

## Page 2

```
1            APPEARANCES OF COUNSEL
2
3    For the Plaintiff JOHN MARSHALL:
4        LAW OFFICES OF MELINDA JANE STEUER
         BY:  MELINDA JANE STEUER, Esq.
5        928 2nd Street, Suite 302
         Sacramento, California 95814
6        (916) 930-0045
         Msteuer@californiainvestoradvocate.com
7
8    For the Defendants DANIEL P. GALVANONI; DPG INVESTMENTS,
     LLC; DPG GOLDEN EAGLE, LLC; SPRING TREE LENDING, LLC;
9    SPRING TREE HOLDINGS, LLC; SPRING TREE FINANCIAL, LLC;
     and SKIBO HOLDINGS, LLC:
10
         KAUFMAN & FORMAN
11       BY:  ALEX B. KAUFMAN, Esq.
         8215 Roswell Road, Building 800
12       Atlanta, Georgia 30350
         (770) 390-9200
13       abk@kauflaw.net
14
         CLARK HILL
15       BY:  BRADFORD G. HUGHES, Esq.
         1055 West Seventh Street, 24th Floor
16       Los Angeles, California 90017
         (213) 417-5107
17       Bhughes@clarkhill.com
18
19   Also Present:
20       Daniel Galvanoni
         Warren Nguyen, Videographer
21              --oOo--
22
23
24
25
```

## Page 3

```
1              INDEX OF EXAMINATIONS
2    WITNESS: JOHN MARSHALL
3    EXAMINATION                              PAGE
4    By Mr. Kaufman                            11
5    By Mr. Hughes                            214
6
7
8              ---oOo---
```

## Page 4

| | INDEX TO EXHIBITS | |
|---|---|---|
| Exhibit | Description | Page |
| Exhibit 1 | Notice of Taking Deposition | 13 |
| Exhibit 2 | Corporate Structure | 17 |
| Exhibit 3 | John Marshall Personal Financial Statement, 7/1/15 | 20 |
| Exhibit 4 | Diagram Graphic | 31 |
| Exhibit 5 | Emails, Galvanoni/Hudspeth, Re: Marriott El Paseo, 6/5/15, JM171-187 | 51 |
| Exhibit 6 | DPG Investments Investment and Fee Agreement, JM5124-5125 | 58 |
| Exhibit 7 | DPG Investments Amended and Restated Investment and Fee Agreement, JM5321-5323 | 67 |
| Exhibit 8 | Emails, Brooksbank/Galvanoni, 6/17/15, JM299-300 | 70 |
| Exhibit 9 | Emails, Galvanoni/Marshall, 6/17/15, JM321-323 | 74 |
| Exhibit 10 | emails, Galvanoni/Hudspeth, 6/18/15, JM325-327 | 79 |
| Exhibit 11 | Bank of America Funds Transfer Request Authorization, JM6202 | 82 |



**Page 5**

INDEX TO EXHIBITS (CONT.)

| Exhibit | Description | Page |
|---|---|---|
| Exhibit 12 | Patelco Domestic Outgoing Wire Transfer Authorization and Agreement, JM6209 | 85 |
| Exhibit 13 | Email, Anderson/Marshall, 6/17/15, JM6201-6210 | 87 |
| Exhibit 14 | Patelco Domestic Outgoing Wire Transfer Authorization and Agreement, JM6203 | 90 |
| Exhibit 15 | Email, Galvanoni/Duryea, 8/9/15, JM884-885 | 93 |
| Exhibit 16 | Patelco Domestic Outgoing Wire Transfer Authorization and Agreement, JM6204 | 95 |
| Exhibit 17 | DPG - John Marshall Loan Agreement, JM5324-5326 | 96 |
| Exhibit 18 | Limited Liability company Operating Agreement of Spring Tree Financial, LLC | 103 |
| Exhibit 19 | Amended and Restated Limited Liability Company Operating Agreement of DPG Golden Eagle, LLC | 105 |

**Page 7**

INDEX TO EXHIBITS (CONT.)

| Exhibit | Description | Page |
|---|---|---|
| Exhibit 29 | Patelco Domestic Outgoing Wire Transfer Authorization and Agreement, JM6208 | 132 |
| Exhibit 30 | Patelco Domestic Outgoing Wire Transfer Authorization and Agreement, JM6210 | 133 |
| Exhibit 31 | Emails, Marshal/Galvanoni, 7/8/16, JM6355-6357 | 135 |
| Exhibit 32 | Emails, Anderson/Marshall, 10/19/16, JM5534-5535 | 140 |
| Exhibit 33 | Tyler Marshall Resume and Letter of Recommendation, JM6251-6254 | 142 |
| Exhibit 34 | Amazon WorkMail Email, 7/31/16, JM6598 | 143 |
| Exhibit 35 | Email, Anderson/Marshall, 8/3/16 with JPGs | 146 |
| Exhibit 36 | Email, Marshall/Anderson, 12/6/16 with UCC-1, JM6236-6251 | 150 |
| Exhibit 37 | Emails, Marshall/Marshall, 12/16/16 | 158 |

**Page 6**

INDEX TO EXHIBITS (CONT.)

| Exhibit | Description | Page |
|---|---|---|
| Exhibit 20 | Emails, Galvanoni/Marshall, 9/14/15, JM1437-1441 | 107 |
| Exhibit 21 | Emails, Galvanoni/Marchall, 9/18/15, JM1578-1581 | 112 |
| Exhibit 22 | Emails, Hartwell/Marshall, 1/13/16, JM2560-2563 | 114 |
| Exhibit 23 | Emails, Hudspeth/Marshal, 1/20/16, JM2583-2585 | 117 |
| Exhibit 24 | Emails, Galvanoni/Marshall, 1/13/16, JM2521-2523 | 118 |
| Exhibit 25 | KPG Investments Preferred Equity Agreement Between DPG Golden Eagle LLC and John Marshall, JM5327-5328 | 122 |
| Exhibit 26 | Emails, Galvanoni/Anderson, 2/11/16, JM6350-6353 | 126 |
| Exhibit 27 | Patelco Domestic Outgoing Wire Transfer Authorization and Agreement, JM6205 | 130 |
| Exhibit 28 | Patelco Domestic Outgoing Wire Transfer Authorization and Agreement, JM6207 | 131 |

**Page 8**

INDEX TO EXHIBITS (CONT.)

| Exhibit | Description | Page |
|---|---|---|
| Exhibit 38 | Emails, Marshall/Haakenson, 3/4/17, JM6690-6692 | 188 |
| Exhibit 39 | Emails, Marshall/Paulin, 2/4/17, JM86008606 | 196 |
| Exhibit 40 | Email, Marshal/Paulin, 2/4/17, JM8607-8608 | 201 |
| Exhibit 41 | Emails, Marshall/Paulin, 2/6/17, JM65946595 | 206 |
| Exhibit 42 | Emails, Galvanoni/Brooksbank, 8/10/15, JM883-884 | 241 |
| Exhibit 43 | Emials, Galvanoni/Marshall, 9/14/15, JM1434 | 248 |
| Exhibit 44 | Marshall Letter with Envelope, JM6010-6014 | 249 |
| Exhibit 45 | Patelco Domestic Outgoing Wire Transfer Authorization and Agreement, JM8116 | 252 |
| Exhibit 46 | Patelco Domestic Outgoing Wire Transfer Authorization and Agreement, with Handwriting, JM8117 | 253 |
| Exhibit 47 | Emails, Marshall/Haakenson, JM8097-8100 | 254 |



Page 9

INDEX TO EXHIBITS (CONT.)

| Exhibit | Description | Page |
|---|---|---|
| Exhibit 48 | Email, IT Email/Johnson, 3/3/17, JM8093 | 257 |
| Exhibit 49 | Emails, Marshall/Paulin, 2/4/17, JM7982-7989 | 259 |
| Exhibit 50 | John Marshall Schedule of Real Estate, JM1031 | 266 |
| Exhibit 51 | Emails, Hudspeth/Galvanoni, 9/13/15, JM1533-1534 | 268 |
| Exhibit 52 | Email, Galvanoni/Marshall, 9/26/15, JM1755 | 274 |
| Exhibit 53 | Email, Galvanoni/Galvanoni, 10/28/15, JM2069 | 292 |

---o0o---

Page 10

DEPOSITION OF JOHN MARSHALL

March 14, 2019

--o0o--

JOHN MARSHALL,

having been first duly sworn, testified as follows:

VIDEO OPERATOR: This is tape No. 1 of the videotaped deposition of John Marshall in the matter John Marshall versus Daniel Galvanoni, et al., being heard in the United States District Court, Eastern District of California, Case No. 2:17-CV-00820-KJM-CKD. Today is March 14th, 2019, and the time is 9:04 a.m.

This deposition is taking place at 2151 River Plaza Drive in Sacramento, California. My name is Warren Nguyen, and I'm the videographer. The court reporter is Jennifer Schumacher. Would counsel please state your appearances.

MS. STEUER: Melinda Steuer, appearing for plaintiff.

MR. KAUFMAN: Alex Kaufman on behalf of the defense.

MR. HUGHES: Bradford Hughes also on behalf of the defense.

VIDEO OPERATOR: Would the court reporter please swear in the witness.

Page 11

1    (Whereupon the witness was sworn in by the
2    court reporter.)
3        EXAMINATION
4    BY MR. KAUFMAN:
5        Q. Good morning, Mr. Marshall. My name is Alex
6    Kaufman. You and I have met, I think, twice; once in
7    San Francisco and once in Arizona. This is your
8    deposition. People today are relying upon what you're
9    going to say, including counsel, as well as the Court.
10   So if there's anything that is unclear in my questioning
11   or something, a word I use that you don't understand,
12   please let me know, otherwise I'm going to assume that
13   you understand.
14       Additionally, if you need to take a break, all
15   I ask is that if there's a question on the table for you
16   to answer it, and then I'll let you have your break.
17   It's not a marathon, but obviously, we've been dealing
18   with this case for a few years now, we all want to be
19   pretty thorough. So with that, I'll begin.
20       Have you ever been deposed before?
21       A. Yes.
22       Q. When?
23       A. I'm not exactly sure.
24       Q. Okay. How many times have you been deposed?
25       A. I'm not exactly sure.

Page 12

1        Q. More than five?
2        A. No, I don't think so.
3        Q. Okay. Were they -- your depositions, were you
4    a party in that lawsuit?
5        A. Yes.
6        Q. Okay. How many times have you been in a
7    lawsuit where you're a party?
8        A. Let me think. There were two car accidents
9    that I was a party in that I think I did a deposition.
10   And let me think what else. There might have been three
11   to four actions, maybe, that I was in a lawsuit with.
12       Q. Okay. And were those actions all in the state
13   of California?
14       A. Yes.
15       Q. Okay. And you were divorced as well, correct?
16       A. Yes.
17       Q. And were you deposed in your divorce?
18       A. Yes, I was.
19       Q. And as part of that divorce, did you file a
20   financial affidavit with the court?
21       A. I believe so.
22       Q. And are you under the influence of any drugs or
23   alcohol or anything that would impair your ability to
24   tell the truth or your memory today?
25       A. No.



Page 13

1    Q. I'll hand you what we'll mark as Defense 1.
2        (Exhibit 1 was
3        marked for identification.)
4    BY MR. KAUFMAN:
5    Q. Have you seen Exhibit 1 before?
6    A. Let me look at this. Yes.
7    Q. And I'll submit to you that this is the
8    subpoena, which while we're here all today, and the
9    location was changed by the agreement of counsel.
10       So when you received this subpoena what, if
11   anything, did you do?
12       MS. STEUER: Objection. Overbroad. Calls for
13   a narrative. You can answer.
14       THE WITNESS: When you say what did you do,
15   what do you mean?
16   BY MR. KAUFMAN:
17   Q. Yeah. Did you talk to anyone? Did you look
18   for any records? I'm not asking you any conversation
19   that you had with counsel. But what did you do?
20   A. Went through to comply with this.
21   Q. Okay. So you did, in fact, gather documents as
22   a result of that subpoena?
23   A. Yes, I did have documents.
24   Q. Okay. And did you provide those to counsel?
25   A. Correct.

Page 14

1    Q. Okay. Did you talk to anyone about -- in
2    preparation of this subpoena and for this deposition
3    today, other than conversations with counsel?
4    A. Yeah, that would be attorney-client privilege.
5    Q. I didn't ask for your characterization of it.
6    I just asked other than conversations with counsel, did
7    you talk with anyone else in preparation for this
8    deposition?
9    A. No.
10   Q. Okay. So what is your understanding of your
11   investments in DPG?
12       MS. STEUER: Vague as to time. You can answer.
13   BY MR. KAUFMAN:
14   Q. What is your understanding?
15       MS. STEUER: You mean now?
16       MR. KAUFMAN: Yeah.
17       THE WITNESS: Now?
18   BY MR. KAUFMAN:
19   Q. Now.
20   A. Currently? That my money was to purchase loans
21   and the money was to be secured by those loans.
22   Q. You made a point of what your understanding is
23   now versus I guess what it was at the time you made
24   those investments. What -- is there a change, in your
25   understanding, from the time you made it to today?

Page 15

1    A. Yeah. It seems that my money was not used to
2    purchase loans and that the money that I did invest was
3    not secured --
4    Q. So --
5    A. -- by those loans.
6    Q. So at the time -- so how much money do you
7    contend you invested? And I'll use the collective with
8    DPG, meaning DPG, Golden Eagle, Spring Tree Holdings,
9    SkiBo, DPG Investments, the entire affiliation group.
10   What was your understanding of the amount you invested?
11   A. 300,000.
12   Q. Okay. And do you have an understanding as to
13   in which entities you invested in, specifically?
14   A. It was supposed to be secured with the loans,
15   and so I would assume that it would be -- my investment
16   was -- it's still pretty foggy because of the
17   different -- all the different entities, but I was
18   assuming that it was completely invested and secured
19   with the loans and the entities.
20   Q. Okay. Well, my question was which entity do
21   you think you actually invested in or entities?
22   A. It was confusing because there was so many
23   different companies that they were developing.
24   Q. Okay. One of those companies is Spring Tree
25   Financial, correct?

Page 16

1    A. Yes.
2    Q. In fact, you helped pick the name Spring Tree,
3    didn't you?
4    A. I don't know if I helped -- or I don't know if
5    I picked the name, but I think they ran it across -- a
6    name that they were choosing for a company.
7    Q. Actually, you and Wes came up with that name,
8    didn't you?
9    A. I don't recall.
10   Q. Okay. Do you have a reason to doubt that you
11   and Wes came up with the name Spring Tree?
12       MS. STEUER: Object. It calls for speculation.
13   You can answer.
14       THE WITNESS: No.
15   BY MR. KAUFMAN:
16   Q. Did you come up with a logo for Spring Tree?
17   A. I didn't come up with a logo. I think I looked
18   at some logos that they ran by and asked my opinion of
19   them.
20   Q. And did you give that opinion?
21   A. I believe so.
22   Q. And did they -- they meaning who?
23   A. Dan Galvanoni and his team.
24   Q. I'll hand you what we'll mark as Exhibit 2.
25       (Exhibit 2 was



Page 17

1       marked for identification.)
2       MS. STEUER: And I'll object to this document
3    on the grounds this has not been produced to us before.
4    This is the first time I've ever seen it.
5       MR. KAUFMAN: Okay.
6       MS. STEUER: And just wondering how many other
7    documents you're withholding that you're planning to
8    spring on us for the first time today.
9    BY MR. KAUFMAN:
10      Q.  Okay.  So I'm showing you Exhibit 2.  Do you
11   recognize Exhibit 2?
12      A.  I do not.
13      Q.  Okay.  As we look at it, at this exhibit, do
14   you believe that this structure as presented is accurate
15   as to how you understood the relationship between DPG
16   Golden Eagle to Spring Tree Holdings to Spring Tree
17   Financial and Spring Tree Lending was?
18      MS. STEUER: Objection. Lacks foundation.  You
19   can answer.
20      THE WITNESS: I'm not sure.
21   BY MR. KAUFMAN:
22      Q.  Do you have an understanding as to the
23   interrelationship between DPG Golden Eagle, Spring Tree
24   Holdings, Spring Tree Financial and Spring Tree Lending?
25      A.  It was confusing to me how they were all set up

Page 18

1    and the different intricacies between them.
2       Q.  So you made your initial investment in 2015,
3    correct?
4       A.  Yes.
5       Q.  And you left -- did you ever leave DPG and its
6    affiliates?
7       MS. STEUER: Objection. Vague.  You can
8    answer.
9    BY MR. KAUFMAN:
10      Q.  In your mind, or are you still a part of it
11   today?
12      MS. STEUER: Also lacks foundation.
13   BY MR. KAUFMAN:
14      Q.  I'm asking your view.
15      A.  I'm not quite sure what you're asking.  Are you
16   asking me am I not invested in any of these entities?
17      Q.  I guess what I'm trying to ask you is, over the
18   course -- since 2015 when you made your initial
19   investment, today you're saying here that the
20   interrelationship between the companies in your view was
21   vague.  Did you ever ask for an understanding or some
22   sort of explanation of the relationship between all the
23   affiliated entities?
24      A.  Yes.
25      Q.  Okay.  Did you ever receive that understanding?

Page 19

1       A.  I never totally received a comprehensive
2    explanation.
3       Q.  Okay.  You have a law degree, don't you?
4       A.  Yes.
5       Q.  Where did you go to law school?
6       A.  BYU.
7       Q.  Brigham Young University?
8       A.  Correct.
9       Q.  What year did you graduate?
10      A.  1989.
11      Q.  Okay.  And what was your undergrad?  Where did
12   you go to college?
13      A.  Oh, UC Berkeley.
14      Q.  And what did you major in at UC Berkeley?
15      A.  I was in social sciences.
16      Q.  I see on your signature block on many emails
17   you use the designation J.D., correct?
18      A.  I do have J.D.
19      Q.  Meaning juris doctorate?
20      A.  Correct, I do have a J.D.
21      Q.  But you're not a member of any state bar, are
22   you?
23      A.  No, I am not.
24      Q.  Did you ever take the bar exam?
25      A.  Yes.

Page 20

1       Q.  Okay.  Did you not pass?
2       A.  Correct.
3       Q.  Which state bar did you take?
4       A.  California.
5       Q.  How many times did you take the state bar of
6    California?
7       A.  Twice.
8       Q.  Did you pass the character and fitness aspect
9    of the bar?
10      A.  It's been so long, I'm not sure what that is.
11      Q.  I'm going to hand you what we'll mark as
12   Defense 3.
13          (Exhibit 3 was
14          marked for identification.)
15   BY MR. KAUFMAN:
16      Q.  Have you seen Defense Exhibit 3 before?
17      A.  Offhand, I don't recall.
18      Q.  Okay.  See if we can -- see the bottom number,
19   we'll call those Bates numbers, where it says JM1030?
20      A.  Uh-huh.
21      Q.  Do you see where it says that?
22      A.  Yes.
23      Q.  Okay.  And I'll submit to you that meant it was
24   a production from you and your counsel pursuant to the
25   request for production of documents.  Okay?



JOHN MARSHALL                                    March 14, 2019
JOHN MARSHALL vs DANIEL GALVANONI                      21–24

Page 21

1    A.  Okay.
2    Q.  Now, it says on Defense 3 that your net worth
3  is -- you see on the right side, $7,437,267.  Does that
4  sound accurate as to your financial net worth as of July
5  1st, 2015?
6    A.  Yes.
7    Q.  Okay.  And do you recall submitting a financial
8  affidavit or this financial statement in an attempt to
9  work on a deal with Dan Galvanoni for a hotel in
10  California?
11    A.  I do remember submitting some information.
12    Q.  Well, and specifically you provided Dan with
13  this personal financial statement in the summer of 2015,
14  didn't you?
15    A.  I believe so.
16    Q.  Did you ever apply for credit in 2015?
17    A.  Apply for credit?
18    Q.  Sure.  Where you put in your net worth, or you
19  know, you're getting a credit card or a loan or
20  someplace elsewhere you would have had to provide credit
21  information?
22    A.  I could have.
23    Q.  Anyplace you would have been able to find out
24  if you had?  Sounds like you said you could have, is
25  that because you don't remember?

Page 22

1    A.  It's 2015, I'm not -- I don't remember applying
2  for credit.
3    Q.  Did you apply for credit in 2016?
4    A.  I could have.
5    Q.  Did you buy -- have you lived in the same house
6  since 2015?
7    A.  Yes.
8    Q.  Have you bought a car since 2015?
9    A.  Yes.
10    Q.  Okay.  So when you bought that car, did you
11  finance that car?
12    A.  No.
13    Q.  And have you opened a credit card since 2015?
14    A.  I could have.
15    Q.  Did you apply for credit in 2017?
16    A.  I could have.
17    Q.  Okay.  Did you ever prepare any other personal
18  financial statement after July 1st, 2015, to the best of
19  your knowledge?
20    A.  I could have.
21    Q.  Well, could have.  I mean, we could do a lot of
22  things.  Is there some way that you would be able to see
23  if you had or had not?  Like do you prepare them and
24  save them on your computer, do you have a pattern and
25  practice, do you save them in a drive?  What do you do?

Page 23

1    MS. STEUER:  Objection.  Compound.  Vague.  You
2  can answer.
3    THE WITNESS:  I would have to go back and see.
4  No, I don't have them saved on a computer.
5  BY MR. KAUFMAN:
6    Q.  So where would you look to see if you had
7  prepared other personal financial statements?
8    A.  I'd have to go back and look to see if I have
9  files on that.
10    Q.  And where do you keep your files?
11    A.  In a file cabinet.
12    Q.  So physical files?
13    A.  Correct.
14    Q.  Okay.  Do you have a computer system where you
15  save files as well?
16    MS. STEUER:  Asked and answered.  You can
17  answer again.
18    MR. KAUFMAN:  He didn't answer it.
19  BY MR. KAUFMAN:
20    Q.  Do you?
21    A.  I have a computer system that things are saved,
22  but not on the financial statement.
23    Q.  Okay.  When you prepared this personal
24  financial statement, what information did you rely on to
25  make it?

Page 24

1    MS. STEUER:  Objection.  Lacks foundation.  You
2  can answer.
3  BY MR. KAUFMAN:
4    Q.  Okay.  Did you prepare this personal financial
5  statement?
6    A.  Yes.
7    Q.  Okay.  Now that we've established that you
8  prepared it, what information did you rely on to make
9  it?
10    A.  I think I went through and estimated these
11  amounts, and I think I talked with Dan Galvanoni as well
12  as preparing this.
13    Q.  As we sit here today, do you believe these
14  amounts are approximately correct as to their values on
15  July 1st, 2015?
16    A.  I believe so, yes.
17    Q.  And did you file taxes in 2015?
18    A.  Yes.
19    Q.  Did you -- did you classify any investment that
20  you made with DPG on those taxes?
21    MS. STEUER:  Objection.  This invades the tax
22  return privilege.  You can answer with a yes or no.
23    THE WITNESS:  I've just -- I give the
24  information to my CPA, and he files my taxes.
25  BY MR. KAUFMAN:

Page 25

1    Q.  And in 2016 did you record the DPG investments
2    on any -- on your taxes?
3        MS. STEUER:  Same objection.  Invades the tax
4    return privilege.  You can answer.
5        THE WITNESS:  Again, I just give the
6    information to my CPA.
7    BY MR. KAUFMAN:
8    Q.  And who is your CPA?
9    A.  Sean Boyd.
10   Q.  Is he an accountant in the state of California?
11   A.  Yes.
12   Q.  In Sacramento?
13   A.  No, he's not in Sacramento.
14   Q.  Where is he?
15   A.  He's in Folsom.
16   Q.  Okay.  Is he still your accountant today?
17   A.  Yes.
18   Q.  Okay.  Do you keep a running balance sheet of
19   your financial standing?  Is that something you keep up?
20   A.  Not really.
21   Q.  Do you make in excess of $200,000 a year --
22   strike that.
23       Did you make over $200,000 a year in 2015?
24   A.  I believe so.
25   Q.  Okay.  In 2016?

Page 26

1    A.  I believe so.
2    Q.  Okay.  And in 2017?
3    A.  I believe so.
4    Q.  Okay.  You've been in other investments with
5    Dan Galvanoni other than these subprime auto lending
6    investments; isn't that correct?
7    A.  Yes.
8    Q.  One of those investments was a venture in Costa
9    Rica, correct?
10   A.  Yes.
11   Q.  And there's been a venture in Atlanta before,
12   hasn't there?
13   A.  Say that again.  There's a --
14   Q.  Well, strike that.
15       Tell me about -- how many other investments
16   have you been in with Dan Galvanoni other than the
17   subprime auto ones being in 2015?
18   A.  I don't know.  I'd have to go back and look but
19   there was the Costa Rica investment.
20   Q.  Are there others?
21   A.  There could be others.  I'd have to go back and
22   look.  It's been a while.
23   Q.  And where would you look?
24   A.  I would see if there's -- if I kept any files
25   on past investments with him.

Page 27

1    Q.  Do you, as a practice, invest in start-ups and
2    other ventures?
3    A.  As a practice?
4        MS. STEUER:  Objection.  Compound.  You can
5    answer.
6        THE WITNESS:  As a practice?
7    BY MR. KAUFMAN:
8    Q.  Yeah.  Do you have experience in other -- in
9    start-up investments?
10       MS. STEUER:  Also vague.  You can answer.
11       THE WITNESS:  I try to invest in situations
12   where my money will be safe and I will get a return.
13   BY MR. KAUFMAN:
14   Q.  Which is the goal of pretty much most
15   investments, aren't they?
16   A.  Yeah.
17   Q.  Okay.  So let's break this down.  You invest in
18   opportunities that are not on stock markets, correct?
19   A.  I've invested in some opportunities that are
20   not on the stock market, that's correct.
21   Q.  Right.  And some of those opportunities are
22   real estate based, right?
23   A.  Correct.
24   Q.  And you invested in those kind of opportunities
25   more than once, right?

Page 28

1    A.  Yes.
2    Q.  How many times have you invested in any real
3    estate-backed opportunity?
4    A.  I don't know.  I'd be making an estimate.
5    Q.  Sure.  Give me your best guess, guesstimate.
6    A.  Ten to 12.
7    Q.  Okay.  And have you ever invested in securities
8    of any kind?
9    A.  You mean stocks and bonds?
10   Q.  Sure.  Or let's back that up.  What is your
11   understanding of a security?
12       MS. STEUER:  Objection.  Calls for a legal
13   conclusion.  You can answer, if you know.
14       THE WITNESS:  Yeah, that would be a legal.
15   BY MR. KAUFMAN:
16   Q.  Yeah, well, you've got a law degree, so let's
17   go.
18       MS. STEUER:  Right, so that makes him an expert
19   on what is a security.
20   BY MR. KAUFMAN:
21   Q.  Doesn't have to be.  I just asked what your
22   understanding is.
23       MS. STEUER:  Also calls for an expert opinion
24   and a legal conclusion.  You can answer if you have an
25   understanding.



Page 29

1    THE WITNESS:  I would say stocks and bonds
2  would fall into securities.
3  BY MR. KAUFMAN:
4    Q.  Do you think -- strike that.
5    You reached out to Dan Galvanoni in 2015,
6  correct?
7    MS. STEUER:  Objection.  Vague.  You can
8  answer.
9  BY MR. KAUFMAN:
10    Q.  Sure.  So the last deal you did with Dan
11  Galvanoni before all the SkiBo in 2015 was the Costa
12  Rica deal, correct?
13    A.  I believe so.
14    Q.  In fact, you hadn't been in contact with him
15  since that deal, had you?
16    A.  No, I don't know.
17    Q.  And then you sent Dan an email in 2015 to
18  rekindle the relationship; isn't that accurate?
19    A.  I'd have to look back, but I don't know if he
20  reached out to me or I reached out to him, but I very
21  well could have reached out to him.
22    Q.  In fact, does it sound familiar that you sent
23  Dan an email asking to be in his new deals?  Does that
24  refresh your recollection?
25    A.  Well, I think we reached out and talked.  We

Page 30

1  hadn't talked for a while, and we were friends.  And he
2  was talking about some other things that he was involved
3  in.
4    Q.  When you spoke to Dan in the summer of 2015,
5  you were evaluating other deals with Dan Galvanoni aside
6  from SkiBo deals; is that correct?
7    MS. STEUER:  Objection.  Vague.  You can
8  answer.
9  BY MR. KAUFMAN:
10    Q.  Aside from subprime auto opportunities?
11    A.  I don't recall directly.
12    Q.  Do you recall evaluating a hotel deal together?
13    A.  Yes.
14    Q.  Okay.  Do you recall evaluating a building
15  opportunity, to build like an office building?
16    A.  This was with Dan?
17    Q.  Correct.
18    A.  I don't recall that, but that could have been
19  something that he might have discussed.  He was talking
20  about other opportunities for me to invest with him.
21    Q.  How about a Howe Avenue building, H-o-w-e,
22  Avenue, does that ring a bell?
23    A.  Yes.
24    Q.  Do you consider yourself a sophisticated
25  investor?

Page 31

1    A.  No, not really.
2    Q.  Do you consider yourself an experienced
3  investor?
4    MS. STEUER:  Objection.  Vague.
5    THE WITNESS:  What is your definition of
6  experienced?
7  BY MR. KAUFMAN:
8    Q.  Sure.  Someone that has done it multiple times.
9    A.  I have invested more than once or twice, yes.
10    Q.  I'll hand you what we'll mark as 3.
11    THE REPORTER:  4.
12    MS. STEUER:  And I'm going to object to this
13  document, again, as being something that's responsive to
14  our request for production that was withheld and that
15  we're seeing for the first time today.
16    MR. KAUFMAN:  Well, that's just not true.  So
17  I've shown you --
18    MS. STEUER:  Maybe you can identify where it is
19  in your production because I've reviewed it and these
20  documents are not in there.
21    MR. KAUFMAN:  Or maybe something is made as a
22  demonstrative.
23    (Exhibit 4 was
24    marked for identification.)
25  BY MR. KAUFMAN:

Page 32

1    Q.  So I'm showing you Exhibit 4.  Does this
2  graphic represent to you your understanding of the
3  interrelationship between the entities listed here?
4    A.  Again, I'm not positive.
5    Q.  So let's take a step back so we have some
6  common understanding because we're going to go in
7  through the experience of these investments starting
8  with the Jim Duryea, SkiBo.  So I'm going to take you to
9  summer of 2015.  Is that your understanding of when the
10  opportunity to invest in SkiBo and JADCO came, to your
11  knowledge?
12    A.  I'm not sure if it was the summer of -- what
13  did you say, summer of 2015?
14    Q.  Correct.
15    A.  It might have been months before that or --
16    Q.  Okay.  So tell me when it got on your radar.
17    A.  I was discussing with Dan Galvanoni -- or
18  actually, he was telling me of something that he felt
19  was a great opportunity.
20    Q.  Did you think it was a good opportunity, too?
21    A.  From his description and what he was saying to
22  me, we were friends, he is somebody I trusted, and it
23  sounded like a good opportunity from what he was
24  describing.
25    Q.  And that opportunity was to invest in subprime



Page 33

1  auto loans into an existing operation; is that correct?
2  A. Yes.
3  Q. And that existing operation was run by Rob
4  Smith and Jim Duryea?
5  A. Yes.
6  Q. In Georgia, correct?
7  A. I believe so, yes.
8  Q. And what was your understanding of what that
9  operation was?
10  A. What was described to me was that this
11  operation had subprime auto loans, they had these auto
12  loans, and Dan talked to me and said that we could
13  purchase these loans. And he felt it would be a great
14  opportunity for us, and he was going to be putting a lot
15  of his own personal money into it as well. And the auto
16  loans were just a great opportunity.
17      And what he described about that was that
18  unlike other investments, like stocks, real estate, he
19  felt the auto loans would be much better than those,
20  much safer because he felt people would pay on their
21  auto loan more so than even paying their mortgage
22  because they need their vehicles to get to work and use
23  their vehicles. And so he told me that, one, he felt
24  that people would pay on those loans even before their
25  mortgage or anything else, and then also that these

Page 34

1  loans would be secured on the vehicles.
2      And being secured on the vehicles, what he said
3  would be that these loans would be diversified in
4  different states and different cities. So if there was
5  a disaster in one city, you were diversified where the
6  loans were at different places and different cities. He
7  also said that the vehicles would be fully insured. So
8  if something happened to the vehicle, if it was stolen
9  or in a major accident, that we would get our money back
10  paid from the insurance on that.
11      He also said that they would have GPS devices
12  put on all vehicles. And with the GPS devices on all
13  vehicles, if somebody wasn't paying on those vehicles,
14  that this GPS device could shut off the vehicle and that
15  he could reclaim that vehicle and either sell it or have
16  somebody else repurchase or do another loan on it. And
17  the loans, as he stated, people would put a down payment
18  on the vehicle, and so there would be a down payment and
19  then we would do a percentage on the loan that would be
20  less than what the value of the vehicle would be so that
21  it would be very difficult to lose your money on a
22  situation of that situation, because the loan is going
23  to be less than what the value of the vehicle is.
24  Q. So I want to break that down a little bit
25  unless you're not finished --

Page 35

1      MS. STEUER: Are you done with your answer?
2      THE WITNESS: Well, let me think a little bit
3  more of the different conversation -- I'm just trying --
4  it's been a while.
5  BY MR. KAUFMAN:
6  Q. I'm talking, just so we're clear, my question
7  is from preinvestment opportunity, just your
8  understanding of what was going on.
9  A. Right.
10  Q. Okay.
11  A. This is what he was describing about the auto
12  loans.
13  Q. That Jim and Rob had set up?
14  A. That they had and that he and his team, that he
15  was -- also had an opportunity involved that were
16  looking into these companies and into these loans, and
17  that the standard, which I was told Jerry Hudspeth that
18  was part of Dan's team, Dan said Jerry had many, many
19  years of experience in banking, I think Bank of America,
20  Wells Fargo, something with his background. And from
21  what Dan described to me was that Wells Fargo was kind
22  of the standard of the auto loans, the subprime auto
23  loans, and that there was an underwriting process in how
24  to do these loans. And he didn't get into all the
25  details, but what he told me was that the loans that we

Page 36

1  would be doing and the loans that we had would be
2  actually higher than the Wells Fargo standard of what
3  they did loans.
4      And he expressed to me, again, you know, my
5  money would be secured on these loans, and so that if
6  worse came to worse, he could always take these loans as
7  a bulk group, sell them, and I get my money back plus,
8  you know, extra money on it. And he expressed that, you
9  know, he wanted to do this right, he wanted to make sure
10  that the loans were, you know, at standard or better
11  than Wells Fargo and, you know, to just absolutely try
12  to limit the risk as much as possible.
13      You know, it was a situation where -- you know,
14  he felt, as he said to me, I was family to him and I was
15  like a brother and all these things. And so there was a
16  lot of -- there was a lot of trust there with him. And
17  just it was, you know -- it was difficult for me after
18  everything that's gone through, but -- so I wanted to go
19  in as an investor and invest my money and making sure
20  that, you know, my money was secure, and that -- you
21  know, to get a return and to get my money.
22      The other thing that he talked about was that
23  he and his team have been doing a lot of due diligence,
24  he was working with an attorney doing a lot of due
25  diligence on the companies that -- Jim Duryea that was



Page 37

1  involved in, and he was spending a lot of time, and you
2  know, for the last 15 years that's what he's done. He's
3  gone in and raised money and has helped, you know, build
4  companies. And he was excited that -- of this
5  opportunity and really went in depth, and it sounded
6  like a very good opportunity.
7  BY MR. KAUFMAN:
8      Q. Okay. So let's break this down. So you're
9  currently in the insurance business now, correct?
10     A. Yes.
11     Q. And in 2015 were you in the insurance business?
12     A. Yes.
13     Q. Okay. And for Armstrong & Associates or a
14 different company?
15     A. 2015, I believe, yes, with Armstrong as an
16 insurance broker.
17     Q. And what kind of insurance do you broker?
18     A. The insurance that I'm involved in is
19 commercial insurance.
20     Q. How long have you been an insurance broker?
21     A. Many years.
22     Q. More than ten?
23     A. Yes.
24     Q. Okay. And do you have to hold a license to be
25 an insurance broker?

Page 38

1      A. Yes.
2      Q. What license?
3      A. Insurance license.
4      Q. And that's from the State of California?
5      A. Yes.
6      Q. Are you licensed in any other jurisdiction?
7      A. I'm not -- I think the license that I hold is
8  the State of California license. But when you ask am I
9  licensed in other jurisdictions, I'm not quite sure what
10 you mean. Do I work or have --
11     Q. So let's break that down. Do you have any
12 licenses given by an insurance commissioner or similar
13 body from any other state other than California?
14     A. I don't believe so.
15     Q. Okay. But it sounds from what you're asking is
16 that you do sell insurance in other states outside of
17 California; is that accurate?
18     A. Yes, I have.
19     Q. Okay.
20     A. I've had -- sold.
21     Q. Do you have any other -- since we're on this
22 sort of background stuff, do you have any other
23 professional licenses or any other accreditations in any
24 other industry?
25     A. In any other industry, no.

Page 39

1      Q. No securities licenses, no series from
2  anyplace?
3      A. No.
4      Q. So going back to your -- you had a pretty long
5  statement about your understanding of the investments
6  that -- the SkiBo and Jim Duryea and Rob Smith, so I
7  want to try to break that down a little bit, if you
8  don't mind.
9          You mentioned it was your understanding that
10 the vehicles were to have -- that Jim and Rob were
11 overseeing, had GPS units in the cars; is that accurate?
12 Or was that something that Dan and company were planning
13 on doing in the future if they got involved?
14     A. It's been a long time from that, and so it's
15 hard to recall those conversations. But I don't recall
16 if Dan said that Jim was doing that, but it was
17 something that Dan told me that he wanted to do and that
18 it just made sense to do it that way.
19     Q. Okay. I was just trying to get a
20 clarification?
21     A. Yeah, and it's hard because, again, we're going
22 back, a while back, and I want to try to be as accurate
23 as I possibly can.
24     Q. Let's --
25     A. I'm trying to remember, too. But Dan was --

Page 40

1  wanted to make sure that they had these. He felt it was
2  just a great idea, it made sense to have it that way.
3      Q. Okay. So is it your understanding that there
4  was an attorney hired by Dan and DPG to conduct due
5  diligence over the Georgia entities?
6      A. Back at that time when we were talking, yes, I
7  was -- I was told that there was an attorney that was
8  overlooking this, as well as his team.
9      Q. Okay. And is it true that there really was an
10 attorney hired to do due diligence; is that correct?
11     A. I don't know if there was an attorney hired or
12 not. I'm not sure.
13     Q. And you mentioned that Jerry Hudspeth, it was
14 represented to you that he had extensive banking
15 experience; is that correct?
16     A. Yeah. Dan said that Jerry had an extensive
17 banking business background.
18     Q. And as you sit here today, do you find that
19 statement to be true?
20     A. I don't believe so, no.
21     Q. So you don't believe that Jerry Hudspeth has
22 had extensive banking experience?
23     A. I am not positive. I don't think so. And can
24 we go back to that previous question about the attorney?
25     Q. Sure. My question was, is it your

Page 41

1  understanding that an attorney was hired to conduct due
2  diligence on behalf of DPG, Dan Galvanoni and this
3  potential investment venture?
4      A. And at the time he -- Dan said that he had one
5  and that he was working with one as well with his team
6  doing the due diligence, and I was under the impression
7  that he was doing that. And as I sit here now, I don't
8  think that happened.
9      Q. You don't believe an attorney was hired or you
10  don't think that due diligence was done well, or
11  something else?
12     A. Well, let me answer the first part of that
13  question. I don't think an attorney was hired.
14     Q. Okay. Now, the next thing you mentioned was
15  that you and Dan had a close relationship and that you
16  trusted him; is that accurate?
17     A. Yes, I did trust him.
18     Q. Okay. And at the time in 2015, did you have a
19  close relationship with Dan?
20     A. I felt that I could trust him, yes.
21     Q. Okay. And the next thing you talked about was
22  your investment. Remember? Did you believe that your
23  investment was going to be a loan or was it going to be
24  equity in this venture that you were discussing with
25  Dan?

Page 42

1         MS. STEUER: Objection. Vague as to time. You
2  can answer.
3  BY MR. KAUFMAN:
4      Q. In 2015. I'm talking before you put any money
5  in and you were discussing with Dan, did you have an
6  understanding of your investment, because you mentioned
7  that your investment was going -- that you wanted it to
8  be secure and you wanted a good return, remember that;
9  is that accurate?
10     A. Uh-huh, yes.
11     Q. Did you have an understanding at that time
12  before you put your first money in whether or not your
13  money was going to be a loan, or a capital contribution
14  or equity of some type, or what was your understanding?
15     A. Well, my understanding was -- is that the money
16  that I was going to put in was going to be used to buy
17  loans, and so that money would be, you know, secured on
18  the loans. Dan also said that he was going to put a lot
19  of his own personal money and that he had other
20  investors that would be also putting in money to
21  purchase more loans.
22     Q. And so that meant -- so let's look at Exhibit
23  4, this demonstrative. Was it your understanding
24  that -- so at the time you were talking to Dan in the
25  summer of 2015, DPG Golden Eagle didn't exist; isn't

Page 43

1  that correct?
2      A. I believe that's correct.
3      Q. So was the plan for DPG to come into existence
4  and that investment money was going to go into DPG
5  Golden Eagle to buy loans separate, or as part of SkiBo,
6  or did you have an understanding?
7      A. The understanding was vague, but what I
8  understood was that my money would be secured, and it
9  would be used to purchase loans. I'm not positive if it
10  was the existing loan. I felt that it would be going,
11  you know, on -- I believe there was a bulk of a purchase
12  of existing loans, and my money would be used to have
13  those. But also he was talking about purchasing more
14  loans, and he very well could have used that money. I'm
15  not sure how much money he used and what he did with
16  that money, if he also purchased other loans on top of
17  that.
18     Q. Okay. So let's look at Exhibit 4. So on the
19  bottom left we have Golden Eagle, JADCO, SkiBo Auto
20  Sales and TSA Financial. Do you see where it says that?
21     A. Yes.
22     Q. And so before anyone had made any investment --
23  and SkiBo Holdings, correct? It owned -- it looks like
24  it owned all four; is that an accurate representation,
25  to the best of your understanding?

Page 44

1      A. You know, I wasn't positive exactly. Like I
2  felt a little bit it was almost like a shell game, you
3  know, who is on first, what's on second. And I wasn't
4  sure about all the different entities.
5      Q. We're not talking about the different entities,
6  I'm talking about -- let's pretend the ones on DPG and
7  the ones on the right of DPG Golden Eagle don't even
8  exist. We'll put our hand over that. That's sort of
9  what it looked like in the summer of 2015 before Dan and
10  DPG got involved. Is that accurate as to your
11  understanding?
12         MS. STEUER: Well, objection. Lacks
13  foundation. You can answer if you have an
14  understanding.
15  BY MR. KAUFMAN:
16     Q. I'm just taking you back to the time in which
17  you were talking to Dan about the potential opportunity
18  from these guys, Jim and Rob in Georgia. So I'm just
19  trying to find out what your understanding was at the
20  time.
21         MS. STEUER: Also, the question misstates his
22  testimony in terms of when he was first talking about
23  the investment. But subject to those objections, you
24  can answer.
25         THE WITNESS: Okay.



Page 45

1  BY MR. KAUFMAN:
2     Q.  So just so we're clear --
3     A.  During that time I was more concerned about the
4  money that I was putting in, not about the different
5  entities, but that my money was purchasing loans and
6  being secured with good solid loans that -- as Dan
7  described would have, you know, full insurance coverage
8  have, the GPS devices --
9     Q.  And we'll get to that.  I haven't asked you a
10  question.  You're just talking.
11     A.  Well, what I'm trying to say is that, you know,
12  my main concern was that --
13     Q.  I will get to your concerns --
14        MS. STEUER:  Actually, there's a question --
15        MR. KAUFMAN:  It's nonresponsive.
16        MS. STEUER:  Maybe you can restate your
17  question.
18        THE WITNESS:  Yeah.
19  BY MR. KAUFMAN:
20     Q.  Sure.  So my question is, prior to any of your
21  money flowing to DPG or any Dan Galvanoni controlled or
22  managed entity, is it your understanding that if you
23  look -- that's what I'm saying, the easiest thing to do
24  is put your hand over the right side where DPG Golden
25  Eagle is.

Page 46

1        MS. STEUER:  He wants you to do that.
2  BY MR. KAUFMAN:
3     Q.  Just do this.  Just like I'm doing.  Was it
4  your understanding when you were talking with Dan about
5  this potential opportunity, the uncovered portion --
6  I'll tell you what, the thing to do is, why don't you
7  take your pen and put a circle around that.  Will you do
8  that for me?
9     A.  Sure.
10     Q.  And then just initial that so we're all on the
11  same page.  Great.  And if you'll put an initial there
12  so we know that you're the one that did that.
13        Okay.  Is that your understanding of the
14  entities that were really owned by Rob Smith and Jim
15  Duryea that Dan was -- Dan and his team were evaluating;
16  is that your understanding?
17     A.  Yes.
18     Q.  And just so we're clear, none of those
19  companies or entities that are in the circle at the time
20  you were initially speaking with Dan about this
21  opportunity, were owned or controlled by Dan Galvanoni
22  or his team; is that accurate?
23        MS. STEUER:  Objection.  Calls for speculation.
24  You can answer, if you know.
25  BY MR. KAUFMAN:

Page 47

1     Q.  To the best of your knowledge in 2015.
2        MS. STEUER:  Also vague as to time.
3  BY MR. KAUFMAN:
4     Q.  Before July 1st, 2015.
5     A.  I believe so.
6     Q.  And so do you know what the business of Golden
7  Eagle was?
8        MS. STEUER:  Objection.  Vague as to time.  You
9  can answer.
10  BY MR. KAUFMAN:
11     Q.  All these questions are from before July 1st,
12  2015.  Do you have an understanding what Golden Eagle's
13  business was?
14     A.  I -- I don't remember exactly what it was, the
15  business for Golden Eagle.
16     Q.  But at one point in time did you know the
17  answer?
18        MS. STEUER:  Calls for speculation.  You can
19  answer.
20        THE WITNESS:  I think I was always a little bit
21  unclear exactly on those different entities.
22  BY MR. KAUFMAN:
23     Q.  Meaning Golden Eagle, JADCO, SkiBo, TSA and
24  SkiBo Holdings?
25     A.  Correct.

Page 48

1     Q.  But it was your understanding that the initial
2  plan that Dan was discussing with you was for loans to
3  be purchased and those loans are secured because each
4  loan was tied to a specific vehicle; was that your
5  understanding July 1st, 2015?
6     A.  Yeah, my understanding was that the money that
7  we were going to be -- put in would be to purchase
8  loans, and those loans were tied to specific vehicles.
9     Q.  And in 2015, in July, did you come to Georgia
10  and visit with Jim and Rob?
11     A.  Yes.
12     Q.  Who else was at that meeting?
13     A.  I think Jerry --
14     Q.  Jerry Hudspeth?
15     A.  -- was at that meeting, and I believe Dan
16  Galvanoni was there.
17     Q.  How many other -- did you have any other
18  meetings with Rob and Jim in Georgia?
19     A.  I don't think so.
20     Q.  Did you ever travel to Georgia on -- concerning
21  this investment other than that summer of 2015 meeting?
22     A.  I think I made a trip out -- I went out to
23  Atlanta, Georgia and met with Jim and Rob, and I believe
24  Dan and Jerry were there as well.  And then later there
25  was a meeting where, again, there were other people, a



Page 49

1  group of people that they were talking about SkiBo and
2  the investments in Atlanta, Georgia.
3      Q.  And part of those visits were for due diligence
4  purposes, weren't they?
5          MS. STEUER:  Objection.  Calls for speculation.
6  You can answer.
7  BY MR. KAUFMAN:
8      Q.  Well, you know why you went out there?
9      A.  Yeah, I wanted to talk to them, and I wanted to
10 talk with Jerry and to see what was going on.
11     Q.  And you -- when you met with Jim and Rob you
12 were shown a presentation; isn't that correct?
13     A.  Yes.
14     Q.  And that was at a country club where you saw
15 books and records as well, right?
16     A.  Well, the first meeting when I went out -- or
17 wait.  Maybe that was the same meeting.  Maybe it was --
18 maybe I met -- I think what happened was I met with Jim,
19 Jerry and Rob before the country club meeting, so I
20 think it was only the one meeting.  And we met and we
21 talked and talked up at the operations.  And then at the
22 country club we met and there was a presentation put on.
23     Q.  And there were also -- you had telephonic
24 meetings as well during that period, correct?
25     A.  Before the meeting?

Page 50

1      Q.  Correct.  In between your two trips to Georgia,
2  you had telephonic meetings with Jim and Rob as well,
3  correct?
4      A.  We could have.  I don't remember exactly.
5      Q.  It's 10:04.  Why don't we take a short break.
6          VIDEO OPERATOR:  Off the record at 10:03 a.m.
7          (Break.)
8          VIDEO OPERATOR:  We're back on the record at
9  10:15 a.m.
10 BY MR. KAUFMAN:
11     Q.  Okay.  We just took a brief break.  Is it safe
12 to say that by June of 2015 you had decided to invest in
13 the subprime automotive deal as proposed to you by Dan
14 Galvanoni?
15     A.  I'm not sure the exact date when I invested.
16 Was it in June?  I believe --
17     Q.  Part of -- I'm sorry.  I didn't mean to cut you
18 off.
19     A.  Oh, that's okay.  Your question was, when did I
20 start making financial investment?
21     Q.  My question was, when did you decide that you
22 wanted to invest?
23     A.  After discussing all the information with Dan
24 and the terms and such.
25     Q.  And after your two visits to Georgia or before?

Page 51

1      A.  I'm not sure when I actually started investing
2  or when I wrote the checks.  I think the checks were
3  written in and around June of 2015, and I forget the
4  exact date my trips were.
5      Q.  Aside from your visit and talking with Dan, did
6  you do any due diligence on your own?
7          MS. STEUER:  Objection.  Vague.  You can
8  answer.
9          THE WITNESS:  Yeah, went out to see Jim and Rob
10 and talked with them and talked with Jerry Hudspeth.
11 BY MR. KAUFMAN:
12     Q.  I'll hand you -- what number are we on, 5?
13         THE REPORTER:  Yeah.
14         THE WITNESS:  Lots of conversations.
15         (Exhibit 5 was
16         marked for identification.)
17 BY MR. KAUFMAN:
18     Q.  This will be Exhibit 5 will be a composite
19 exhibit.  It's Bates stamped from your counsel 171 to
20 187.  Okay.  So if you look --
21         MS. STEUER:  I seem to have two copies of it.
22 Would you like one back?
23 BY MR. KAUFMAN:
24     Q.  Is that accurate, is that what you have in
25 front of you?

Page 52

1      A.  Say that again.
2      Q.  Bates 171 to 187.
3      A.  Yes.
4      Q.  So on Bates 171, is that the Marriott boutique
5  hotel opportunity that you and Dan were looking at in
6  2015?  Is this the same one you and I were talking about
7  earlier, or was there another hotel deal?
8      A.  No, I believe this is the one Dan was talking
9  to me about.
10     Q.  Okay.  And this is the same deal that you
11 provided the financial statement on?  Is this the deal,
12 the reason why you provided Dan with your financial
13 statement?
14     A.  Yes.
15     Q.  Did you provide Dan any other financial
16 statements or send that financial statement on to other
17 opportunities with you and Dan?
18         MS. STEUER:  Objection.  Compound.  You can
19 answer.
20         THE WITNESS:  I don't think so.
21 BY MR. KAUFMAN:
22     Q.  Okay.  So I want to take you to Bates stamp
23 173.  If you look at 173, 174 and 175, have you seen
24 this document before?  I'm just asking if you've seen
25 it.



Page 53

1    A. Yeah, yeah.

2    Q. And it's your Bates stamp. It's produced by

3  you.

4    A. Right. Right. I'm just going back. It's been

5  a while since I've looked at any of these things. I

6  think I have seen this.

7    Q. Let's look at 173 on the front. Okay? It

8  says, "This Agreement serves as the Investment and Fee

9  Agreement between DPG Investments, LLC (herein as

10  referred to as DPG) and John Marshall (herein referred

11  to a Marshall), herein collectively referred to as the

12  parties. This agreement shall serve for the purpose of

13  defining investment and fee terms related to a mezzanine

14  loan of $2,000,000 made to Golden Eagle Lending, LLC

15  (Golden Eagle) a non-prime auto loan company, in

16  tranches of $250,000 over the next six months. This

17  agreement is hereby executed by the aforementioned

18  parties and is binding in its nature." Did I read that

19  correctly?

20    A. Yes.

21      MS. STEUER: Did you have a copy that's

22  executed by John or --

23      MR. KAUFMAN: Well, it's my deposition. I just

24  asked if I read it correctly.

25  BY MR. KAUFMAN:

Page 54

1    Q. And you said you've seen this before, correct?

2  It came from your production.

3    A. Yes.

4    Q. So let's go down to where it says Investment.

5  It says, "Marshall shall invest $125,000 of the first

6  tranche of $250,000 and shall receive 14.75 percent

7  interest per annum over a 18 month term plus 10-year

8  warrants in Golden Eagle and affiliated companies equal

9  to 3 percent of each company priced at .001 cent per

10  unit." Did I read that correctly?

11    A. Yes.

12    Q. And so when we look at the whereas provision,

13  do you see that on the first page? There's five of

14  them. If we look at the first one it says, "Whereas

15  Golden Eagle is seeking a mezzanine loan of $2 million

16  and DPG has agreed to arrange such a loan; and whereas

17  Golden Eagle will secure $5 million in senior debt; and

18  whereas Golden Eagle is affiliated with TSA Financial

19  Group, LLC (TSA), which is a non-prime auto lender with

20  about $3.5 million in outstanding senior debt, SkiBo" --

21      (Clarification by the reporter.)

22  BY MR. KAUFMAN:

23    Q. "SkiBo Auto Sales, LLC which refurbishes and

24  sells repossessed autos, and JADCO, LLC, which brokers

25  auto loans." Did I read that part correctly?

Page 55

1    A. Yes.

2    Q. Does this refresh your understanding of the

3  interrelationship with the TSA, SkiBo and JADCO

4  entities?

5      Let me ask a different question. Do you have

6  any reason to believe that that whereas clause

7  discussing what each of the TSA, JADCO and SkiBo

8  entities do is inaccurate?

9      MS. STEUER: Objection. Calls for speculation.

10  Lacks foundation. You can answer.

11  BY MR. KAUFMAN:

12    Q. Do you have any personal understanding? That's

13  the question.

14    A. Yeah, I don't know if that statement was

15  accurate.

16    Q. Do you have an understanding of what senior

17  debt is?

18    A. No, I didn't -- I was not aware on these

19  companies and what was going on. As I said before, my

20  money was --

21    Q. My question was -- hold on. My question was

22  just, do you have an understanding of what the

23  definition of what senior debt is?

24      MS. STEUER: You can answer if you have an

25  understanding.

Page 56

1      THE WITNESS: I think debt, to my

2  understanding, debt is money owed.

3  BY MR. KAUFMAN:

4    Q. But senior debt, does that have a definition to

5  you?

6    A. No.

7      MS. STEUER: Objection. Calls for a legal

8  conclusion. You can answer.

9  BY MR. KAUFMAN:

10    Q. I asked if you have an understanding. I didn't

11  ask for a legal conclusion. Does senior debt have a

12  definition to you?

13    A. Senior debt, no.

14    Q. What about a mezzanine loan, do you have an

15  understanding of a mezzanine loan is?

16    A. I'm not sure what mezzanine loan is.

17    Q. Did you ever Google it, look it up somehow?

18    A. No.

19    Q. If we look on the page Bates stamped JM175,

20  that's the last page of the agreement, do you see that?

21  Are you with me?

22    A. Yes.

23    Q. Okay. And it says, "Agreed and accepted

24  effective as of the 30th day of August, 2015." And do

25  you recognize the signature?

Page 57

1    A. It looks like it's Dan Galvanoni's signature.
2    Q. Do you have an understanding if Dan Galvanoni
3  signed this agreement personally, or if it was
4  electronically signed?  Do you have any understanding at
5  all?
6    A. I don't, no.
7    Q. Okay.  Did you sign this version?
8      MS. STEUER: Objection.  Calls for speculation.
9  BY MR. KAUFMAN:
10    Q. Something if you know or not.  Did you sign it
11  or not?
12    A. I don't recall.
13    Q. Okay.  When you -- do you know if this
14  agreement was emailed to you?
15    A. I don't recall.
16    Q. To the best of your recollection, did anyone
17  from DPG Investments send this agreement to you via U.S.
18  mail or FedEx?
19    A. I don't recall.  I don't remember.
20    Q. Did you ever receive an agreement from DPG
21  Investments in physical form and not electronic in the
22  history of your relationship with them?
23    A. I'm not sure.  I could have.  I'm not sure.
24    Q. Who sent the agreement to you, do you remember
25  who addressed it to you?

Page 58

1      MS. STEUER: Objection.  Calls for speculation.
2  You can answer.
3      THE WITNESS: I don't know.
4  BY MR. KAUFMAN:
5    Q. Did you deal with anyone other than Dan
6  Galvanoni concerning paperwork in 2015 in your
7  investments?
8    A. I don't recall.  I could have.
9      MR. KAUFMAN: I believe this is 6, right,
10  ma'am?
11      THE REPORTER: Right.
12        (Exhibit 6 was
13        marked for identification.)
14  BY MR. KAUFMAN:
15    Q. I've handed you what's Bates JM5124 and JM5125.
16  And so at the bottom at the JM5124, do you see where it
17  says page 1 of 3 is part of the agreement.
18    A. Uh-huh.
19    Q. And then you flip it over and it says page 3 of
20  3.
21    A. Okay.
22    Q. Does it say that?
23    A. Yes.
24    Q. Do you have any idea where page 2 of 3 is?
25    A. I do not.

Page 59

1    Q. No idea why it's missing in the production?
2    A. I'm not sure.
3    Q. Okay.  So let's look at the first page.  Okay?
4  Actually, let's go back to the back on JM5125.  So I'm
5  going to refer to the Bates numbers, if you'll turn that
6  over for me, Mr. Marshall.  Is that your signature?
7    A. Yes.
8    Q. You signed this agreement?
9    A. Yes, I believe so.
10    Q. Okay.  All right.  So let's look at the front
11  page.  It says here that this is an Investment and Fee
12  Agreement between DPG Investments, LLC and John
13  Marshall; isn't that correct?
14    A. Yes.
15    Q. So in the first paragraph it reads, "This
16  Agreement (Agreement) serves as the Investment and Fee
17  Agreement between DPG Investments LLC (herein referred
18  to as DPG) and John Marshall (herein referred to as
19  Marshall), herein collectively referred to as the
20  parties.  This agreement shall serve for the purpose of
21  defining investment and fee terms related to a mezzanine
22  loan of $2,000,000 made to SkiBo Holdings, LLC (SkiBo
23  Holdings).  This agreement is hereby executed by the
24  aforementioned party and is binding in nature."  Did I
25  read that correctly?

Page 60

1    A. Yes.
2    Q. Okay.  So we've already been through you don't
3  know what a mezzanine loan is, correct?
4    A. Correct.
5    Q. And you didn't know what it was when you signed
6  this agreement in June of 2015; is that correct?
7    A. Correct.
8    Q. So is there a reason why you didn't ask anyone
9  what a mezzanine loan was?
10    A. Well, I talked to Dan Galvanoni about this, and
11  again, my money was going to be secured on the loans,
12  and I would be getting my money paid back on the loans
13  and receiving interest, and I invested my money as an
14  investor into this.  So these were things that were
15  discussed.
16    Q. Well, Mr. Marshall my specific question was --
17      MR. HUGHES: Hey, hey.
18  BY MR. KAUFMAN:
19    Q. -- did you ask Dan Galvanoni about the
20  definition of a mezzanine loan?
21      MS. STEUER: Only one of you gets to ask
22  questions.  I'm not going to tolerate this tag teaming.
23      MR. KAUFMAN: He hasn't asked a question.
24      MR. HUGHES: There was no tag teaming.  I was
25  going to object to the response as being nonresponsive.



Page 61

1      MS. STEUER: Well, I think -- again, you don't
2  get to do that. Let him --
3      MR. KAUFMAN: That's fine.
4      MS. STEUER: Which of you is taking the
5  deposition?
6      MR. KAUFMAN: He hasn't even asked a question.
7  He hasn't even said anything.
8      MR. HUGHES: I haven't asked a single question.
9      MS. STEUER: No, but you were about to make an
10 objection.
11     MR. KAUFMAN: So now you're a mind reader.
12     MR. HUGHES: Hang on a second. I am counsel of
13 record in this case. I'm allowed to make an objection
14 to the witness's response.
15     MS. STEUER: Only one of the counsel is allowed
16 to take this deposition, so I'm going to object if --
17 having both of you do this.
18 BY MR. KAUFMAN:
19     Q. Okay. Let's just be very clear. I asked a
20 very specific question, Mr. Marshall. Okay. My
21 question was, did you ask anyone about the definition of
22 a mezzanine loan?
23     MS. STEUER: That's a different question, but
24 you can answer that.
25     THE WITNESS: I don't remember.

Page 62

1  BY MR. KAUFMAN:
2      Q. Okay. And then you made a comment about
3  talking to Dan, and then I asked the next question, did
4  you ever ask Dan Galvanoni what the definition of a
5  mezzanine loan is?
6      MS. STEUER: And he just wants a yes-or-no
7  answer.
8  BY MR. KAUFMAN:
9      Q. Just a yes or no.
10     A. I just don't remember if I asked him or not.
11     Q. Did you ever ask anyone what the definition of
12 senior debt was or is?
13     A. I don't remember asking anybody.
14     Q. Okay. So this agreement that you signed, you
15 see where it says -- it's the one, two, three, four,
16 five, six, seventh whereas, do you see where it says
17 that? It says, "Whereas, Golden Eagle is also seeking
18 senior debt of $5,000,000 in senior debt." Do you see
19 where it says that on JM5124?
20     A. Okay. Yes.
21     Q. Did you have an understanding that Golden Eagle
22 was, in fact, seeking $5 million in senior debt at the
23 time you signed this agreement?
24     A. I was not sure.
25     Q. Okay. Did you read this agreement before you

Page 63

1  signed it?
2      A. I think I went through it, and I believe that I
3  called Dan to make sure that -- again, right from the
4  beginning and all the way through, that my money would
5  be secured and I would get my money paid back and get
6  the interest and stuff back. So if worse came to worse,
7  we could sell the loans and I would, you know, have my
8  money back.
9      Q. Okay. And so you sort of told me that a few
10 times. So let's look at JM5125 on the back. Okay? Do
11 you see where it says, "The following provisions shall
12 be binding on the parties," do you see where it says
13 that under Article II General Provisions? Are you with
14 me?
15     A. Yes.
16     Q. So one of the binding provisions, which let's
17 look down to the fourth bullet point. Do you see where
18 it says, "This agreement shall be governed by the laws
19 of the State of Georgia." Do you see where it says
20 that?
21     A. Yes.
22     Q. Did I read that correctly?
23     A. Yes.
24     Q. And the fifth one, "This agreement contains the
25 entire understanding between the parties with respect to

Page 64

1  the subject matter of this agreement. Each party
2  acknowledges that it has not been induced to enter this
3  agreement by any representations or assurances, whether
4  written or oral, and agree that each has not received
5  any promises or inducements other than as herein set
6  forth. Each party has had sufficient opportunity to
7  have this agreement reviewed by legal counsel." Did I
8  read that correctly?
9      A. Yes.
10     Q. Okay. Then you signed this agreement on or
11 about June 16th, 2015; isn't that correct?
12     A. Yes.
13     Q. Do you have any of your original agreements
14 that you signed with DPG Investments?
15     A. I don't. I don't believe so. I may. I'm not
16 sure.
17     Q. Did you ever look in your file cabinet you
18 mentioned where you saved important documents?
19     A. Yeah, that's where I would find my documents.
20     Q. Did you ever look in it was my question?
21     A. Yes.
22     Q. Okay. And are there any originals, to the best
23 of your recollection, of any of the agreements that you
24 signed with DPG Investments?
25     A. I don't believe so.



Page 65

1    Q. Did you ever send drafts or revisions of any of
2  your agreements with DPG Investments to anyone? Did you
3  ever send drafts or edits back and forth with anyone at
4  DPG?
5    A. No, I don't think so.
6    Q. So you never had, like, red lines or tracked
7  changes?
8    A. Well, I made some changes on some of the
9  contracts to try to best reflect what the agreements
10  were, and then I signed them and mailed them.
11    Q. Okay. But no one ever said, okay, or we're
12  going to agree on those terms, correct?
13    A. I'd have to think back.
14    Q. But you never had what I would consider a --
15  what I'll sort of describe as a back-and-forth
16  negotiation on terms, did you?
17    A. No, I was on the impression that the terms that
18  we agreed on were always going to be that way.
19    Q. But I'm just talking about as far as the actual
20  paperwork, these agreements, there was never -- just so
21  we're crystal clear, there was never any revisions sent
22  back and forth with each other on multiple occasions,
23  was there?
24    A. I don't think so, no. I don't recall, but I
25  don't think so.

Page 66

1    Q. Okay. In fact, the agreements that you did
2  sign were already signed by Dan Galvanoni when they
3  arrived at your location, correct, every one of them?
4    A. I believe so.
5    Q. And they were all electronically signed by Dan?
6    MS. STEUER: Calls for speculation.
7    THE WITNESS: I'm not sure.
8  BY MR. KAUFMAN:
9    Q. And then you would sign and send back, is that
10  sort of how the process was?
11    A. Yeah, I believe so.
12    Q. And would you send these agreements back to DPG
13  Investments via email or U.S. mail, or how would you do
14  it?
15    A. I'd mail them back.
16    Q. When you say mail, you mean physical mail?
17    A. Yeah.
18    Q. Did you keep a copy for yourself?
19    A. I believe so.
20    Q. Okay. So you would send the original and keep
21  the copy, was that your pattern and practice? Or would
22  you keep the original and send a copy?
23    A. I would keep a copy and send the original.
24    Q. And it's your testimony that you did that every
25  single time for all of the documents you signed with

Page 67

1  DPG?
2    A. I'm not sure.
3    Q. I'll hand you 7.
4        (Exhibit 7 was
5        marked for identification.)
6  BY MR. KAUFMAN:
7    Q. I've handed you what's been named Exhibit 7.
8  It's JM5321 through 5323. Is that what you have before
9  you?
10    A. Yes.
11    Q. So this agreement is dated the 29th day of
12  June, 2015; isn't that correct? It's on the last page.
13    A. Yes.
14    Q. Okay. And this document came to you signed by
15  Dan Galvanoni, correct?
16    A. I believe so, yes.
17    Q. And then is it your testimony that you made
18  these handwritten changes?
19    A. Yes.
20    Q. Okay. And that's your handwriting everywhere?
21    A. Yes.
22    Q. Only yours?
23    A. Yes.
24    Q. And then you signed it and mailed it back; is
25  that accurate?

Page 68

1    A. I believe so, yes.
2    Q. And is it your testimony as we sit here today
3  that you do not have in your care, custody or control
4  the original of this document?
5    A. I don't believe so.
6    Q. Is it your testimony that you looked for the
7  original of this document?
8    A. Yeah, I would, yeah.
9    Q. That you would or did?
10    A. I believe so, yes, I did.
11    Q. You did look. So you don't have it?
12    MS. STEUER: Asked and answered. You can
13  answer again.
14    THE WITNESS: Yes.
15  BY MR. KAUFMAN:
16    Q. And it's your testimony that you, as to this
17  specific document, Exhibit 7, mailed it to DPG
18  Investments in Scottsdale, Arizona --
19    A. Yes.
20    Q. -- via U.S. mail?
21    A. Correct.
22    Q. And you didn't email a copy ahead?
23    A. I don't think so. I'm not sure.
24    Q. Is it fair to say you substantially altered the
25  document with your handwritten notes?



Page 69

1     MS. STEUER:  Objection.  Vague.
2     MR. KAUFMAN:  Sure.
3     MS. STEUER:  You can answer.
4  BY MR. KAUFMAN:
5     Q.  Well, you changed the governing law, for
6  example, correct?
7     A.  Yes.
8     Q.  Okay.  You changed where your preferred equity
9  would be from SkiBo Holdings into DPG Golden Eagle
10  Lending, correct?
11     A.  Correct.
12     Q.  You wrote this idea of Marshall will have the
13  right to secure first position in lien on auto loans and
14  assets of DPG Golden Eagle exit plan.  See as E below.
15  You wrote that, correct?
16     A.  Correct.
17     Q.  Okay.  You changed in C that Marshall shall
18  receive a -- receive ten-year warrants in DPG Golden
19  Eagle rather than in SkiBo Holdings, correct?
20     A.  Yes.
21     Q.  Okay.  And then you affirmatively made it so
22  you will not be on the board of directors of SkiBo
23  Holdings; isn't that correct?
24     A.  That's correct.
25     Q.  And then you wrote a whole new provision that

Page 70

1  you entitled Exit Plan, correct?
2     A.  Correct.
3     Q.  And then you made other changes as well as to
4  the fees section, correct?
5     A.  Correct.
6     Q.  In fact, you never received a response from
7  anyone at DPG Investments that this agreement was
8  acceptable to them, did you?
9     A.  I've talked to Dan Galvanoni about -- from the
10  beginning all the way through, and this is exactly what
11  we agreed on, and I told him that I would make
12  alterations.
13     Q.  But my question was after you sent this
14  document with your changes via U.S. mail, you never had
15  a conversation with anyone at DPG Investments that your
16  changes were accepted, did you?
17     A.  I don't recall.
18     Q.  Let's talk about your conversations leading up
19  to signing that.  So I'm going to hand you what we'll
20  mark as 8.
21         (Exhibit 8 was
22          marked for identification.)
23  BY MR. KAUFMAN:
24     Q.  Do you have any other emails addresses other
25  than JMarshall@Armstrongprofessional.com?

Page 71

1     A.  Yeah.
2     Q.  Okay.  What are they?
3     A.  I have lighteningnow@yahoo.com.
4     Q.  Did you have lighteningnow@yahoo.com in June of
5  2015?
6     A.  I believe so, yes.
7     Q.  What other email addresses did you have or do
8  you have?
9     A.  I think that's about it.
10     Q.  Is there a reason you were using your
11  Armstrongprofessional.com email address rather than your
12  personal Yahoo address to conduct DPG investment
13  opportunity business?
14     A.  I have a difficult time sometimes on Yahoo
15  reading some of the stuff.
16     Q.  Did you ever use your Yahoo account to
17  correspond with anyone at DPG Investments?
18     A.  I could have, yes.
19     Q.  When we sent discovery requests from Brad's
20  office and mine, did you search your Yahoo account for
21  responsive documents?
22     A.  Yeah.
23     Q.  Okay.  In the same manner that you -- was that
24  search done in the same manner that you searched your
25  Armstrong Professional account?

Page 72

1     A.  Yes.  I looked through the personal account to
2  see if I could find any documents.
3     Q.  Okay.  And when you did that search, do you use
4  some sort of methodical system, or did you just scroll
5  through it?
6     A.  I think on the lightening now, I think I
7  scrolled through it.
8     Q.  Okay.
9     A.  I have difficulty a little bit with reading and
10  writing.
11     Q.  So when we look at JM299 that's in front of
12  you, Exhibit 8, and we'll read these from -- I guess
13  really from the second email, the one from Dan
14  Galvanoni, do you see that one dated June 17th, 2015 at
15  9:18 a.m.?
16     A.  Yes.
17     Q.  Okay.  And you were a recipient of that email,
18  correct?
19     A.  Yes.
20     Q.  And was this your introduction to the first
21  time you spoke with Wes Anderson at DPG Investments LLC?
22     A.  I'm not sure.
23     Q.  Did you know Wes Anderson prior to June of
24  2015?
25     A.  I'm not sure when -- exactly when I first met



Page 73

1  Wes.
2      Q.  Did you meet Wes through DPG Investments?
3      A.  Yes.
4      Q.  Let's look at this email.  It reads, "Wes, our
5  partner John will be calling you today to introduce
6  himself."  Did I read that correctly?
7      A.  Yes.
8      Q.  Are you the John that is being referenced here?
9          MS. STEUER:  Objection.  Calls for speculation.
10 You can answer.
11 BY MR. KAUFMAN:
12     Q.  To the best of your knowledge?
13     A.  I would assume so.
14     Q.  And you're the only John on the email, correct?
15     A.  Correct.
16     Q.  "We need the deck changed on TSA with just the
17 rates and no equity.  John is going to sell down and
18 keep the arbitrage with us.  Cheers.  He needs this
19 today.  Bill, if you can help, great.  We are ready to
20 close the 250K and I will have 150K behind it so we can
21 get some time.  But they only need 250K now.  Westley G.
22 Anderson."  Did I read that correctly?  Yes?
23     A.  Yes.
24     Q.  Okay.  Were you trying to keep the arbitrage
25 with DPG?

Page 74

1          MS. STEUER:  Objection.  Vague.  You can
2  answer.
3          THE WITNESS:  I'm not sure.  I mean, a lot of
4  these emails are so deluded and cryptic, it doesn't
5  make -- I didn't -- I don't know.
6  BY MR. KAUFMAN:
7      Q.  Okay.  Let's go to Exhibit 9.
8          (Exhibit 9 was
9           marked for identification.)
10 BY MR. KAUFMAN:
11     Q.  So I've handed you Exhibit 9, which is Bates
12 JM321 through JM323.  Do you have that in front of you?
13     A.  Yes.
14     Q.  Let's turn to JM323.  Let's look in the middle
15 on June 17th, 2015 at 1:10 p.m.  That's an email that
16 you wrote, correct?
17     A.  Okay.
18     Q.  You wrote that email, right?
19     A.  Yes.
20     Q.  And you wrote, "Now that I signed a contract
21 and I am part of DPG, I am going to come out to Arizona,
22 and I am going to get a few of the DPG hats.  I coach
23 all over the country, and I'll be wearing our DPG logo,
24 my friend.  I am so thankful, Dan.  I could not pick a
25 better friend and partner.  I love you, my brother.

Page 75

1  Thank you, John Marshall.  J.D. CIC."  Did I read that
2  correctly?
3      A.  Yes.
4      Q.  What does CIC stand for?
5      A.  I think it's counselor insurance council or
6  something like that.
7      Q.  So does this email reflect the time -- the
8  proper date that you signed an agreement with DPG?
9      A.  It may, yes.
10     Q.  And was that the first agreement that you ever
11 signed with DPG was that date, June -- in or around June
12 17th, I believe it's the 16th, which I think the
13 exhibits in front of you, it's JM5124 is the Bates
14 stamp?  Is that the first agreement you ever signed?
15 I'm just trying to get the order correct.
16     A.  I'm not positive.
17     Q.  So let's look through -- I believe it will be
18 dated -- it will say Investment and Fee Agreement DPG
19 Investments.  It should be like Exhibit 6.
20         MS. STEUER:  So it's the one that's not the
21 amended one.
22         THE WITNESS:  This one?
23 BY MR. KAUFMAN:
24     Q.  Yes.  Is that -- will you check the back?  Is
25 that dated June 16th, 2015?

Page 76

1      A.  Yes.
2      Q.  So is this -- what is the exhibit in your hand
3  number?  Just turn it over.
4      A.  6.
5      Q.  Exhibit 6.  Is that the agreement that you're
6  referencing in your June 17th, 2015 email?
7          MS. STEUER:  Objection.  Calls for speculation.
8  You can answer.
9          MR. KAUFMAN:  Well, he wrote it.
10 BY MR. KAUFMAN:
11     Q.  You wrote the email.  Is that the agreement
12 you're referencing?
13     A.  You know, I'm not positive.
14     Q.  Did you sign another agreement in or around
15 June 17th, 2015 with DPG?
16     A.  I'd been talking to Dan Galvanoni for a period
17 of time.
18     Q.  Well, my question was, you wrote that now that
19 I signed a contract and I am part of DPG, you wrote
20 that, I'm asking did you sign another agreement in or
21 around June 17th, 2015?  Or are you referencing Exhibit
22 6 that is in front of you?
23     A.  I'm not sure.
24     Q.  Let's look at JM321.  So it's Exhibit 9 in
25 front of you.  Do you see where it says June 17th, 2015



JOHN MARSHALL
JOHN MARSHALL vs DANIEL GALVANONI

March 14, 2019
77–80

Page 77

1  at 2:57 p.m. in an email that you wrote. Are you with
2  me in the middle?
3      A. Uh-huh.
4      Q. Yes?
5      A. Yes.
6      Q. Okay. Let's look at the second paragraph.
7  Didn't you write, "I will wire my money tomorrow, let's
8  make a lot of money on this and expand and buy other
9  companies and make other investments, let's build an
10  empire!!!" You wrote that, correct?
11      A. Yes.
12      Q. How much money were you wiring on I guess, June
13  18th, 2015?
14      A. I would have to go back and look.
15      Q. Do you remember what that wire was for that
16  you're referencing?
17      A. To buy up auto loans and have ownership in auto
18  loans.
19      Q. Do you recall who was going to receive that
20  wire, which corporate entity?
21      A. It's being wired to Dan Galvanoni and his
22  company, I believe.
23      Q. So it was your testimony you were going to send
24  it to Dan Galvanoni personally for Dan Galvanoni to
25  handle?

Page 78

1      A. I'd followed their instruction to Dan Galvanoni
2  who to wire it to so that he could take that money and
3  buy up the loans.
4      Q. But you were going to be involved in this
5  enterprise, weren't you?
6      MS. STEUER: Objection. Vague. You can
7  answer.
8      THE WITNESS: Involved in which way?
9  BY MR. KAUFMAN:
10      Q. Well, you weren't just going to be a silent
11  investor and have -- as if you bought something on Wall
12  Street, were you?
13      MS. STEUER: Objection. Argumentative. You
14  can answer.
15      MR. KAUFMAN: It's not argumentative. It's a
16  question.
17      THE WITNESS: Oh, well, I was going to be
18  involved in the extent that I was an investor. I wanted
19  to put money in and I was going to get -- I had not only
20  a return on my money and secured by the loans and such
21  that also with the profitability, I was going to receive
22  a percentage from the profitability as well.
23  BY MR. KAUFMAN:
24      Q. Well, you also were going to try to find other
25  investors to come into the enterprise, wasn't that part

Page 79

1  of your job?
2      A. Well, it wasn't my job. No, it wasn't.
3      Q. Were you trying to -- were you going to look
4  for insurance on behalf of this enterprise?
5      A. Well, they asked me, I think -- I don't recall,
6  but I think they asked me to look into insurance.
7      Q. You were on management calls concerning the
8  enterprise, weren't you?
9      MS. STEUER: Objection. Vague. You can
10  answer.
11      THE WITNESS: I was on calls to find out what
12  was going on with my investment, yeah.
13  BY MR. KAUFMAN:
14      Q. You were also on calls concerning strategic
15  decisions for the enterprise, weren't you?
16      A. On those calls they might have talked about
17  that, but my main focus was to make sure my money was
18  being secured and I was going to get my money back.
19      Q. Okay. Well, let's look at Exhibit 8.
20      THE REPORTER: 10.
21      MR. KAUFMAN: 10, I apologize.
22      (Exhibit 10 was
23      marked for identification.)
24  BY MR. KAUFMAN:
25      Q. So I've handed you Exhibit 10, which is Bates

Page 80

1  JM325 through 327. Is that what you have in front of
2  you, Mr. Marshall?
3      A. Yes.
4      Q. Okay. Let's turn to Bates 326. Do you see an
5  email from Jim, and it's Jim Duryea, I'll represent to
6  you, sent on June 18th, 2015. Are you with me?
7      A. Yes.
8      Q. Okay. Now, you're not a recipient of this
9  email, but its subject is Job Duties; is that correct?
10      A. This subject says Job Duties, correct.
11      Q. Right. And you were also not a to or a cc
12  recipient of that email from Jim Duryea, correct?
13      A. Correct.
14      Q. But the email was forwarded to you from Dan
15  Galvanoni that same day at 1:45 p.m.; isn't that
16  accurate?
17      A. Yes.
18      Q. So have you seen this email before?
19      A. I don't know. I don't recall. Unfortunately,
20  I don't recall. I had a job and sometimes I didn't read
21  all emails. I have difficulty with reading and writing,
22  to be honest.
23      Q. Well, you actually responded to this email, if
24  you go to the first page on JM325; isn't that accurate?
25      A. Well, let me look. I haven't looked at this.



Page 81

1    Q. So on JM325, isn't it true that you sent an
2  email on June 18th, 2015 at 2:00 p.m., Subject:  Re:
3  Job Duties?
4    A. Yes.
5    Q. Okay.  Let's look at the next email reading up.
6  So then the next email on the string is from Dan
7  Galvanoni on June 18th, 2015 at 2:08 p.m.  Do you read
8  that?
9    A. Yes.
10   Q. Okay.  And in that email that you're copied on,
11 correct -- you're actually to, you're sent on, you're
12 one of the recipients, you're the last email address,
13 right?
14   A. Yes.
15   Q. That email Dan writes, "Dear Jim, see below.
16 John and I are 10 year friends and family.  He wired in
17 his 125K today and is in.  John also a deep network of
18 wealthy friends as he is in SF area.  John is also a
19 lawyer.  John will also set up a captive insurance
20 company.  John is family and we are all family now.
21 Wealth creation will benefit us all and our
22 grandchildren.  See below.  I'll be back at my
23 desk in 45 minutes to talk.  Dan."
24      Did I read that correctly?
25   A. Yes.

Page 82

1    Q. Were you looking to set up a captive insurance
2  company at one point?
3    A. No, I don't believe so.
4    Q. Were you ever evaluating the insurance needs
5  for this entity?
6    A. Yes, I looked into doing the insurance, but I
7  don't believe I did the insurance for this entity.
8    Q. Well, I didn't ask if you did it, I just asked
9  if you were asked to evaluate it.
10   A. I think so, yes.
11   Q. Okay.  And you were also a board member,
12 correct?
13   A. No, I never wanted to be a board member.
14   Q. You were never on a -- a board member of any of
15 these entities?
16   A. I never wanted to be on one, no.
17   Q. I didn't ask if you wanted to be.  I asked if
18 you were ever on one.
19      MS. STEUER:  Calls for speculation.  You can
20 answer.
21      THE WITNESS:  I shouldn't have been.
22      MR. KAUFMAN:  Exhibit 11.
23      (Exhibit 11 was
24      marked for identification.)
25 BY MR. KAUFMAN:

Page 83

1    Q. So Exhibit 11 is Bates JM6202.  Is that what
2  you have in front of you?
3    A. Yes.
4    Q. Is that your signature, customer's signature?
5    A. Yes.
6    Q. And it's dated June 18th, 2015?
7    A. Yes.
8    Q. Okay.  So did you sign this document?
9    A. Yes.
10   Q. Okay.  And it's a Bank of America Funds
11 Transfer Request Authorization; isn't that correct?
12   A. Yes.
13   Q. And it is for -- basically it's a wire, isn't
14 it, or funds transfer from you to DPG Golden Eagle, LLC,
15 correct?
16   A. Yes.
17   Q. So it's not to Dan Galvanoni or DPG
18 Investments, it's a separate entity, correct?
19   A. Yes.
20   Q. Okay.  And the wire amount was for $100,000;
21 isn't that accurate?
22   A. Yes.
23   Q. And actually, the wire looks like it was dated
24 on June 19th, 2015, so that's probably the day it
25 actually went out.  Do you have any reason to doubt

Page 84

1  that?
2    A. No.
3    Q. And did you -- if we look for additional
4  reference information, do you see where it says that
5  under recipient information?
6    A. Okay.
7    Q. It says for TSA; isn't that correct?
8    A. Yes.
9    Q. And TSA is one of the entities that was owned
10 and operated by Jim Duryea, correct?
11      MS. STEUER:  Objection.  Vague as to time.  You
12 can answer.
13 BY MR. KAUFMAN:
14   Q. Well, as of the date that this was sent on June
15 19th, 2015, TSA was owned and operated by Jim Duryea,
16 correct?
17      MS. STEUER:  Calls for speculation.  If you
18 know, you can answer.
19      THE WITNESS:  I think so.
20 BY MR. KAUFMAN:
21   Q. You also sent another wire in and around this
22 time; isn't that correct?
23   A. I believe so.
24   Q. Okay.  And that wire was for $25,000, right?
25 I'll give you Exhibit 12.



Page 85

1      (Exhibit 12 was
2    marked for identification.)
3   BY MR. KAUFMAN:
4      Q.  Take a look at Exhibit 12, which is Bates
5    stamped JM6209.  Is that what you have in front of you,
6    Mr. Marshall?
7      A.  Yes.
8      Q.  Okay.  Look at the member signature.  Is that
9    your signature?
10     A.  Yes.
11     Q.  Okay.  And a date and time, says June 18th,
12   2015 at 10:42 and 25 seconds a.m.  Do you see that?
13     A.  Yes.
14     Q.  Do you have any reason to believe that that
15   date and time was inaccurate as to the time you signed
16   this agreement?
17     A.  No, I believe that's accurate.
18     Q.  Okay.  And so are you a member of the Patelco
19   Credit Union?
20     A.  Yes.
21     Q.  And you wired looks like $25,000.  Do you see
22   where it says that under the wire amount?
23     A.  Yes.
24     Q.  Was that an accurate amount?
25     A.  I believe so, yes.

Page 86

1      Q.  Okay.  And it says call back phone number.  Is
2    this your number, (916) 960-9196?
3      A.  Yes.
4      Q.  And you wired $25,000 to -- do you see where it
5    says name on the account, it reads what?
6        MS. STEUER:  You want him to read it?
7   BY MR. KAUFMAN:
8      Q.  Yeah, what does it say?
9      A.  On the bank, full name?
10     Q.  Name on account, it reads, DPG Golden Eagle
11   LLC.  Did I read that correctly?
12     A.  Oh, name on the account, DPG Golden Eagle LLC.
13     Q.  So that's when you wired $25,000 was to DPG
14   Golden Eagle LLC, correct?
15     A.  Correct.
16     Q.  Under special instructions it says for TSA,
17   doesn't it?
18     A.  Yes.
19     Q.  Do you have an understanding if TSA was in
20   bankruptcy?
21     A.  I did not know that.
22     Q.  Just asked if you had an understanding if that
23   was the case?
24     A.  An understanding, no, I don't.
25        MS. STEUER:  And that lacks foundation.

Page 87

1        MR. KAUFMAN:  I just asked if he had an
2    understanding.
3   BY MR. KAUFMAN:
4      Q.  On June 18th and 19th looks like you wired a
5    collective $125,000 to DPG Golden Eagle LLC based upon
6    these two documents; is that accurate?
7      A.  Yes.
8      Q.  When you were getting information to send the
9    wires, were you communicating with Wes Anderson at DPG
10   Investments or someone else?
11        MS. STEUER:  Objection.  Compound.  You can
12   answer.
13        THE WITNESS:  Yeah, I think I was communicating
14   with Wes and Dan and others.
15        MR. KAUFMAN:  We'll go to Exhibit 13.
16        (Exhibit 13 was
17        marked for identification.)
18   BY MR. KAUFMAN:
19     Q.  So I've handed you Exhibit 13, which is Bates
20   JM6201 to JM6209.  Is that what you have in front of
21   you?  Actually, 6210.  I apologize.  They are double
22   sided.
23     A.  Yes, JM6210.
24     Q.  Okay.  Perfect.  So if we look on JM6201, this
25   is an email from Wes Anderson, Westley, W-e-s-t-l-e-y,

Page 88

1    Anderson to you dated June 17th, 2015, copying Dan
2    Galvanoni; is that accurate?
3      A.  Yes.
4      Q.  Is that what you have in front of you?  Okay.
5    The subject is DPG Golden Eagle - Wiring Instructions;
6    is that correct?
7      A.  Yes.
8      Q.  Okay.  So you get -- this email is the wiring
9    instructions for DPG Golden Eagle LLC; isn't that
10   correct?
11     A.  Yes.
12     Q.  And now, there were no attachments to the email
13   but included in your document production are looks like
14   most of the wire receipts that we just looked at; is
15   that correct, if you look through this package?
16     A.  There's no --
17     Q.  The email doesn't reference an attachment.  If
18   you look under the first page of the Outlook-styled
19   email, do you see that?
20     A.  Correct.
21     Q.  There's no attachments.  But these wire
22   authorization agreements that are following are just
23   part of your production.  Okay?  And these are the same
24   agreements we've looked at, correct?
25     A.  Okay.



Page 89

1       MS. STEUER:  Objection.  Misstates testimony.
2   BY MR. KAUFMAN:
3       Q.  I'm just asking if some of these -- I'll
4   rephrase that.
5       Are some of these the agreements that we've
6   already looked at, the wire instructions?  Because not
7   all, there are more.  Actually, let's strike that.
8       I want to draw your attention to JM6206.  Will
9   you go to that page, please?
10      A.  JM6206?
11      Q.  Correct.
12      A.  Okay.
13      Q.  Whose handwriting is on this application?
14      MS. STEUER:  Objection.  Misstates the
15  document.
16  BY MR. KAUFMAN:
17      Q.  Okay.  There's handwriting on JM6206; isn't
18  that correct?
19      A.  Yes.
20      Q.  Okay.  Did you write this?
21      A.  Yes.
22      Q.  Okay.  You didn't write this contemporaneous
23  with the wire, did you?
24      A.  I don't recall.
25      Q.  Do you remember writing it or do you just

Page 90

1   recognize your handwriting?
2       A.  I recognize my handwriting.
3       Q.  But you have no present sense recollection of
4   when you actually made this written notations, do you?
5       A.  I don't recall.
6       Q.  Do you have the original of this document in
7   your care, custody and control?
8       A.  This document?
9       Q.  Correct, 6206.
10      A.  I'm not sure.
11      Q.  But again, this document 6206 is signed by you,
12  correct?
13      A.  Yes.
14      Q.  And it's dated, it's February 11th, 2016,
15  correct?
16      A.  Correct.
17      Q.  And this was for $25,000, correct?
18      A.  Correct.
19      Q.  And it was also sent to DPG Golden Eagle LLC,
20  correct?
21      A.  Correct.
22      Q.  Next I'll hand you, this will be 14.
23          (Exhibit 14 was
24          marked for identification.)
25  BY MR. KAUFMAN:

Page 91

1       Q.  Mr. Marshall, I've handed you Bates 6203, okay,
2   which is Exhibit 14.  Did you sign this document?
3       A.  Yes.
4       Q.  Okay.  And did you sign it on June 29th, 2015?
5       A.  Yes.
6       Q.  And this was for a wire from your Patelco
7   Credit Union to DPG Golden Eagle LLC; isn't that
8   correct?
9       A.  Yes.
10      Q.  And this wire was for $50,000?
11      A.  Correct.
12      Q.  Do you recall what this wire was for?
13      A.  With the money that I was wiring, as I said
14  before, from the start all the way through, Dan
15  Galvanoni instructed me that -- you know, to wire the
16  money, and the money would be used to purchase loans and
17  secure up my money with purchase of loans, and I would
18  be getting my money paid back and the interest on the
19  money, and also I had a -- being an investor, I had I
20  think around a 13 percent interest in the profits from
21  the other company.
22      Q.  I'm asking about that specific wire, did you
23  have an understanding about what you were wiring and
24  getting in exchange?
25      MS. STEUER:  Asked and answered.  You can

Page 92

1   answer again.
2       THE WITNESS:  Okay.  The money, this 50,000
3   that was wired, like the other money, it was to purchase
4   the loans and to secure my money and to be paid back my
5   money, plus interest on that, and also secure my -- as
6   an investor, secure my interest, that I would be getting
7   a percentage of the profit as well around, I think, 13
8   percent.
9   BY MR. KAUFMAN:
10      Q.  Profit in which entity?
11      A.  I would think all the entities or whatever
12  profit that would be from the companies.
13      Q.  So every company to the extent there was a
14  profit you were entitled to 13.5 percent of that profit
15  distribution?
16      A.  Yeah, I was under the impression that I would
17  be getting 13 percent of profit from the entities when
18  there was profit.
19      Q.  So we've seen that your initial investment was
20  done in June of 2015, correct?
21      A.  Yes.
22      Q.  And by August of 2015, is it fair to say that
23  there was an understanding that TSA and the related
24  entities were not what everyone thought or hoped they
25  would be, in the sense that they would be not



Page 93

1  profitable?
2      MS. STEUER: Objection. Lacks foundation. You
3  can answer.
4      THE WITNESS: I'm not sure what you're
5  referring to.
6  BY MR. KAUFMAN:
7      Q. Sure, by August of 2015, did you have an
8  understanding that TSA and its affiliated entities were
9  not profitable for DPG? Was that your understanding in
10 August of 2015?
11     A. Still, I'm not sure -- I didn't receive any
12 financials, and I'm not sure what you're referencing to.
13     Q. So let's talk about this. We'll go to Exhibit
14 15.
15             (Exhibit 15 was
16             marked for identification.)
17 BY MR. KAUFMAN:
18     Q. So Exhibit 15 is Bates JM884 and 885. Okay.
19 So let's look at 884. And I know you're not on this
20 email, but have you seen it before dated August 19th,
21 2015 from Dan Galvanoni?
22     A. Let me look.
23     Q. I'll tell you what, look at 885. Flip it over.
24 There's a bottom email. This may jog your memory.
25 You're on this email. Okay?

Page 94

1      A. Okay.
2      Q. Dated August 12th, 2015 from Dan to Jim Duryea,
3  carbon copying John Marshall, Jerry Hudspeth, Westley
4  Anderson, Rob Smith and Bill Brooksbank. Do you see
5  that email?
6      A. Yes.
7      Q. And here if we look at the subject it says,
8  "Re: 3pm Eastern LOC-loan of net 150K range." Do you
9  see where it says that? Did I read that correctly?
10     A. Okay.
11     Q. Do you have an understanding what LOC is?
12     A. I would think a letter of credit.
13     Q. Letter or a line of credit, correct? Basically
14 the same thing in your mind?
15         MS. STEUER: Objection. That misstates
16 testimony. Calls for speculation.
17 BY MR. KAUFMAN:
18     Q. I'm asking if that's the same thing in your
19 mind.
20     A. I would think LOC is a letter of credit.
21     Q. Okay. So when we look at this email it says,
22 "This note, DPG will fund 100K. Wes is now in for 15K.
23 Hopefully John for 50K." Did I read that correctly?
24     A. Yes.
25     Q. Do you remember a discussion in August of 2015

Page 95

1  that a line of credit was going to be necessary for the
2  TSA investment? Do you remember a discussion as to that
3  effect? It's just a yes or no.
4      A. Yeah, I'm not positive.
5      Q. But you ultimately invested an additional
6  $25,000 in August of 2015, didn't you?
7          Here, I'll help you out. This will be Exhibit
8  20 -- what number are we at?
9      THE REPORTER: 16.
10             (Exhibit 16 was
11             marked for identification.)
12 BY MR. KAUFMAN:
13     Q. So I've handed you exhibit Bates JM6204. Is
14 that what's in front of you?
15     A. Yes.
16     Q. So this is a document that you signed, correct?
17     A. Yes.
18     Q. And the date is August 12th, 2015, correct?
19     A. Yes.
20     Q. All right. And this document shows a wire from
21 John R. Marshall's account in the amount of $25,000 to
22 DPG Golden Eagle, LLC; isn't that correct?
23     A. That's correct.
24     Q. And you sent that wire?
25     A. I did.

Page 96

1      Q. Exhibit 17.
2             (Exhibit 17 was
3             marked for identification.)
4  BY MR. KAUFMAN:
5      Q. All right. I've handed you Exhibit 17, which
6  is Bates JM5324 through 5326. Is that what you have in
7  front of you?
8      A. Yes.
9      Q. Okay. Let's look at 5326. You signed this
10 agreement, correct?
11     A. Yes.
12     Q. Okay. And it's dated 22nd s-t day of July
13 2015, correct?
14     A. Yes.
15     Q. And it looks like there's a signature on Dan
16 Galvanoni's portion as well, correct? It's a little
17 hard to read.
18     A. Yes.
19     Q. And you signed this agreement?
20     A. Yes.
21         MS. STEUER: Asked and answered.
22 BY MR. KAUFMAN:
23     Q. And so when you signed this agreement, it was
24 at the same time that you made these handwritten changes
25 in -- strike that. Let's go back.



Page 97

1        If we look at this agreement, there are
2    handwritten changes and revisions to this agreement,
3    correct?
4        A. Yes.
5        Q. Okay. And you made them, correct?
6        A. Yes.
7        Q. It's in your handwriting?
8        A. Yes.
9        Q. Based upon your prior testimony I doubt that
10   the answer to this will be what it is, but do you have
11   the original of the DPG John Marshall Loan Agreement in
12   your care, custody or control?
13       A. I don't.
14       Q. Okay.
15       A. I don't think so, no.
16       Q. And did you negotiate these changes with anyone
17   at DPG prior to sending the revised agreement back to
18   them?
19       MS. STEUER: Objection. Vague. You can
20   answer.
21       THE WITNESS: Again, from the beginning --
22   BY MR. KAUFMAN:
23       Q. I just want to know about these specific
24   changes.
25       A. Yeah, I talked to Dan Galvanoni to make sure

Page 98

1    that my money would be secured and that, you know, if
2    worse came to worse, there was an exit plan where we
3    could sell the loans because my money was secured on
4    those loans, and as I was told by Dan, that the great
5    thing about these auto loans is that they were better
6    than real estate and other investments because we
7    could -- real estate might take six months a year to
8    sell, but with these loans it was pretty easy, you know,
9    to sell these loans. And so therefore, that I had
10   nothing to worry about with my money, that by putting my
11   money in this and being secured, Dan told me not to
12   worry that you know my money would be okay and
13   everything else. And as I always told Dan, too, I
14   wanted to make sure that if worse came to worse, you
15   know, I could get my money out. And again, I was
16   assured that, you know, we'd sell a chunk of the loans
17   and I could get my money out and he said, John, I'll get
18   you out, don't worry about it, I'm going to take care of
19   you, and I'm going to -- I've got your back.
20       Q. Let's break through -- because you received
21   this agreement already signed by Dan Galvanoni in July
22   of 2015, correct? It came to you presigned, right?
23       A. Okay.
24       Q. Well, is that true?
25       A. I believe so.

Page 99

1        Q. All right. And then you made these revisions,
2    correct?
3        A. Correct.
4        Q. And then you -- how did you send it back to
5    DPG, or did you send it to DPG?
6        MS. STEUER: Objection. Compound. You can
7    answer.
8    BY MR. KAUFMAN:
9        Q. Did you just make these revisions --
10       A. I mailed it to him.
11       Q. When you say mail, you mean U.S. mail?
12       A. Yes.
13       Q. And again, you didn't scan or send an email a
14   copy of it to anyone?
15       A. I don't recall. I might have. I don't
16   remember.
17       Q. But you had copy of this in your file, correct?
18       A. Yes, I had a copy of this.
19       Q. But you signed -- just so we're clear, you
20   signed it after Dan had E-signed it, correct?
21       MS. STEUER: Objection. Calls for speculation.
22   You can answer.
23   BY MR. KAUFMAN:
24       Q. Well, it came to you with Dan's signature on
25   it, correct?

Page 100

1        A. Yes.
2        Q. That's what you testified to. And then you
3    signed?
4        A. Yes.
5        Q. And you never spoke to Dan or anyone else at
6    DPG after you mailed it back to them and told them -- or
7    you never heard of them saying, okay, we accept these
8    changes, did you?
9        MS. STEUER: Objection. Compound. You can
10   answer.
11   BY MR. KAUFMAN:
12       Q. I'll rephrase. Did you ever hear from anyone
13   at DPG that your modifications to this loan agreement
14   were acceptable to DPG?
15       A. These were acceptable. These were -- this is
16   what --
17       MS. STEUER: No, his question is a little bit
18   different.
19       MR. KAUFMAN: My question is --
20       THE WITNESS: That's what Dan and I agreed on
21   that --
22       MR. KAUFMAN: Hold on. My question is very
23   clear.
24       MS. STEUER: So John, focus on his question.
25       THE WITNESS: Oh, okay.



Page 101

1      MS. STEUER:  So he's just asking if somebody at
2  DPG said these modifications are acceptable.
3  BY MR. KAUFMAN:
4      Q.  Correct.  Did you ever receive an
5  acknowledgment, oral, written, smoke signal, any way?
6      A.  I'm not sure.  I'm not positive if I talked
7  with somebody or Dan that they were okay with this.  I
8  don't remember.  I remember conversations with Dan,
9  again, trusting him and he continued to make me feel
10 safe and secure in letting me know that he had no
11 problem with changes or with the agreement because he
12 wanted to make sure that I would get my money back and
13 it would be secured.
14     Q.  Right.  But I'm trying to ask you a very
15 specific question, which you haven't really answered.
16 It's frankly a yes or no.
17     A.  Okay.
18     Q.  Did you hear or receive any communication,
19 whatsoever, that your modifications to this specific
20 agreement were accepted or rejected?
21     A.  Alex, I think back in that time, I'm trying to
22 remember if I talked with Dan about it, saying, hey, him
23 or maybe a representative, one of his people on his
24 team --
25     Q.  Well, let me --

Page 102

1      A.  I -- I'm just trying to remember.  I don't --
2      Q.  Well, is it safe to say you don't remember of
3  an oral communication?
4      A.  I don't remember, but I've got a -- I would
5  have to look back.  You know, I continually -- you know,
6  continually sent stuff to Danny and his team, and I
7  talked to Joe Joseph and Wes Anderson and different
8  people.  I think at one time, I'm not sure, I can't
9  remember a conversation, I might have talked with Bill
10 and Jerry on this stuff as well and then --
11     Q.  But you can't point to a specific, yes, we
12 accept as to that term, can you, as to this agreement
13 that you signed and sent electronically?
14     A.  I just don't recall.
15     Q.  Do you have a writing that evidences acceptance
16 by anyone at DPG or any affiliated entity of your change
17 in the terms and conditions to this loan agreement,
18 Exhibit 17 in front of you?
19     A.  Well --
20     Q.  It's a yes or no.  You either have a document
21 or you don't.
22     MS. STEUER:  Or you don't remember or you don't
23 know.
24     THE WITNESS:  I don't know.
25 BY MR. KAUFMAN:

Page 103

1      Q.  Let's move on.  Let's go to Exhibit 18.
2      (Exhibit 18 was
3      marked for identification.)
4  BY MR. KAUFMAN:
5      Q.  Before we start on Exhibit 18, have you ever
6  seen an operating agreement for Spring Tree Financial,
7  LLC?
8      MS. STEUER:  These documents are all combined,
9  right?
10 BY MR. KAUFMAN:
11     Q.  I just asked him a simple question, not even
12 referencing the document yet.  Have you ever seen an
13 operating agreement for Spring Tree financial, LLC?
14     A.  I requested different documents at the time
15 because sometimes I didn't get documents and like at the
16 one meeting we had in Atlanta, I didn't get copies of
17 the documents and --
18     Q.  Well, when you were meeting in Atlanta, Spring
19 Tree Financial didn't even exist.
20     A.  Okay.  So --
21     Q.  So it's just a question, have you seen an
22 operating agreement of Spring Tree Financial, LLC
23 before?  Yes, no, or I don't remember.
24     A.  I don't recall if I got this or not.
25     Q.  What about an operating agreement for Spring

Page 104

1  Tree Holdings, LLC?
2      A.  You know, off the top of my head.  I don't -- I
3  don't recall if I was given this, or what was the other
4  one?
5      Q.  So there's Spring Tree Financial is the first
6  one, first page which is Bates -- now it's Defendants,
7  this is what we produced, okay, 1 through 3, actually,
8  through 6.  Okay.  I just didn't know if you'd seen an
9  operating agreement before of Spring Tree Financial.
10 And now I've now asked if you've seen an operating
11 agreement -- I haven't even asked you about this
12 document, about 18 in front of you.  I'm just asking, in
13 general, have you seen an operating agreement of
14 Spring Tree Financial, LLC?
15     A.  I don't recall if I did.
16     Q.  What about an operating agreement for Spring
17 Tree Holdings, LLC?
18     MS. STEUER:  You don't need to look.
19     MR. KAUFMAN:  You don't have to look at the
20 document.
21     MS. STEUER:  He just wants to know if you've
22 ever seen one.
23     THE WITNESS:  I don't recall if I got that or
24 not and if I looked at it.
25 BY MR. KAUFMAN:



Page 105

1    Q.  What about Spring Tree Lending, LLC?  So you
2    have Spring Tree Financial, Spring Tree Holding --
3    A.  What page is Spring Tree Lending?
4    Q.  It's not in the exhibit in front of you.  But
5    Spring Tree Lending, if you want to know, is Bates 26.
6    I'm just asking, in general, have you ever seen any of
7    these operating agreements before, Spring Tree Lending,
8    LLC?
9    A.  Well, I was going to look at it to see if it
10   might jar my memory.  I don't remember.  What page is it
11   on?
12   Q.  So Spring Tree Lending is Bates 26.
13   A.  Yeah, I don't recall.
14   Q.  Do you have an understanding of Wes Anderson
15   was actually the president of Spring Tree Holdings, LLC?
16   A.  I believe Wes was an officer, but I thought he
17   was -- I don't recall if he was president or COO, but I
18   remember he was an officer and he was --
19   Q.  This will be 19.
20   A.  -- involved with these entities.
21   Q.  Okay.  I'm going to hand you Exhibit 19.
22        (Exhibit 19 was
23        marked for identification.)
24   BY MR. KAUFMAN:
25   Q.  Have you ever seen an operating agreement of

Page 106

1    DPG Golden Eagle, LLC?
2    A.  I don't recall seeing this.
3    Q.  As we sit here today, do you contend that you
4    are a member of any entities controlled or operated or
5    affiliated with Dan Galvanoni?
6    A.  As of today?
7    Q.  Yeah, do you believe you own a member interest
8    in any entity controlled or operated by Dan Galvanoni?
9    A.  I believe I'm an investor with money, and I
10   believe that --
11   Q.  My question is very specific.  Do you believe
12   you own a membership interest?  Because I mean,
13   investments certainly can come in multiple flavors, you
14   would agree with me on that, correct?  You can just give
15   someone a loan, right?
16   A.  I'm not sure if I'm a member or not.
17   Q.  Do you believe that you are?
18   A.  What would be the definition of a member?
19   Q.  Sure.  Someone that has a membership interest
20   or an ownership interest in an entity.
21   A.  And how would they have that?
22   Q.  Either through a stock or a membership
23   agreement.
24   A.  And so --
25   Q.  My question is, do you believe --

Page 107

1    A.  -- if I had stock or a membership, I would have
2    a copy of that that would be given to me from that
3    entity, right?
4    Q.  My only question to you is, do you believe, as
5    we sit here today, that you have an -- call it an
6    ownership interest, in any company that is controlled or
7    managed by Dan Galvanoni?
8    A.  I'm not sure.
9    Q.  Do you believe that you ever had an ownership
10   interest in a company that was controlled or managed or
11   affiliated with Dan Galvanoni?
12   A.  I believe I had interest and would receive 13
13   percent profit from the different companies for the
14   profit of it.
15   Q.  20.
16        (Exhibit 20 was
17        marked for identification.)
18   BY MR. KAUFMAN:
19   Q.  So I've handed you -- it should be Bates
20   stamped 1347.  Is that what's on the front page?
21   A.  Yes.
22   Q.  So before I get into it, do you contend that
23   you had a lack of information, and is that part of why
24   you're here today?  Well, you filed a lawsuit, correct?
25   A.  Right.

Page 108

1    Q.  And one of your claims was that you were, is it
2    fair to say, not given appropriate information from Dan
3    Galvanoni and his team?
4    A.  Yes.
5    Q.  Okay.  So let's look at JM1437.  All right?  On
6    the bottom it's dated September 14th, 2015 at 3:15 p.m.
7    Are you with me?
8    A.  Okay.
9    Q.  You wrote this email, correct?
10   A.  Yes.
11   Q.  And in it you wrote, "Perfect, I have some
12   leads on other groups that we can underwrite loans as
13   well.  We just need to properly underwrite and not call
14   and get a gas station instead of the person that was
15   supposedly proofed up for the loan.  LOL.  Dan, I had
16   Jerry call and you called on just two loans.  Jerry got
17   a gas station and you got no one.  LOL.  I just got off
18   the phone with Bill on the agreements and contracts.  I
19   will take care of them.  I will follow up with Jerry and
20   Wes to review every loan we have and to make sure no
21   scams are going on.  With regards to Jim's loan, Jim's
22   $250,000 loan from Golden Eagle to JADCO, Jim's wrongful
23   termination case/lawsuit currently at $16,000 in legal
24   fees, his 20,000 run up of a credit card, and all of
25   Rob's issues.  I will personally be involved and help



Page 109

1  Jerry and Wes as well. I am going to schedule a flight
2  and go see our DPG team, Jerry, Ed, et cetera in Atlanta
3  so they know they have our support and to let them know
4  we will handle all these issues. I have other investors
5  to put their money in, in which I am backing, but at
6  this point, I have to hold off, this stuff is killing
7  me. I want to get a min of 10 percent. I would like to
8  get a lot more since we will most likely be taking Jim
9  and Rob's interest back. So let's talk about that, and
10  in the meantime, we will deal with these and other bumps
11  in the road. Thank you, John Marshall, J.D. CIC."
12       Did I read that correctly?
13  A. Yes.
14  Q. So the Rob you're referencing is Rob Smith,
15  correct?
16  A. Yes.
17  Q. And the Jim is Jim Duryea, correct?
18  A. Yes.
19  Q. Is it fair to say that September 14th, 2015, as
20  of that date there was some concern that Jim and Rob's
21  representations as to the quality of their loans was not
22  coming to fruition?
23       MS. STEUER: Objection. Lacks foundation. You
24  can answer.
25  BY MR. KAUFMAN:

Page 110

1  Q. Well, you wrote the email. Is that what you
2  meant by this email?
3  A. Yes, there was some concerns.
4  Q. And that was the purpose of this email,
5  correct? Is that correct?
6  A. Yes, I was following up --
7  Q. In fact, you were --
8  A. -- with information given to me.
9       (Clarification by the reporter.)
10  BY MR. KAUFMAN:
11  Q. Part of your email was that you were going to
12  take action personally, correct?
13  A. I was very interested in protecting my money
14  and making sure my money was secure on valid loans.
15  Q. Well, you said you personally -- you will
16  personally be involved and help Jerry and Wes, right?
17  And that's Wes Anderson?
18  A. Correct, Wes Anderson. But yes, I would -- I
19  wanted to make sure my money was secure on valid loans.
20  Q. Right. In fact, you said you would review
21  every loan, correct? You wrote that, right?
22  A. Well, I think what I meant when I wrote that
23  was that Jerry and Wes would be reviewing the loans and
24  I wanted to follow up with them and make sure they went
25  through each loan to make sure they were legitimate

Page 111

1  because I was very concerned that my money that was
2  supposedly used to buy those loans, that those loans
3  weren't legitimate.
4  Q. And Dan Galvanoni put his personal money in to
5  buy those loans, too, didn't he?
6       MS. STEUER: Objection. Calls for speculation.
7  You can answer if you know.
8       THE WITNESS: I'm not sure. I asked for
9  records.
10  BY MR. KAUFMAN:
11  Q. But you had an understanding you were not the
12  only person that was buying these loans, correct?
13  A. Dan Galvanoni told me that he was putting a lot
14  more money than my own money into these loans.
15  Q. Okay.
16  A. But that's what he told me. I never got
17  validation.
18  Q. In fact, you had a plan of action to deal with
19  Jim and Rob, didn't you?
20       MS. STEUER: Objection. Vague. You can
21  answer.
22       THE WITNESS: I'm not sure what you're talking
23  about.
24       MR. KAUFMAN: Okay. Exhibit 21.
25       (Exhibit 21 was

Page 112

1       marked for identification.)
2  BY MR. KAUFMAN:
3  Q. I've handed you what's been marked Exhibit 21,
4  which is Bates stamped JM1578. Do you see that at the
5  bottom?
6  A. Yes.
7  Q. Let's look at September 18, 2015 at 10:02 a.m.
8  Are you with me?
9  A. Yes.
10  Q. You wrote an email on September 18th, 2015 at
11  10:02 a.m., didn't you?
12  A. Yes.
13  Q. Okay. And you wrote, "I have read all the
14  emails and I am in touch with Jerry/Wes. I have talked
15  with them extensively. I have a strong plan of action
16  to deal with Jim and Rob. We also need to have a strong
17  strategy for going forward and stabilizing our company.
18  I think we should be in good shape. Let's talk this
19  weekend. I'll also call Jerry and Wes this weekend and
20  recap to make sure we have a strong plan of action
21  moving forward. I also have other investors lined up
22  but the Jim and Rob issues have put me in a tough
23  situation. I have not pulled them in until we take care
24  of the issues. Thank you, John Marshall, J.D. CIC."
25  Did I read that correctly?



Page 113

1    A. Yes.
2    Q. And so you were not a passive investor, were
3 you?
4        MS. STEUER: Objection. Vague. You can
5 answer.
6        THE WITNESS: I was very involved with my
7 investment.
8 BY MR. KAUFMAN:
9    Q. Okay.
10    A. I wanted to make sure my investment was secure,
11 legitimate loans.
12    Q. So as part of that involvement you were in
13 communication with Jerry Hudspeth, correct?
14    A. Yes.
15    Q. As part of your involvement with your
16 investment you were in touch with Westley Anderson,
17 correct?
18    A. Yes.
19    Q. As part of your involvement with your
20 investment you were in touch with Dan Galvanoni,
21 correct?
22    A. Yes.
23    Q. And as part of your investment you were giving
24 your input to the DPG leadership team, weren't you?
25    A. Yes, I was very concerned about my money.

Page 114

1    Q. So that involvement that we just referenced
2 here in September of 2015 continued well into 2016,
3 didn't it?
4        MS. STEUER: Objection. Vague. You can
5 answer.
6        THE WITNESS: I've always been concerned about
7 my money and getting my money back and getting my
8 return.
9 BY MR. KAUFMAN:
10    Q. Well, I know you've mentioned the word concern.
11 But my question was about the involvement that you had
12 with Jerry and Wes and Dan and having information and
13 communication with those fellows. Okay. So that's how
14 I'm going to describe involvement.
15        So with that definition, your involvement
16 started in 2015 with this investment team, correct?
17    A. Correct.
18    Q. And that involvement, based upon my definition
19 I just gave you, continued into 2016, correct?
20    A. I believe so, yes.
21    Q. Exhibit 22.
22        (Exhibit 22 was
23        marked for identification.)
24 BY MR. KAUFMAN:
25    Q. So I've handed you Bates Exhibit 22, and I want

Page 115

1 to start here on JM2560. Are you with me?
2    A. Yes.
3    Q. So you wrote an email to Mr. Ed Hartwell, Jerry
4 Hudspeth and Westley Anderson on January 13th, 2016 at
5 1:50 p.m., correct?
6    A. Yes.
7    Q. And in that email you wrote, "Subject: Advice
8 and insight from family and close friends." Is that
9 correct? Yeah?
10    A. Yes.
11    Q. You wrote, "Ed, my brother, how are you, my
12 friend? Hey, I have been talking with Jerry and Wes.
13 We are still moving through the operations on Spring
14 Tree. I suggested Jerry to reach out to you about some
15 different platforms for setting up agreements/contracts
16 with investors and developing a loan portfolio for
17 investors." Did I read that correctly?
18    A. Yes.
19    Q. Okay. So we now know that Spring Tree was
20 created prior to January 13th, 2016, correct?
21    A. Yes.
22    Q. Okay. And you were involved with Spring Tree,
23 right?
24        MS. STEUER: Objection. Vague.
25 BY MR. KAUFMAN:

Page 116

1    Q. Using the same definition of involvement that
2 we've been using before, meaning talking with
3 leadership, giving advice, looking at information and
4 being on calls for -- about the business. Is that your
5 understanding of the involvement that we've been talking
6 about?
7    A. Yes, I was involved.
8    Q. As part of that involvement, based upon the
9 definition, you were assisting in looking for other
10 finance opportunities to grow the business with,
11 correct?
12    A. What would happen, if I heard of somebody that
13 might be interested in investing or that had some
14 knowledge of how to help Dan Galvanoni and his team grow
15 the business or be involved, I would let people know and
16 refer them to them.
17    Q. That's because the plan was for the business to
18 eventually get a large bank line, wasn't that always the
19 plan as far as you knew?
20    A. I thought the plan was for the company to have
21 a lot of loans and be very profitable.
22    Q. Right. And in order to buy -- so the plan was
23 to always buy more loans, right, because it had to keep
24 buying loans?
25    A. I don't know if it had to.



Page 117

1    Q.  Was the plan always to buy loans?
2    A.  The plan was to have profitable loans and so
3  that the business would be profitable.
4    Q.  In fact, you were on conference calls with
5  potential investors into Spring Tree, LLC, weren't you?
6    A.  What potential investors are you talking about?
7    Q.  I'm just asking if you were ever on calls with
8  potential investors into Spring Tree.
9    A.  I could have been.
10   Q.  Number 22.
11     MS. STEUER:  You just did 22.
12     MR. KAUFMAN:  23.
13       (Exhibit 23 was
14       marked for identification.)
15  BY MR. KAUFMAN:
16   Q.  So I've handed you Exhibit 23, which is Bates
17  JM2583.  Are you with me?
18   A.  Yes.
19   Q.  And let's look at your email that you sent to
20  Stewart Hanlon, Westley Anderson and Jerry Hudspeth on
21  January 20th, 2016 at 5:37 p.m., Subject Re:  Spring
22  Tree LLC.  Importance:  High.  Do you see that email
23  that you sent?
24   A.  Yes.
25   Q.  You wrote, "Gentlemen, please confirm 10:30

Page 118

1  a.m. PST Monday 1/25/16, will work for conference call
2  with Stewart?  Wes, can you set it up and send out
3  invite with call in number and code?  Thank you, John
4  Marshall, J.D. CIC."  You wrote that, correct?
5    A.  Yes.
6    Q.  Okay.  And is Stewart Hanlon with White Oak, to
7  the best of your knowledge?
8    A.  I believe so.
9    Q.  And White Oak would have been a funding
10  opportunity for Spring Tree, LLC, that was the purpose
11  of the call, wasn't it?
12   A.  Yes, I believe so.
13     MR. KAUFMAN:  24.
14       (Exhibit 24 was
15       marked for identification.)
16  BY MR. KAUFMAN:
17   Q.  In January of 2016 you still believed that
18  Spring Tree and the related investment opportunities
19  would be successful; is that correct?
20   A.  May I have a moment to look?
21   Q.  Well, it's got nothing to do with 24 yet.  It's
22  got nothing to do with 24.  I'm just asking you, in
23  general, as of January of 2016, you were of the belief
24  that Spring Tree and these subprime auto loan
25  investments were going to be profitable, was that still

Page 119

1  your belief at that time?
2    A.  Because it was so far back, when you say
3  specific dates, I'm not positive of that date.  But yes,
4  I did invest because I thought I was investing in
5  profitable companies, and they would be profitable.
6    Q.  Well, let's look at the bottom of JM2521.  This
7  is your signature block, correct, for your email?
8    A.  Yes.
9    Q.  Okay.  And so you wrote an email on Wednesday,
10  January 13th, 2016 at 12:05 p.m., correct?
11   A.  Correct.
12   Q.  And you wrote to Wes Anderson, Dan Galvanoni
13  and Jerry Hudspeth, right?
14   A.  Correct.
15   Q.  And you wrote, "There is no doubt in my mind
16  you are one of the best investment bankers, and I know a
17  ton of them now, and way back to Michael Miliken (out of
18  Beverly Hills) days in the '80s when I worked for Kidder
19  in New York and many of my good buddies, Cal grads, with
20  with investment bankers all over the country and the
21  world.  You have an incredible amount of talent.  I
22  could not pick a better partner and brother to be with.
23  I am fortunate and blessed.  Let's get this to take off.
24  All my time and effort have been committed to Spring
25  Tree.  Why wouldn't I?  It is the best opportunity we'll

Page 120

1  ever have.  I have just been focused on lining up
2  investors and bankers to hear our story and start
3  putting money up.  Now is the time.  We need to start
4  getting large investments in.  I also have huge
5  connections with a ton of car dealers here in California
6  to send us loans, but we need to first get the money.
7  Thank you, John Marshal, J.D. CIC."  Did you write that
8  email?
9    A.  Yes.
10   Q.  And I read it correctly?
11   A.  Yes.
12   Q.  And so you worked on Wall Street in New York?
13   A.  Did not work on Wall Street but had friends
14  that worked there and knew people that were there.
15   Q.  So what did you do for Kidder in New York?
16  K-i-d-d-e-r.
17   A.  I think that's -- that might have been a
18  misspell, but I worked with some people trying to get
19  insurance deals to cover, you know, real estate
20  investments and such.
21   Q.  And is it true that you know many investment
22  bankers?
23   A.  I don't know if I know many, but I do know
24  several.
25   Q.  Well, you said -- you wrote a ton of them, so I



Page 121

1  assume it was multiple; is that accurate?
2     A.  Yes, more than one.
3     Q.  Okay.  And do you think Dan is one of the best
4  investment bankers you know?
5        MS. STEUER:  Objection.  Vague as to time.
6  Mean now or then?
7        MR. KAUFMAN:  I just asked.  You wrote it.
8        MS. STEUER:  I'm just asking, do you mean did
9  he think --
10        MR. KAUFMAN:  That's fine.  Let's see if he can
11  answer first before you coach him.
12  BY MR. KAUFMAN:
13     Q.  So do you think that Dan Galvanoni is one of
14  the best investment bankers that you know?
15     A.  Currently, now?
16     Q.  Now.
17     A.  No.
18     Q.  And at the time when you wrote this on January
19  13, 2016 after you had been spending most of your time
20  working and committed to Spring Tree, did you believe
21  it?
22     A.  At the time I felt very grateful because the
23  information that I was being given is that the money
24  that I was investing was secured with loans and that I
25  was going to be getting the returns and that I also was

Page 122

1  going to get percentages of the profit of the different
2  companies.  And Dan Galvanoni was telling me that he had
3  a lot of people going to invest and put money in, and so
4  I was impressed with his efforts.
5     Q.  So in -- I'm going to hand you -- what number
6  are you on?  This should be 25.
7        (Exhibit 25 was
8        marked for identification.)
9  BY MR. KAUFMAN:
10     Q.  So we know that you made about $125,000 of
11  investment in the summer of 2015, correct?
12     A.  Yes.
13        MS. STEUER:  Objection.  Misstates the
14  documents.
15  BY MR. KAUFMAN:
16     Q.  Did you invest -- what is inaccurate about that
17  statement, Mr. Marshall?  We've seen your bank transfers
18  and those agreements.  Did you invest more than $125,000
19  in the summer of 2015?
20        MS. STEUER:  Yeah, we just saw a thing saying
21  200,000, so you're completely misstating the documents.
22  That's why I objected.
23  BY MR. KAUFMAN:
24     Q.  How much did you invest in 2015?
25     A.  We've been through it.  We can go back and look

Page 123

1  at the documents.  So let's look at -- let's look at
2     Q.  All right.  So let's look at
3  Bates JM5327 in front of you.  That's Exhibit 25.  Okay?
4  Does it read Preferred Equity Agreement Between DPG
5  Golden Eagle LLC and John Marshall?
6     A.  Yes.
7     Q.  Okay.  And those are the only two parties to
8  this agreement, correct?
9     A.  Yes.
10     Q.  And this agreement, I assume, is going to be
11  just like the other ones, but let's go through.  It was
12  sent to you presigned by Dan Galvanoni, correct?
13     A.  Yes.
14     Q.  And that was sent to you via email, or do you
15  not remember?
16     A.  I'm not positive.
17     Q.  Okay.  And there's handwriting on this
18  document, correct?
19     A.  Yes.
20     Q.  And that handwriting is yours, correct?
21     A.  Yes.
22     Q.  Okay.  And then you made these handwritten
23  changes and signed the document on or about February
24  11th of 2016, correct?
25     A.  I'm not positive when I signed it, but yes,

Page 124

1  that is my handwriting, and those are --
2     Q.  Your changes?
3     A.  -- changes and details that I put in to reflect
4  what Dan Galvanoni and I always agreed on, that my
5  money, again, would be secured.
6     Q.  All right.  Well, I'm here to talk about the
7  specific changes that you made.  Okay?
8     A.  Okay.
9     Q.  So you made these changes, correct?
10     A.  Yes.
11     Q.  And you signed it?
12     A.  Yes.
13     Q.  And is it your testimony that you then placed
14  your changes in the U.S. mail?
15     A.  Yes.
16     Q.  Did you send a copy or email to anyone?
17     A.  I don't recall if I sent an email, but I mailed
18  it, the original.
19     Q.  And I assume no one ever responded specifically
20  to this February 11th, 2016 agreement with your changes
21  on it, that the changes were specifically acceptable,
22  did they?
23     A.  I don't recall, but again, this was the
24  agreement that we agreed upon that my money would be
25  secured.



Page 125

1    Q.  And we'll take notice that your claim is that
2  all your changes reflect your overall global agreement
3  with Mr. Galvanoni.  But what I'm trying to find out --
4    A.  That we've always agreed to, yes.
5    Q.  -- as to specifically when you allegedly mailed
6  this back to DPG Investments in Scottsdale, Arizona, is
7  it your testimony that someone told you these changes
8  specifically are acceptable?  Is that your testimony?
9  Or did you not have that conversation with anybody?
10   A.  I don't recall.
11   Q.  And you don't have a writing that reflects that
12  these changes were acceptable to anyone at DPG
13  Investments, correct?
14   A.  No, I don't believe so.
15   Q.  And more specifically, since this agreement is
16  only between DPG Golden Eagle and you, no one told you
17  at DPG Golden Eagle that these revisions to the
18  agreement were acceptable to DPG Golden Eagle, did they?
19   A.  Well, again, as stated before --
20   Q.  Like I said, we understand that your position
21  is that this was the --
22   A.  This was agreed upon.
23   Q.  But of course, the situation changed since you
24  initially spoke to Mr. Galvanoni in the summer of 2015
25  about the potential of investing at the then time with

Page 126

1  TSA and affiliates, correct?
2    A.  What changed?
3    Q.  You found out, for example, that the loans as
4  represented by Mr. Duryea and Mr. Smith were not as they
5  were representing, correct?
6        MS. STEUER:  Objection.  Misstates -- lacks
7  foundation.  Misstates testimony.
8  BY MR. KAUFMAN:
9    Q.  You can answer that.  You can answer that.
10   A.  Yes, there was a period of time where I was
11  made known that there was some issues with my original
12  investment with those different entities.
13   Q.  What is the next exhibit?  What is the number
14  in your hand?  26.  This will be 26.
15        (Exhibit 26 was
16        marked for identification.)
17  BY MR. KAUFMAN:
18   Q.  Okay.  I've handed you what's been marked as
19  Exhibit 26.  Let's go to JM6352.  Do you see that Bates
20  number?
21   A.  Yes.
22   Q.  This is an email dated February 5th, 2016 at
23  10:22 a.m. from Wes Anderson to you, correct?  Do you
24  see it?
25   A.  February, yes, from Wes to myself, yes.

Page 127

1    Q.  And it says Wire Instructions is the subject.
2    A.  Uh-huh.
3    Q.  That email reads, "Hello John, The wire
4  instructions have been attached hereto.  100K investment
5  in Series A preferred equity in DPG Golden Eagle with a
6  10 percent coupon payable when DPG Golden Eagle becomes
7  sufficiently profitable and warrants to purchase an
8  additional 5 percent (once all your warrants are
9  exercised you will have a 12.5 percent of the company).
10  4 installment of 25K over the next 30 days.  I will have
11  the paperwork drafted and emailed over to you.  Thanks,
12  Westley G. Anderson, chief operating officer, DPG
13  Investments LLC."  Did I read that correctly?
14   A.  Yes.
15   Q.  So nowhere in Wes Anderson's email to you does
16  it mention the word security, does it?  That word
17  doesn't appear, does it?
18   A.  In this email?
19   Q.  Correct.
20   A.  There's no word that says security.
21   Q.  And then Wes Anderson, if we go to JM6350, the
22  first page, he's the one that mails you the wiring
23  instructions, correct?  Is that how you got the wiring
24  instructions, was from Wes?
25   A.  I'm looking at your email here.  So from Wes

Page 128

1  Anderson it says sent Thursday, February 11th to John
2  Marshall, cc Dan Galvanoni.  And it says, reason, wiring
3  instructions.
4    Q.  Well, that's an email from Dan to you is the
5  one I think you're talking about on the very first page.
6    A.  Okay.  Well, I'm looking for where the wiring
7  instructions are on the email.
8    Q.  My only question is Wes -- it's not in the
9  email.  Did Wes actually send you the wiring
10  instructions?
11   A.  I think so.
12   Q.  Because you ultimately sent a wire, didn't you?
13   A.  Correct.
14   Q.  So actually, let's look at Dan's email since
15  you mentioned it on the first page.  This is from Dan
16  Galvanoni to Wes Anderson and John Marshall dated
17  February 11th, 2016 at 2:25 p.m.  That's the email you
18  were referencing, correct, Mr. Marshall?
19   A.  Well, I was looking down below from Wes to me
20  to look for the wire instructions.  But you're on the
21  very first one?
22   Q.  Yeah, it's the first email on top.
23   A.  Okay.
24   Q.  Okay.  So if we look at the one, two, three,
25  fourth line down, do you see where it says, "You will be



Page 129

1  the second largest shareholder and legend." Did I read
2  that correctly?
3      A. Yes.
4      Q. So is it your understanding that you were going
5  to be a shareholder of DPG Golden Eagle based upon
6  sending a wire in February of 2016 of $100,000? I'm
7  just asking if that reflects your understanding.
8      A. With these emails, again, reading and writing
9  is kind of difficult with me. But with these emails,
10  too, they were also, you know, phone calls and phone
11  conversations.
12      Q. I wasn't asking about that. I was just saying,
13  based upon that email, is that an accurate reflection of
14  your understanding? It's either yes, no or I don't
15  know.
16      A. Well, on this email -- can you say that again?
17  "You will be the second largest shareholder and legend."
18      Q. Right. And my question was, was it your
19  understanding that you were going to be the second
20  largest shareholder in DPG Golden Eagle?
21      A. Yeah, my understanding was I was going to have
22  a large interest in the companies and I would be getting
23  large amounts of money paid to me.
24      Q. So I'm going to hand you what we'll call
25  Exhibit 27.

Page 130

1          (Exhibit 27 was
2          marked for identification.)
3      (Discussion off the record.)
4  BY MR. KAUFMAN:
5      Q. So I've handed you Exhibit 27, which is JM6205.
6  Is that what's in front of you?
7      A. Yes.
8      Q. It's a wire authorization agreement from you to
9  send money to DPG Golden Eagle, LLC, correct?
10      A. Yes.
11      Q. Okay. And that's your signature?
12      A. Yes.
13      Q. And you sent a wire on February 11th, 2016 at
14  11:28 and 50 seconds a.m., correct?
15      A. Yes.
16      Q. And that wire was for $25,000?
17      A. Yes.
18      Q. And that wire went -- when it says special
19  instructions, you wrote, John Marshall Spring Tree,
20  correct?
21      A. Yes.
22      Q. Do you -- and that was your instruction to have
23  typed in there to the teller -- I assume the teller was
24  the one who actually typed it, correct? You didn't type
25  it, did you? Or did you go to the branch -- let's back

Page 131

1  that up.
2          Did you go to the branch to send this wire or
3  did you send it from your own computer?
4      A. I think I believe I was at the branch.
5      Q. On February 11th -- so February 11th you sent a
6  $25,000 wire from Patelco Credit Union, correct?
7      A. Yes.
8      Q. And then you sent another wire a few days
9  later, correct? Yes?
10      A. Do you have it there?
11      Q. Yeah. Well, let me back up. Who is Madison
12  Marshall?
13      A. Madison is my daughter.
14          (Exhibit 28 was
15          marked for identification.)
16  BY MR. KAUFMAN:
17      Q. I've handed you 28, and this is another wire
18  transfer from Patelco Credit Union, correct? Right?
19      A. Yes.
20      Q. And this one is actually from Madison Marshall
21  to DPG Golden Eagle, LLC, correct?
22      A. It says from Madison Marshall on there.
23      Q. So did it come from her account?
24      A. No, it came from my account.
25      Q. Was your daughter a minor in February of 2016,

Page 132

1  meaning under the age of 18?
2      A. Yes, she is.
3      Q. Is she still under 18 today?
4      A. No.
5      Q. So did this money come from an account that
6  was -- that she was -- had an interest in or was this an
7  error?
8      A. I'm not sure.
9      Q. So -- and again, it was sent from at least
10  Madison Marshall to DPG Golden Eagle, LLC in the amount
11  of $25,000, correct?
12      A. Correct.
13      Q. And it says special instructions, John Marshall
14  Spring Tree, right?
15      A. Correct.
16      Q. And then you sent a wire again, didn't you?
17  29.
18          (Exhibit 29 was
19          marked for identification.)
20  BY MR. KAUFMAN:
21      Q. Handing you Exhibit 29, Bates JM6208. Is that
22  what you have in front of you?
23      A. Yes.
24      Q. Okay. It's, again, another wire transfer
25  agreement, correct?



Page 133

1   A. Yes.
2   Q. And it says John R. Marshall, that's you,
3   right?
4   A. Correct.
5   Q. To DPG Golden Eagle, LLC.
6   A. Correct.
7   Q. And it's to John Marshall, and in special
8   instructions are John Marshall Spring Tree, correct?
9   A. Correct.
10  Q. And you signed this agreement on February 26th,
11  2016 at 1:46 p.m.?
12  A. Correct.
13  Q. And you sent that wire, correct?
14  A. Yes.
15  Q. That will be 30.
16          (Exhibit 30 was
17          marked for identification.)
18  BY MR. KAUFMAN:
19  Q. I've handed you Exhibit 30, Bates stamped
20  JM6210. Is that what you have in front of you, sir?
21  A. Yes.
22  Q. And that is the last of the wires sent in
23  February and March of 2016, correct? So it was the
24  fourth payment to equal 100,000?
25  A. Yes.

Page 134

1   Q. So this wire was for 25,000 from your account
2   to DPG Golden Eagle, LLC's account, correct?
3   A. Yes.
4   Q. And Purpose/Special Instructions reads, "John
5   Marshall, Spring Tree," correct?
6   A. Yes.
7   Q. And then you signed it and sent it on March 4,
8   2016, correct?
9   A. Yes.
10  Q. Why don't we go off the record and have lunch.
11      VIDEO OPERATOR: Off the record at 12:13 p.m.
12      (Break.)
13      VIDEO OPERATOR: We're back on the record at
14  1:21 p.m.
15  BY MR. KAUFMAN:
16  Q. So we've been going about two hours and 57
17  minutes. So right now it is a little after 1:20.
18      Mr. Marshall, did you, aside from your counsel,
19  talk to anyone about your testimony today during lunch?
20  A. No.
21      MR. KAUFMAN: Madam Court Reporter, what number
22  are we on? 30?
23      THE REPORTER: 31.
24      (Discussion off the record.)
25      (Exhibit 31 was

Page 135

1           marked for identification.)
2   BY MR. KAUFMAN:
3   Q. I've handed you what we've marked as 31, which
4   is Bates numbered JM6355 through JM6357. Is that what
5   you have that in front of you?
6   A. Yes.
7   Q. I'm going to draw your attention to the first
8   page, JM6355, that's an email that you sent to Mr. Dan
9   Galvanoni on Friday, July 8th, 2016 at 10:40 in the
10  morning; isn't that correct?
11  A. I believe so, yes.
12  Q. Well, let's look at JM6356. Isn't that your
13  signature block from your email, John Marshall, J.D.
14  CIC, at the very top?
15  A. 356, yes.
16  Q. Okay. So do you contend this is indeed your
17  email that you sent to Dan?
18  A. Yes.
19  Q. Let's take a look at this email real quick.
20  You wrote, "Dan, I appreciate what you are saying and I
21  agree, we need to get some size. Jim and Rob really
22  hurt us. However, for this last year I have been
23  working with Jerry the Atlanta office and Wes." Did I
24  read that correctly?
25  A. Yes.

Page 136

1   Q. Okay. What work were you doing with Jerry and
2   Wes?
3   A. I was following up on making sure that the
4   loans we had were good loans and my money was secure on
5   those loans.
6   Q. Okay. And you wrote following the next
7   sentence, "The good news is we have found all the bad
8   loans. We have a majority of good loans in place and we
9   are running the company much more efficiently and
10  profitable." Did I read that correctly?
11  A. Yes.
12  Q. And so were you a part of evaluating which
13  loans were good loans and bad loans with Wes and Jerry?
14  A. No.
15  Q. Did you look -- so what did you mean by, "We
16  have found all the bad loans"?
17  A. Well, I guess what I should have said in there
18  is Jerry and Wes had gone through all the loans, and my
19  recollection of when I talked to them from time to time
20  to see how things were going because I was concerned that,
21  you know, my money might be at risk, that the loans
22  weren't good, that they went through the operations,
23  they went through the loans, and what they told me was
24  that, you know, pretty much most of all the loans were
25  all good, profitable, good loans.



Page 137

1      Q.  Let's switch gears a little bit.  When was the
2    last time you spoke to Westley Anderson?
3      A.  I don't recall.
4      Q.  Okay.  Was it in this calendar year, 2019?
5      A.  No, I don't believe so.
6      Q.  Okay.  Did you talk to him -- you were at his
7    deposition where you and I attended in Phoenix in
8    December of 2017.  Do you remember that?
9      A.  Yeah, yeah.
10     Q.  Sorry.  2018, correct?
11     A.  Right.
12     Q.  Have you talked to Wes Anderson after his
13   deposition?
14     A.  I don't believe so.  I think I -- the last time
15   that we might have had words was when I saw him at that
16   deposition.
17     Q.  Have you emailed with Wes since his deposition?
18     A.  No, I don't believe so.
19     Q.  Okay.  Have you sent text messages with Wes
20   Anderson, either sent or received, since his deposition?
21     A.  I don't think so.  I don't -- I'm not sure.  I
22   don't believe so.
23     Q.  You mentioned that you have a daughter.  What
24   is her name?
25     A.  Madison.

Page 138

1      Q.  And you have a son, Tyler, correct?
2      A.  Yes.
3      Q.  Do you have any other children?
4      A.  No.
5      Q.  And Tyler interned at DPG Investments in
6    Scottsdale, Arizona between May 2016 and August 2016; is
7    that accurate?
8      A.  Yes.
9      Q.  And did you ever visit with him in Scottsdale
10   while he was working at DPG Investments?
11     A.  No.
12     Q.  Did you ever communicate with Tyler about DPG
13   Investments at any time?
14     A.  I might have checked with him to see how things
15   were going.
16     Q.  Do you know if he was working at evaluating
17   whether the loans were good loans or bad loans that had
18   been subsumed by DPG Golden Eagle?
19     A.  I'm not sure.
20     Q.  Did you ask Westley Anderson to write a letter
21   of recommendation for Tyler based upon his job duties at
22   DPG Investments, LLC in the summer of 2016?
23     A.  I think I talked with Wes about if he felt he
24   did a good job to write a letter of recommendation.
25     Q.  Is there a reason why you spoke only -- asked

Page 139

1    Wes and not to Dan about this letter of recommendation?
2      A.  Because at the time I don't think Dan and I
3    were getting along, and I don't think we were getting
4    along at the time.
5      Q.  When did you and Dan stop, using your words,
6    getting along?
7      A.  I'm not sure.
8      Q.  Was it in -- I mean, we've seen that you sent a
9    wire.  What is the date of that wire on the exhibit in
10   front of you?  What is the exhibit number?
11     A.  March 2016.
12     Q.  Okay.  So as of March 2016, were you and Dan
13   getting along?
14     A.  I believe so.
15     Q.  Okay.  In April 2016 were you and Dan getting
16   along?
17     A.  I don't recall the exact dates exactly when we
18   were and when we were not.
19     Q.  When your son, Tyler, was supposedly interning
20   at DPG Investments from May to August of 2016, were you
21   and Dan getting along during that period?
22     A.  I don't recall.  I think we may not have been,
23   but I'm not positive.
24     Q.  Why did you want Tyler to intern -- or strike
25   that.

Page 140

1          Did you want Tyler to intern at DPG
2    Investments?
3      A.  Well, I think when I was talking with Dan
4    Galvanoni, we were talking and Tyler was looking at
5    internships, Dan said that the internship at DPG would
6    be great because he would get a lot of good experience
7    and a lot of the other internships out there, they put
8    kids in the back room, they don't learn much, and they
9    don't get mentored.  And so, again, I was taking him for
10   his word.
11     Q.  I'll hand you -- this will be 32.
12         (Exhibit 32 was
13         marked for identification.)
14   BY MR. KAUFMAN:
15     Q.  I've handed you what we've marked as Exhibit
16   32, which is JM5534 through JM5535.  Is that what you
17   have in front of you?
18     A.  Yes.
19     Q.  That was produced by you, correct, you and your
20   counsel?
21     MS. STEUER:  If you look in the bottom
22   right-hand corner.
23     THE WITNESS:  Yes.
24   BY MR. KAUFMAN:
25     Q.  So in this email that you're copied on the



Page 141

1  10/19/2016 at 9:51 in the morning email from Wes
2  Anderson, isn't that correct, to Tyler cc'ing you?
3     A.  Yes.
4     Q.  In that email, so we look at the -- it's got an
5  attachment, correct?  Do you see where it says,
6  "Subject:  Re:  Letter of Rec.  Attachments:  DPG
7  Internship - Tyler Marshall.pdf."  Do you see where it
8  says that?
9     A.  Yes.
10    Q.  So if we turn the page to JM5535, to the best
11  of your understanding, was that the attachment to that
12  email?
13    A.  Not sure.
14    Q.  Have you seen this letter of recommendation
15  that's dated July 15, 2016 before?
16    A.  I don't recall.
17    Q.  Do you know if it's true if Mr. Marshall,
18  meaning Tyler, assisted the company, meaning DPG
19  Investments, with multiple mergers and acquisitions?
20    A.  I'm not sure.
21    Q.  Okay.  Do you know if it's true if Tyler's
22  primary responsibilities were preliminary underwriting,
23  coordinating events and countless spreadsheets?
24    A.  I'm not sure.
25    Q.  Is it true that Tyler interned for DPG

Page 142

1  Investments from May 2016 through August 2016?
2     MS. STEUER:  Objection.  Misstates the
3  document.  Lacks foundation.
4  BY MR. KAUFMAN:
5     Q.  Nothing to do with the document.  I asked him
6  is it true if -- that Tyler Marshall interned for DPG
7  Investments from May 2016 through August 2016?  Is that
8  true, to the best of your knowledge?
9     MS. STEUER:  Calls for --
10  BY MR. KAUFMAN:
11    Q.  Well, to the best of your knowledge, is that a
12  true statement?
13    A.  I don't know.
14    Q.  Do you know based upon your personal knowledge
15  if Tyler received pay from DPG Investments, LLC?
16    A.  I'm not sure if he was paid or not.
17        (Exhibit 33 was
18        marked for identification.)
19  BY MR. KAUFMAN:
20    Q.  I'm going to hand you what's marked as Defense
21  Exhibit 33, Bates stamped JM6251 through 6253 -- through
22  6254.  Let's look at 6251.  Have you seen this document
23  before?
24    A.  Which document?
25    Q.  The one that's Tyler's supposed résumé as of

Page 143

1  Bates stamp 6251, first page.  Have you seen that one
2  page before?
3     A.  I may have seen it, yes.
4     Q.  To the best of your knowledge, is it accurate?
5     A.  I'm not sure.
6     Q.  Okay.  Does Tyler have a history of being not
7  truthful?
8     A.  No, not to my knowledge.
9     Q.  Exhibit 34.
10        (Exhibit 34 was
11        marked for identification.)
12  BY MR. KAUFMAN:
13    Q.  This is Bates stamped JM, meaning your
14  production, 6598.  Is that what you have in front of
15  you?
16    A.  Yes.
17    Q.  Okay.  Have you seen this document before?
18    A.  I don't remember.
19    Q.  Okay.  You're not copied on any of these
20  emails, are you?  You don't see your name or email
21  address on it, do you?
22    A.  Yeah, I don't see my email on there.
23    Q.  Have you seen Dan Galvanoni using an Amazon
24  WorkMail account before?
25    A.  Where is it, Amazon?  I'm not certain.

Page 144

1     Q.  If you look in the top left corner, it says,
2  Amazon WorkMail.  I believe it's who posted the mail.
3  But I'm just representing to you it says Amazon WorkMail
4  in the top left corner.  Do you see where it says that?
5     A.  Okay.  Yes.
6     Q.  Did Wes Anderson print this email and get it to
7  you, is that how you have possession of it?
8     A.  Yes, I would think so.
9     Q.  In fact, Wes Anderson would print emails of
10  Dan's and get them to you on multiple occasions; isn't
11  that correct?
12    A.  I would have to look back, but yes.
13    Q.  Is that because you asked him to get them to
14  you or did he do that on his own?
15    A.  Dan Galvanoni instructed me to work with his
16  people, and I would talk with Wes Anderson and Jerry and
17  Joe Hudspeth, and I would get information from them.
18    Q.  So as a practice would Wes Anderson -- you said
19  you would get information from them or to you, but as a
20  practice, would he just print emails or take pictures of
21  emails and send them to you rather than just forwarding
22  it to you?
23    A.  I'm not sure how he -- what he did.  However,
24  he got me emails.
25    Q.  Okay.  But you could see here where it says



Page 145

1  inbox Dan Galvanoni, this is clearly just a print screen
2  of this page, wouldn't you agree with me that's what
3  this is?
4      A.  I'm not a big computer-type guy, but it looks
5  like, yeah, this is an inbox of Dan Galvanoni.
6      Q.  And you don't have an email, to the best of
7  your knowledge, where this is forwarded to you from Dan,
8  do you?
9      A.  I'm not sure.
10     Q.  Did you ever ask Wes Anderson to take a picture
11 with his cell phone of Dan's inboxes?
12     A.  I don't believe so.
13     Q.  Did Wes Anderson ever take pictures of Dan
14 Galvanoni's email and send them to you, pictures meaning
15 with his cell phone?
16     A.  I'm not sure.
17     Q.  You're not sure or you don't remember?
18     A.  I don't.  I don't remember.  He could have.
19 I'm not positive.
20     Q.  Did you ever ask Wes Anderson to take pictures
21 of Dan's email surreptitiously and send them to you?
22         MS. STEUER:  Objection.  Asked and answered.
23 You can answer again.
24         THE WITNESS:  Yeah, I don't --
25 BY MR. KAUFMAN:

Page 146

1      Q.  Okay.
2      A.  I don't remember.  I don't recall.
3      Q.  Do you recall if you ever received emails that
4  were taken in that fashion by Mr. Anderson?
5          MS. STEUER:  Asked and answered.  You can
6  answer again.
7          THE WITNESS:  I don't recall.
8          MR. KAUFMAN:  35.
9          (Exhibit 35 was
10             marked for identification.)
11 BY MR. KAUFMAN:
12     Q.  I'll hand you which is marked 35, and I'll
13 submit to you proper that they are pages 51, 52 and 53
14 of Mr. Anderson's production to, I believe it was
15 actually your counsel's subpoena at his deposition,
16 okay, which was December 11th, 2018.  Have you seen
17 these documents before?
18     A.  It's really difficult to read these.
19     Q.  I'm not asking you to read them.  I'm just
20 asking you if you've seen them?
21     A.  Well, it's hard to know if I've seen them if I
22 can't read what they are.
23     Q.  Okay.  So do you see on the top it says
24 Subject, the first email on page 51 of 69.
25     A.  Subject, yes.

Page 147

1      Q.  Subject it says none, right?
2      A.  Correct.
3      Q.  Date, August 3rd, 2016 at 10:57:44 a.m.
4  Mountain Standard Time, I guess an hour behind you,
5  correct?
6      A.  Okay.
7      Q.  Is that what it says?
8      A.  Yes.
9      Q.  And it's from Westley Anderson, right?
10     A.  Yes.
11     Q.  To John Marshall.  But it says Marshall, John,
12 I assume that's you, correct?
13     A.  Correct.
14     Q.  And then it's got attachments that are JPG
15 files, correct?
16     A.  Yes.
17     Q.  JPG, to the best of your knowledge, is that a
18 picture?
19     A.  Yeah, it looks like a picture.
20     Q.  So does that jog your memory as to receiving
21 pictures that were taken by Wes Anderson sent to you on
22 maybe August 3rd, 2016?
23     A.  Yes, it looks like there's pictures that were
24 taken and sent.
25     Q.  Okay.  And can you -- let's look at the first

Page 148

1  picture, first picture down, right under attachments on
2  page 51 of 69.  Do you see the reflection of the person
3  taking the picture?
4      A.  Reflection?
5      Q.  Sure.  Do you see a picture -- if you look at
6  this screen, can you see the image of a person with his
7  phone up in front of his head?  Do you see that?
8      A.  Oh, oh, in the background.
9      Q.  In the background, do you see that?
10     A.  Yes.
11     Q.  Okay.  Do you know if that's Wes Anderson
12 taking that picture?
13     A.  I do not.
14     Q.  But the emails came from Wes Anderson, correct?
15     A.  From this document, yes, it says from Westley
16 Anderson.
17     Q.  Okay.  So can you make out -- let's look at the
18 first picture.  I know it's a little hard to see.  I
19 apologize for that.  It's how it came to us.  But you
20 can see in the top right corner July 13th, 2015 at 11:36
21 a.m.?  Can you make that out on the top right-hand
22 corner?
23     A.  Okay.
24     Q.  Yes?
25     A.  Yes.



Page 149

1    Q. And it's clearly Dan Galvanoni's email, and it
2  looks like he sent it to you and cc'd himself.  Can you
3  make that out?
4    A. Yes.
5    Q. And it says, "Dan Galvanoni balance sheet DPG
6  2014 income statement."  Can you read that?
7    A. Yes.
8    Q. Okay.  So that's an email that was sent to you,
9  right?
10   A. It appears so, yes.
11   Q. Do you know why Wes Anderson would be taking
12 pictures and sending you pictures of an email that you
13 already had received?
14   A. I'm not sure.
15   Q. So do me a favor, why don't you count the
16 number of pictures that are in this email.
17   A. The entire email?
18   Q. Sure.  Do you get five separate pictures that
19 he sent to you?
20   A. Yes.
21   Q. Okay.  Did he ever send you pictures via text
22 message or any other medium, other than email?
23   A. I'm not sure.
24   Q. Aside from this August 3rd, 2016 email, have
25 you received any other correspondence from Wes Anderson

Page 150

1  that included screen shots, now that you've looked at
2  this, similar to this?
3    A. I just don't remember if I did or didn't.
4    Q. Do you know why this email was produced only by
5  Wes Anderson's counsel and why you did not produce it
6  pursuant to your discovery production?
7    A. I'm not sure.
8        MS. STEUER:  And he did a comprehensive email
9  search for everything with Westley Anderson.
10       MR. KAUFMAN:  It's his depo, Melinda.
11       MS. STEUER:  I know, but --
12       MR. KAUFMAN:  That's fine.  We can talk off
13 record.
14 BY MR. KAUFMAN:
15   Q. I'm just asking if you have a reason or if you
16 had seen this before.
17   A. I don't.  I tried to get all the information I
18 could.
19   Q. Next exhibit.  Before we go there, you can mark
20 it, but I'm not going to present it yet.
21       (Exhibit 36 was
22        marked for identification.)
23 BY MR. KAUFMAN:
24   Q. Do you consider Wes Anderson a friend today?
25   A. I don't know a friend, but I think that he was

Page 151

1  trying to do the right thing and do what he felt was
2  right.
3    Q. So you believe Wes Anderson took the pictures
4  of Dan Galvanoni's email accounts and sent them to you
5  because Wes Anderson was trying to do the right thing,
6  that's your belief?
7    A. No.  Well, you were just asking me my opinion,
8  if I felt he was a friend, and I was giving you my
9  opinion of what I felt of him.
10   Q. Do you know if Wes Anderson sent pictures to
11 you of emails pertaining to any other employee at DPG
12 Investments or affiliated company?
13   A. I'm not sure.
14   Q. Is it possible?
15   A. Anything is possible.
16   Q. Is it possible that you are just not willing to
17 commit that that happened or you just don't remember?
18   A. I just don't remember, and I don't remember
19 these as well.
20   Q. Wes Anderson was the one in December of 2016
21 that was helping you file UCC-1 against DPG property in
22 the state of Arizona; isn't that correct?
23       MS. STEUER:  Objection.  Lacks foundation.
24 Assumes facts not in evidence.
25 BY MR. KAUFMAN:

Page 152

1    Q. Well, we're getting to the evidence now; is
2  that correct?  Is he the person that helped you do that?
3    A. Yes.
4    Q. In fact, you were in a lawsuit over those
5  filings, weren't you?
6    A. Yes.
7    Q. Okay.  And that's the only time that's
8  happened, so we're all talking about the same situation,
9  correct?  You remember this in December of '16, correct?
10       MS. STEUER:  Well, that's -- objection.  Lacks
11 foundation.
12 BY MR. KAUFMAN:
13   Q. You remember you filing the UCC-1s in
14 December -- in '16, correct?
15   A. Well, I didn't file them.  Dan's team filed
16 them.
17   Q. Dan's team -- Wes Anderson filed them, correct?
18   A. Well, Jerry Hudspeth was also involved.
19   Q. When you say Jerry Hudspeth, you mean Jerry
20 Hudspeth?
21   A. Excuse me.  If that's how it's pronounced,
22 Hudspeth.
23   Q. I'm just making sure we're talking about the
24 same guy.
25       And actually, you were communicating with Jerry



Page 153

1  about the UCC-1s in July of '16, correct?
2      A. I'm not positive about the date, but I think
3  that's when that was going on.
4      Q. Did you ever get Dan's permission to file the
5  UCC-1?
6      A. Again, with Dan Galvanoni, he told me that my
7  stock -- excuse me -- my money would be secured on the
8  loans, and he said that he and his team and his people
9  would secure my money on those loans.
10     Q. Did he tell you that, or did he tell you that
11  the loans were secured by the collateral of the cars?
12     A. I think he also said that the loans were
13  secured by the collateral of the cars. But my money,
14  too, would be secured on those loans that are secured on
15  those cars.
16     Q. So did you believe you had a security interest
17  in the vehicle or a security interest in the car -- or
18  in the loan?
19     A. What I believed was -- is that my money was
20  secured and oversecured, that we could sell the loans
21  and get my money back and the interest, and as Dan said,
22  I was totally secured, oversecured and -- to not have my
23  investment at risk.
24     Q. You filed a UCC-1 without receiving Dan's
25  explicit approval; isn't that correct?

Page 154

1      MS. STEUER: Objection. Misstates testimony.
2  Lacks foundation. You can answer.
3  BY MR. KAUFMAN:
4      Q. Is that correct?
5      A. Not in my opinion.
6      Q. So you got -- so it's your testimony that Dan
7  Galvanoni, sitting right there, gave you specific
8  approval to file the UCC-1?
9      A. Well, Dan Galvanoni told me that my money was
10  going to be secured by the loans.
11     Q. That wasn't my question.
12     A. And the only way to secure the money on those
13  loans is I was later told by he and his team that there
14  would have to be a UCC filing.
15     Q. Okay.
16     A. And so that's why his team filed the UCC to
17  secure my money on those loans.
18     Q. Okay. So let's look at Exhibit 35, which is
19  right here. Actually, it's 36. I apologize. Exhibit
20  36. Your Bates stamp 6236 through 6251. I'm not
21  quite -- and I know -- we just included your Bates
22  stamps. I mean, I know the back is Tyler's résumé, but
23  that's how it was produced to us.
24      Let's look at this email dated July 14th, 2016
25  from Jerry Hudspeth to you. Subject: UCC-1. Do you

Page 155

1  see that on JM6236?
2      A. Yes.
3      Q. Okay. And it reads, "John, attached the
4  initial and most important UCC-1. You will have to get
5  Dan's/DPG Investment's approval before you file.
6  Thanks, Jerry." Did I read that correctly?
7      A. Yes.
8      Q. Did you ever receive any writing from Dan or
9  anyone at DPG Investments that gave you approval to file
10  a UCC-1 after July 14, 2016 at 4:27 p.m.?
11     A. I'm not sure.
12     Q. And then you sent -- you forwarded this email
13  now on December 6th, 2016 from you to Westley Anderson,
14  correct?
15     A. Yes.
16     Q. And you sent it to Westley Anderson at his
17  NXGfinancial.com email address, correct?
18     A. Yes. Wherever I was -- yes.
19     Q. And of course, the UCC-1 here is blank, so we
20  don't know which company it was to be filed against,
21  correct? It's just a form from the state; is that
22  accurate?
23     A. Yes.
24      MS. STEUER: Well, it's not -- I mean, we
25  don't --

Page 156

1      THE WITNESS: I don't know if this is the
2  attachment, but the form, the UCC form is blank.
3  BY MR. KAUFMAN:
4      Q. The one that's attached here to this JM6236
5  through 6251, it's a blank form, correct?
6      A. Yes.
7      Q. Now, this email from you to Wes was in December
8  6, 2016, right? Correct?
9      A. Yes.
10     Q. And at that time you and -- you no longer
11  considered Dan Galvanoni your friend; isn't that
12  correct?
13     A. I think there were -- I think we had issues.
14     Q. You told me that by the time Tyler was
15  interning over the summer you were no longer
16  communicating with Dan Galvanoni; is that accurate?
17     A. Yes.
18     Q. Okay. And that was why you said you were
19  connecting through Westley Anderson instead, right?
20     A. Correct. But we might have had communications
21  and there might have been some repair done, but I don't
22  recall exactly. We're talking different time periods.
23     Q. Sure. Let's get our time periods straight. So
24  we know that Jerry sent you this, or at least he says,
25  "Attached the initial and most important UCC-1," in



Page 157

1  July, July 14th, 2016, correct?
2      A. Yes.
3      Q. And about six months later in December of 2016,
4  John Marshall, meaning you, send a UCC-1 to Westley
5  Anderson, correct?  So that's six months go by between
6  Jerry sending you the initial email and you forwarding
7  this email to Westley; is that accurate?
8      A. From this information that I've given, yes,
9  that looks accurate.
10     Q. And then also in December of '16 you informed
11  your son that he should change his résumé; isn't that
12  correct?
13     A. In December.
14     Q. December of 2016.  It's not on that sheet of
15  paper.  I'm just asking you a question, what also
16  happened in December 2016.
17     A. Oh, I don't recall that.
18     Q. But you did tell him to do that, didn't you, to
19  remove DPG and put on NXG Financial?
20     A. I'm trying to think back.  I'm trying to
21  recall.  I'm thinking back.
22     Q. Well, isn't it true that you also asked Westley
23  Anderson to change Tyler's letter of recommendation to
24  no longer be from DPG but now be from Westley's company
25  NXG in December of 2016?

Page 158

1      A. I think there might be a concern --
2      Q. I wasn't asking about concerns.  I was just
3  asking if you did that.
4      MS. STEUER: He's not asking why.  If it
5  happened, just yes, no or you don't remember or you
6  don't know.
7      THE WITNESS: I forget.  I'm not positive.
8  That very well could have happened.
9  BY MR. KAUFMAN:
10     Q. Do you often ask your son to retroactively
11  change his credentials?
12     A. No.
13     Q. Do you recall -- maybe the date doesn't ring a
14  bell, but do you recall asking your son to change the
15  contents of his résumé?
16     A. Thinking about it, I don't -- I don't remember
17  the exact conversation.
18     Q. Let's see if this will help.  Exhibit 37,
19  correct?
20         (Exhibit 37 was
21          marked for identification.)
22  BY MR. KAUFMAN:
23     Q. So I've handed you Exhibit 37, which I'll
24  represent to you was produced by Westley Anderson
25  pursuant to your attorney's subpoena response for his

Page 159

1  December 2018 deposition.  So I've handed you pages 72
2  through 76 of 365.  So your son -- let's go to page 76.
3  Your son, Tyler, emailed you on Tuesday, October 25th,
4  2016 at 9:12 in the morning; isn't that correct?  Go to
5  page 76.
6      MS. STEUER: It's the last page.
7  BY MR. KAUFMAN:
8      Q. Did your son email you on Tuesday, October
9  25th, 2016?
10     A. Are you talking about the one down below at the
11  bottom?
12     Q. Yeah, the last email.
13     A. Yes.
14     Q. So that's a yes?
15     A. Yes.
16     Q. Okay.  And about two months later is the next
17  email, correct?  And that's from you to Westley
18  Anderson.  Priority: High.  Correct?
19     A. Yes.
20     Q. And then you sent it with attachments, Marshall
21  resume, DPG internship Tyler Marshall.pdf, so you sent
22  two PDF attachments, correct?
23     A. Yes.
24     Q. And you wrote, "Wes, if you could immediately
25  update Tyler's letter of recommendation for NXG and not

Page 160

1  DPG also and also put your cell phone number under your name,
2  it would be appreciated.  Also, can you update his
3  résumé real quick and just change DPG out on the résumé
4  and put NXG as discussed.  Thank you, my friend.  Tyler,
5  I really appreciate you, your family and care about you
6  very much.  Love you my friend.  John, thank you.  John
7  Marshall, J.D. CIC."  Did I read that correctly?
8      A. Yes.
9      Q. So you had a conversation with Wes Anderson
10  prior to sending that email, isn't that correct, about
11  the subject of Tyler Marshall's letter of recommendation
12  and his résumé, according to this email?
13     A. I believe so.
14     Q. What did you tell Wes Anderson?
15     A. I'm trying to recall that conversation, but I
16  think it was a situation where I think there was some
17  concerns that Dan and I were having a falling out and
18  that Tyler had done his internship and primarily working
19  for Wes, and I think on some off time or stuff did some
20  other things for Wes and his NXG company, and so we felt
21  it would be more appropriate that -- not having the DPG
22  and having NXG would be more appropriate.
23     Q. So it was just a coincidence you sent this
24  email to have the change of the letter of recommendation
25  and résumé, was in and around the same time you filed a



Page 161

1 UCC-1 six months after Jerry Hudspeth's email?
2      MS. STEUER: Objection. Lacks foundation as to
3 the date of the filing of the UCC-1.
4      MR. KAUFMAN: We just looked at those emails.
5 So is that --
6      MS. STEUER: Well, the email didn't state that
7 the filing.
8      (Interruption by the reporter.)
9      MS. STEUER: The email does not state the date
10 that the UCC-1 was filed. You know perfectly well when
11 the UCC-1 was filed, and you're deliberately misstating
12 the evidence.
13     MR. KAUFMAN: That's just not true, so --
14     MS. STEUER: You've got the file of UCC-1 --
15     MR. KAUFMAN: You can make your objection.
16 We're not here for speaking objections.
17     MS. STEUER: If you get the file UCC-1, then
18 you can all know the date. You know the date is wrong.
19 That's why your question lacks foundation and misstates
20 the evidence.
21     MR. KAUFMAN: You're entitled to saying your
22 objection. You're not here to speak. You're not here
23 to yell and chirp. Let's get back to it.
24 BY MR. KAUFMAN:
25    Q. So you sent an email in December of 2016 with

Page 162

1 Wes Anderson concerning UCC-1, correct? We looked at
2 that email just two exhibits ago, right?
3    A. Yes.
4    Q. And that email was six months after you
5 received the email from Jerry Hudspeth with a blank
6 UCC-1, correct?
7      MS. STEUER: Objection. It also misstates the
8 email from Jerry Hudspeth because the documents were not
9 in Bates number sequence. You don't have the actual
10 attachment, so --
11     MR. KAUFMAN: The emails were produced.
12     (Interruption by the reporter.)
13     MS. STEUER: So the objection is lacks
14 foundation. Misstates the evidence. And it's
15 deliberately misleading.
16     MR. KAUFMAN: Well, I'm unaware of deliberately
17 misleading in the Federal Rules of Evidence. We're
18 not -- we're done with your speaking objections. You
19 can put your objection on the record, and we'll move on.
20 BY MR. KAUFMAN:
21    Q. So going back to it, you received an email from
22 Jerry Hudspeth in July of 2016 concerning a UCC-1 that
23 said to put -- to wait for Dan Galvanoni or DPG
24 Investments' approval, correct? Do you remember that
25 email?

Page 163

1      MS. STEUER: Objection. Misstates the email.
2 Lacks foundation.
3 BY MR. KAUFMAN:
4    Q. Do you want to look at the email again? Fine.
5 Let's look at the email.
6      MS. STEUER: Can you go back to the email?
7      THE WITNESS: Can I talk to her?
8 BY MR. KAUFMAN:
9    Q. No, because we have a question on the table, so
10 the answer is no.
11     MS. STEUER: Answer the question, and then we
12 can take a break.
13 BY MR. KAUFMAN:
14    Q. So let's look at your email, Exhibit 36.
15     MS. STEUER: The email, Exhibit 36.
16 BY MR. KAUFMAN:
17    Q. All right. Exhibit 36. Do you see the email
18 dated July 14th, 2016, 4:27 p.m. from Jerry Hudspeth to
19 John Marshall UCC-1. Do you see that email?
20    A. Yes, I do.
21    Q. That email said, "John attached the initial and
22 most important UCC-1. You will have to get Dan's/DPG
23 Investment's approval before you file. Thanks, Jerry."
24 Did I read that correctly?
25    A. Yes.

Page 164

1    Q. Okay. And above that, from John Marshall on
2 December 6th, 2016 at 3:05 and 40 seconds p.m. to
3 Westley Anderson. Forward UCC-1. John Marshall.
4 UCC-1.pdf is the attachment, correct?
5    A. Yes.
6    Q. Okay. Did I read that correctly?
7    A. Yes.
8    Q. Okay. So is it a coincidence that you received
9 and had this correspondence with Westley Anderson
10 concerning the UCC-1 for you to file and you also asked
11 Westley Anderson and your son to change the résumé in
12 the same month? Is that a coincidence or is that part
13 of something else?
14    A. These things were taking place at the same
15 time. I guess that would be considered a coincidence.
16     MS. STEUER: Now can we take a break?
17     MR. KAUFMAN: Sure.
18     VIDEO OPERATOR: Off the record at 2:07 p.m.
19     (Break.)
20     VIDEO OPERATOR: We're back on the record at
21 2:17 p.m.
22 BY MR. KAUFMAN:
23    Q. Mr. Marshall, before you asked for a break we
24 were on Exhibit 37; isn't that correct? So why don't we
25 keep that in front of you, please.



Page 165

1    So let's go to page 74 of 365 found in Exhibit
2  37. So if we look at this email from Westley Anderson
3  to you, Subject: Tyler, Thursday, December 15, 2016 at
4  9:09 a.m., do you see where we are?
5    A. Yes.
6    Q. Okay. There's no comment there other than just
7  says, Thanks, Westley G. Anderson; isn't that correct?
8    A. Yes.
9    Q. So that's an email from Wes to you, right?
10   A. Yes.
11   Q. Okay. So the next email above it is from you
12  to Westley Anderson and it's got an attachment, correct?
13   A. Yes.
14   Q. It says, "image001.png."
15   A. Yes.
16   Q. Do you have any idea what that image is?
17   A. I'm not sure.
18   Q. So this email is dated December 15th, 2016 at
19  10:10 and 45 seconds, Mountain Standard Time, correct?
20   A. Yes.
21   Q. And you wrote, "Thanks Wes, are you able to
22  make change on his résumé too?" Did I read that
23  correctly?
24   A. Yes.
25   Q. And so do you recall if Wes had changed the

Page 166

1  letter of recommendation to say that Tyler had really
2  worked at NXG Financial and that you also wanted him to
3  change the résumé, is that what this is about, or is
4  this something different?
5    A. I'm not exactly sure.
6    Q. Okay. So after you orchestrated this change
7  with Westley Anderson, you communicated with your son,
8  correct?
9    A. Yes.
10   Q. And you gave your son a slightly different
11  explanation than you've told me about today; isn't that
12  correct?
13   A. What are you referring to?
14   Q. Well, let's read your email, then. So you
15  wrote an email on --
16   A. What page are you on?
17   Q. Page 72 of 365, front page.
18   A. Okay. Go ahead.
19   Q. So you gave Tyler a different explanation as to
20  why you should change his résumé and get a new letter of
21  recommendation from Westley Anderson than you had told
22  Westley Anderson, correct?
23   A. I'm confused by your question.
24   Q. Okay. Well, let's read what you wrote first.
25  You wrote an email from you to Tyler and carbon copied

Page 167

1  Westley Anderson, correct?
2    A. Correct.
3    Q. And with that email it was dated December 16,
4  2016 at 11:18 and 44 seconds Mountain Standard Time,
5  correct?
6    A. Correct.
7    Q. All right. You wrote, "Tyler, going forward
8  please change your résumé and instead of DPG Financial
9  replace it with NXG Financial. Instead of using the
10  recommendation letter Wes gave you with DPG letterhead,
11  use this letter of recommendation instead. Please send
12  me the new change on your résumé and this new letter of
13  recommendation. The reason why is you worked for Wes
14  Anderson and you did work for NXG as well and a lot of
15  talks were deals about NXG, not DPG. Finally, the main
16  reason is DPG Financial is not as respected in the
17  financial world as Wes's company NXG Financial, as Wes
18  does not want anyone to call Dan Galvanoni or anyone
19  else at DPG Financial asking about you. Wes only wants
20  them to call him. He does not trust DPG Financial.
21  Focus on your finals and we will follow up on this
22  later. Please call when you are done with finals and we
23  can discuss. Love, Dad. Thank you, John Marshall, J.D.
24  CIC." Did I read that correctly?
25   A. Yes.

Page 168

1    Q. But the reality is you were the one that
2  initially contacted Westley Anderson about making the
3  change, not Westley Anderson contacting you first,
4  correct?
5    A. No.
6    Q. No. So Westley Anderson contacted you and said
7  we should change Tyler's letter of recommendation and
8  résumé, that was Westley's idea?
9    A. We had some conversations before this email.
10   Q. So whose idea was it?
11   A. Wes and I discussed that -- the concerns that
12  Tyler was working for him and under him, and he did do
13  some work at NXG and Wes, as well as I had a concern
14  that -- issues with Dan Galvanoni.
15   Q. That's because you had already contacted the
16  Securities and Exchange Commission prior to December 14,
17  2016; isn't that correct?
18   A. I had and Wes had concerns of Dan Galvanoni
19  with somebody contacting or being in touch with him for
20  Tyler.
21   Q. With somebody, who is the somebody you're
22  referencing?
23   A. There were just concerns.
24   Q. When did you contact the Securities and
25  Exchange Commission first?



Page 169

1  A. I'm not positive.
2  Q. Was it before December 14th, 2016 or after
3  December 14th, 2016?
4  A. I'm not sure.
5  Q. Okay. Was it in the year 2016?
6  A. I would have to go back and look. I'm not
7  sure.
8  Q. When did you contact someone at the
9  regulatory -- the Security Regulatory Agency in the
10 state of Arizona?
11 A. I'm not sure.
12 Q. Was it before December 14th, 2016, or after
13 December 14th, 2016?
14 A. I'm not sure.
15 Q. Okay. When did you contact a regulatory
16 authority in the state of California concerning DPG and
17 Dan Galvanoni?
18 A. Can you -- which regulatory?
19 Q. Any regulatory authority. Let's back that up.
20 Have you contacted any governmental agency concerning
21 Dan Galvanoni in the state of California?
22 A. Yes, I've contacted regulatory agencies.
23 Q. Who in California did you contact?
24 A. I would have to go back and look.
25 Q. Have you contacted more than one regulatory

Page 170

1  agency in the state of California concerning Dan
2  Galvanoni?
3  A. Yes, possibly I have.
4  Q. Okay. Do you recall any of their names?
5  A. I would have to go back and look.
6  Q. Okay. Where would you look?
7  A. I would try to go back and look at any
8  documentation or files that I might have called on,
9  phone numbers of regulatory agencies.
10 Q. Okay. Other than regulatory agencies in the
11 state of California, Arizona and Securities and Exchange
12 Commission in Washington, D.C., have you contacted any
13 other regulatory agency concerning Dan Galvanoni? And
14 when I say Dan Galvanoni, I mean him and any company
15 associated with him.
16 A. I don't recall the different ones that I
17 contacted, but I would have to go back and look.
18 Q. And you said you would go back and look. Where
19 would you look physically?
20 A. I would try to go back and look and see if I
21 had a sheet of -- written down of names and phone
22 numbers of people that I contacted at the regulatory
23 agencies.
24 Q. Okay. Other than regulatory agencies, have you
25 contacted any law enforcement agencies concerning Dan

Page 171

1  Galvanoni and any company related to him?
2  A. Yes, I believe.
3  Q. Okay. Was that the Federal Bureau of
4  Investigation?
5  A. I believe so.
6  Q. Other than the FBI, who else have you contacted
7  in law enforcement concerning Dan Galvanoni or any
8  company associated with him?
9  A. I would have to go back and look.
10 Q. And so it's your testimony that you have a
11 sheet of paper with a list of every contact that you
12 have made against Dan Galvanoni?
13 A. No, I don't know if I still have that sheet.
14 Q. Have you told people that you were going to
15 have Dan Galvanoni arrested?
16 A. I feel that there were things that were done --
17    MS. STEUER: Can you focus on his question?
18    THE WITNESS: Oh.
19 BY MR. KAUFMAN:
20 Q. Yeah, I wasn't asking about what your feelings
21 were.
22    MS. STEUER: Yeah, just focus --
23 BY MR. KAUFMAN:
24 Q. Straight up, have you made that statement or
25 something similar to the effect, that you were going to

Page 172

1  have Dan Galvanoni arrested?
2  A. I don't remember that.
3  Q. Have you made a statement that he will be
4  jailed?
5  A. I don't remember that.
6  Q. Have you bragged that you've had other people
7  who you've done deals with that -- strike that.
8     Have you bragged that you have -- strike that.
9     Have you made a statement that other people you
10 have done deals with and have mistreated you have gone
11 to jail as a result of your allegations, or something to
12 that effect?
13 A. I have had a situation in the past where
14 someone has ripped me off, taken advantage of me, and
15 they have gone to prison.
16 Q. Did you contact -- did the same person against
17 Dan Galvanoni that you contacted with this other
18 arrangement -- strike that. Let's get a better
19 question.
20    Who was the person that you did the deal with
21 that he went to prison?
22 A. There were two people.
23 Q. Okay. What are their names?
24 A. James Burkhise and Dan Chartraw.
25    (Clarification by the reporter.)



Page 173

1  BY MR. KAUFMAN:
2     Q.  Chartwell?
3     A.  Chartraw.
4     Q.  How do you spell that?
5     A.  I'm not sure.  I think C-h-a-r-t.
6     Q.  I got the first part.  The hard part is the
7  second part.
8     A.  Yeah, I'm not -- I'm -- r-a-w, I think,
9  Chartraw.
10    Q.  Are they still incarcerated, to the best of
11  your knowledge?
12    A.  I'm not sure.
13    Q.  Were they incarcerated by the federal
14  government or a state entity?
15    A.  I think it was the FBI.
16    Q.  Did you contact the same FBI agent that you
17  addressed your concerns with about Mr. James -- was it
18  Burkhise and Dan Chartraw as you did against Dan
19  Galvanoni?
20    A.  I don't remember who I reached out to the FBI.
21    Q.  Do you have multiple contacts at the FBI?
22    A.  I don't have multiple contacts.  It's the FBI.
23    Q.  Who did you contact at the FBI?
24       MS. STEUER:  Vague.
25       THE WITNESS:  Pardon me?

Page 174

1        MS. STEUER:  Objection.  Vague.
2  BY MR. KAUFMAN:
3     Q.  Who did you initially contact at the FBI with
4  your concerns about Dan Galvanoni?
5     A.  I don't recall.
6     Q.  Do you have a personal friend at the FBI?
7     A.  No.
8     Q.  Do you have a personal friend at the Securities
9  and Exchange Commission?
10    A.  No.
11    Q.  Do you have a point of contact with the
12  Securities and Exchange Commission prior to your
13  complaint against Dan Galvanoni?
14    A.  No.
15    Q.  Did you contact the FBI first or the SEC first
16  concerning Dan Galvanoni?
17    A.  I don't recall.
18    Q.  When was the last time you spoke to an
19  investigator concerning Dan Galvanoni from the state of
20  California?
21    A.  I'm not sure.
22    Q.  When was the last time you spoke to an
23  investigator from the state of Arizona concerning Dan
24  Galvanoni?
25    A.  I'm not sure.

Page 175

1     Q.  Was it in the last year?
2     A.  I don't recall.
3     Q.  Was it more than a year ago?
4     A.  I just don't remember.
5     Q.  When was the last time you spoke to someone at
6  the FBI concerning Dan Galvanoni?
7     A.  I don't remember.
8     Q.  Was it in the last calendar year, meaning
9  January 1st, 2019 through present?
10    A.  I'm not positive, but I don't think so.
11    Q.  Did you speak to the FBI after Westley
12  Anderson's deposition in December of 2018?
13    A.  I don't recall.
14    Q.  Have you talked to the Securities and Exchange
15  Commission since Westley Anderson's deposition in 2018?
16    A.  I don't remember.
17    Q.  Do you keep a calendar of where you have been
18  or appointments like on Outlook or something like that?
19    A.  No, not on Outlook.
20    Q.  Where do you keep your calendar?
21    A.  I'll write it down.
22    Q.  Where?
23    A.  In a book.
24    Q.  So you have a planner or something like that or
25  what kind of book?

Page 176

1     A.  Yes, I have a book, a planner.
2     Q.  And has that been your practice since 2015, to
3  keep your appointments on your planner?
4     A.  I don't really -- when you say keep
5  appointments, what do you mean?
6     Q.  Okay.  To write down what you need to do and
7  where you're going to be or phone numbers or, you know,
8  a planner.
9     A.  Yeah, yeah, I'll write stuff in the planner,
10 but it's not very detailed.  Reading and writing is kind
11 of difficult, so I kind of just remember stuff.
12    Q.  To the extent you had a planner, we'll call it
13 a planner, have you had one in 2015?
14    A.  Yeah.
15    Q.  And 2016?
16    A.  Yes.
17    Q.  2017?
18    A.  Yes.
19    Q.  And 2018?
20    A.  Yes.
21    Q.  Okay.  Did Wes Anderson ever have a call with
22 you and your counsel present concerning his concerns
23 with Dan Galvanoni?
24    A.  Did Wes Anderson have a call?
25    Q.  The three of you, did you ever have a



Page 177

1  conference call, you, Melinda and Wes?
2     A.  Would that be considered attorney-client
3  privilege?
4     Q.  Well, I don't think so.  He's not represented
5  by Melinda.
6     MS. STEUER:  Yeah, I wouldn't consider it
7  attorney-client privilege.
8  BY MR. KAUFMAN:
9     Q.  So my question is, did that call happened?  I
10  haven't even asked you what was discussed.
11     A.  Oh, okay.  I think we might -- I think we
12  may -- I don't know.  I don't remember if we had a
13  conversation together or not.
14     Q.  So we found that in December of 2016, looking
15  at Exhibit 37, that you certainly had a falling out by
16  that point with Dan Galvanoni; is that accurate?
17     A.  I believe so.
18     Q.  Are you familiar with the law firm of Garvey,
19  Schubert and Barer?
20     A.  Schubert and Barer.  The law firm Garvey,
21  Schubert and Barer.  Where are they located?  Who are
22  they?
23     Q.  That's what I'm asking, just if you're familiar
24  with them.
25     A.  If you could jar my memory.  I'm not sure.

Page 178

1     Q.  Sure.  I believe they are a Washington State
2  law firm.
3     A.  Yes.
4     Q.  And you and Westley Anderson hired them, didn't
5  you?
6     A.  No, I didn't hire them.
7     Q.  You certainly communicated with them, didn't
8  you?
9     A.  Yes.
10     Q.  Okay.  And you communicated with them to create
11  an entity called Spring Tree Lending Washington, LLC;
12  isn't that correct?
13     A.  I wasn't creating that entity.
14     Q.  Well, what were you communicating with them
15  about then?
16     A.  There was a gentleman that I was going to maybe
17  do the insurance for him, and he was in the business of
18  cannabis.  And like some others, he was mentioning to me
19  about investments like, you know, if I did investment
20  annuities, life insurance, those sorts of things.  I
21  said, no, I just do commercial insurance.  But I shared
22  with him that I invested money into car loans, and he
23  said he was interested.  And I talked to Dan Galvanoni
24  about it, and he said to talk to Wes and Jerry and let
25  them deal with those investments.  He was busy dealing

Page 179

1  with other investments and other institutions.
2     So I referred them -- I referred him, and then
3  Wes was talking to him about investing money into the
4  car loans.  And because the cannabis is kind of a
5  different animal recognized by the state being legal but
6  not recognized by the feds, Wes Anderson was talking to
7  an attorney to see if, you know, he could get investment
8  money from the cannabis person or cannabis people.
9     Q.  But you were also talking to the attorney,
10  weren't you?
11     A.  Well, I was involved.  I was a little bit
12  concerned because I had my money invested, and I wanted
13  to make sure that something wasn't going to happen to my
14  money.  And this is a while back, but from what I
15  remember, the attorney said that if he took money and
16  invested into the companies that we were involved, that,
17  you know, the feds could come in and it tainted
18  everybody's money, and they could come in and confiscate
19  all the money and say that it was illegal money and this
20  sort of thing.
21     So I told Wes, I said, hey, Wes, I'm not
22  interested in my money or other people's money being
23  tainted with cannabis money.  And that was some of the
24  conversations, and then I think what happened was that
25  they are going to maybe create a company, but I don't

Page 180

1  think that was going to work either because people that
2  had interests, like I had 13 percent to get profit out
3  of -- or to get 13 percent payout on profit, if that
4  company was totally separate and not with the other
5  entities, and I'm not sure how to set that up or how
6  they were going to set it up.  That was the
7  conversations with the attorney, that that wasn't going
8  to work either.
9     Q.  Well, you were actually listed as one of the
10  owners of Spring Tree Lending Washington, LLC as a
11  member; isn't that correct?
12     A.  I probably shouldn't have been.
13     Q.  And you also had an attorney-client
14  relationship, you, John Marshall, with this Garvey,
15  Schubert and Barer law firm; isn't that correct?
16     A.  What kind of relationship?
17     Q.  Well, you were receiving correspondence from
18  them directly; isn't that accurate?
19     A.  Well, like I said before, I was concerned on
20  what was going on because --
21     Q.  I wasn't asking about concerns.  I just asked,
22  yes or no, were you receiving communications from the
23  law firm of Garvey, Schubert and Barer of Washington
24  state?
25     A.  I may have received communications.



JOHN MARSHALL                                      March 14, 2019
JOHN MARSHALL vs DANIEL GALVANONI                        181–184

Page 181

1    Q. And you were a member of Spring Tree Lending
2  Washington, LLC, isn't that correct, on the Secretary of
3  State's records?
4       MS. STEUER: Objection. Calls for speculation.
5  You can answer, if you know.
6       THE WITNESS: I'm not sure. I don't think I
7  was supposed to be.
8  BY MR. KAUFMAN:
9    Q. Okay. And is it true that you caused the law
10 firm of Barer [sic], Schubert and Barer to receive a
11 $5,000 wire from DPG Golden Eagle, LLC in March of 2016?
12   A. That I caused them --
13   Q. Yeah, did you initiate that wire, you and Wes?
14   A. I didn't initiate a wire.
15   Q. Did you discuss sending that wire on March
16 29th, 2016 with Wes Anderson for $5,000?
17   A. I don't -- I don't -- I wasn't part -- I was an
18 investor in DPG and was not -- I didn't wire the money.
19 The only money that I've wired is into DPG, my own
20 personal money.
21   Q. Did you know that DPG Golden Eagle was wiring
22 to the law firm of Garvey, Schubert and Barer $5,000 to
23 incorporate Spring Tree Lending Washington, LLC, on
24 behalf of Westley Anderson and John Marshall?
25   A. I don't recall.

Page 182

1    Q. So in 2017 you filed a lawsuit against Dan
2  Galvanoni, DPG Investments, LLC, and a bunch of other
3  companies and individuals; isn't that correct?
4    A. That's correct.
5    Q. And then you amended that lawsuit on November
6  17th, 2017; is that accurate? You amended that
7  complaint?
8    A. I believe so.
9    Q. Okay. And that was after many of the motions
10 to dismiss were filed on some of the individuals; is
11 that correct?
12   A. I don't recall exactly. I'd have to go back
13 and look.
14   Q. Are you and Wes Anderson in any deals together
15 now?
16   A. No.
17   Q. Okay. Were you in any deals other than these
18 DPG deals that we discussed earlier with Wes Anderson?
19   A. The deals that I was involved was with Dan
20 Galvanoni and his team, and Wes was part of the team and
21 those companies.
22   Q. So aside from those deals, you're not in any
23 other financial dealings with Wes Anderson?
24   A. No.
25   Q. Is that accurate?

Page 183

1    A. Correct.
2    Q. Have you made any introductions to Wes Anderson
3  outside of these DPG deals that we've discussed today?
4    A. I don't think so. I don't recall.
5    Q. So we talked about your lawsuit that you filed
6  in 2017. Why didn't you sue Wes Anderson?
7    A. I felt at the time and during the time that he
8  was the one that was honest and acting in good faith to
9  me.
10   Q. Do you still believe that today?
11   A. Yes, at this time.
12   Q. Are you aware that Wes Anderson was
13 surreptitiously recording meetings and phone
14 conversations involving DPG and its principals?
15   A. Wes sent me some recordings that he said that
16 he recorded.
17   Q. How many recordings did he send you?
18   A. He sent me several. More than one.
19   Q. Have you produced all of those recordings to
20 your counsel?
21   A. Yes.
22   Q. Okay. Have you ever made any recordings of any
23 meetings or conversations involving DPG and its
24 principals and affiliated agencies?
25   A. No, I don't think so.

Page 184

1    Q. Okay. Have you ever made any videos involving
2  Dan Galvanoni or anyone at DPG?
3    A. Have I personally made any videos involving
4  Dan?
5    Q. Sure.
6    A. No, I don't think so.
7    Q. You made sure you qualified, have you
8  personally. Have you ever caused any videos to be made
9  by anyone else of Dan Galvanoni or anyone else at DPG?
10   A. No, I don't believe so.
11   Q. Have you ever hired an investigator to
12 investigate Dan Galvanoni or anyone at DPG?
13   A. No.
14   Q. When did Wes Anderson start sending you audio
15 recordings of DPG and its affiliated leaders?
16   A. I don't exactly remember.
17   Q. Okay. Did you ask him to do those recordings?
18   A. No, we discussed that he had some recordings,
19 and I asked him if he could send them to me.
20   Q. Okay. So after you had that discussion, did he
21 send you any additional recordings or make any
22 additional ones to send you?
23      MS. STEUER: Objection. Compound. Calls for
24 speculation.
25 BY MR. KAUFMAN:



Page 185

1    Q.  I'm just trying to -- let's break this down a
2  little bit.  So here's my confusion.  Maybe you can help
3  me.  I don't know the way you answered, if he made all
4  the recordings and said happenchance I have these, John,
5  you may like them, or some of them were made before, he
6  told you about them, and some were made subsequent to
7  it.  So if you could help me with that, it would shorten
8  this questioning.
9    A.  There was a period of time that we were
10  talking, and he was telling me certain things, and he
11  said that he had some recordings, and I asked him if I
12  could get those recordings.
13    Q.  And after that request, he sent them to you,
14  the recordings?
15    A.  Yes, he sent me the recordings.
16    Q.  Okay.  Did he make any additional recordings
17  after you made that request?
18       MS. STEUER:  Calls for speculation.  You can
19  answer.
20       THE WITNESS:  I don't recall.
21  BY MR. KAUFMAN:
22    Q.  What were you and Wes talking about that his
23  comment that he had recordings came up?
24    A.  The same thing that I was talking to him and
25  Dan's team that I was really concerned, that I wanted to

Page 186

1  make sure my money was secure on the loans, and that if
2  worse came to worse, I could sell my loans or sell the
3  chunk of the loans to get my money back and interest, as
4  Dan Galvanoni promised me and said over and over.
5    Q.  Did you have legal counsel in August of 2016 to
6  assist you with preparation of an UCC-1?
7    A.  No, I don't believe so.
8    Q.  Why did you wait from July 2016 until you filed
9  the UCC-1?  Why did you wait so long?
10       MS. STEUER:  Objection.  Lacks foundation.
11  Misstates the evidence.  You can answer.
12  BY MR. KAUFMAN:
13    Q.  Well, I mean, we know that you received a UCC-1
14  or you and Jerry Hudspeth discussed the UCC-1 in July of
15  2016.  Do you remember that?
16    A.  Okay.  Yes.
17    Q.  When did you file it?
18       MS. STEUER:  Lacks foundation.  You can answer.
19  BY MR. KAUFMAN:
20    Q.  Did you file an UCC-1 in the state of Arizona?
21    A.  I did not file one.
22    Q.  Okay.  Was one filed on your behalf in the
23  state of --
24    A.  I believe so, yes.
25    Q.  When was the UCC-1 filed on your behalf in the

Page 187

1  state of Arizona?
2    A.  I'm not sure the exact date or the date of when
3  it was.
4    Q.  Do you remember if it was '16 or '17?
5    A.  I am not positive.
6    Q.  Who filed the UCC-1 on your behalf?
7    A.  Wes Anderson.
8    Q.  Let's talk about the California investigation
9  against Dan Galvanoni.  Did you physically go in and
10  talk to an investigator from the State of California to
11  initiate the investigation?
12    A.  Which entity are you talking about?  Which --
13    Q.  Have you ever spoken to someone named Dean
14  Haakenson, H-a-a-k-e-n-s-o-n, with the State of
15  California, with the Department of Business Oversight
16  for the state?
17    A.  Yes, I believe I contacted them.
18    Q.  Aside from the Department of Business
19  Oversight, what other regulatory or law enforcement
20  agencies have you spoken to in California about Dan
21  Galvanoni?
22    A.  I don't recall.
23    Q.  Aside from Dean Haakenson, we'll call it at the
24  DBO, are you okay with that?
25    A.  Yep.

Page 188

1    Q.  Who else have you spoken to about Dan Galvanoni
2  in regulatory agencies in California, any other names?
3    A.  I don't remember.
4       (Exhibit 38 was
5       marked for identification.)
6  BY MR. KAUFMAN:
7    Q.  All right.  I've handed you Exhibit 38 marked
8  JM6690 and it goes through 6692.  Let's start on page
9  6690.  Are you with me?
10    A.  6690, yes.
11    Q.  Front page.  So it's an email from you on March
12  4th, 2017 to DeanHaakenson@DBO.ca.gov.  "Subject:
13  Marshall v Galvanoni, file number C-21678 emails."  Did
14  I read that correctly?
15    A.  Yes.
16    Q.  So let's read the first sentence.  It says,
17  "Dean, it was a pleasure receiving your emails.  I look
18  forward to talking to you sometime in the future."  Did
19  I read that correctly?
20    A.  Yes.
21    Q.  Is there a reason that you have not produced
22  any emails from DeanHaakenson@DBO.ca.gov as part of your
23  document production?
24    A.  I'm not sure.  We went through to get all the
25  emails.



Page 189

1    Q. Do you have emails from
2    DeanHaakenson@DBO.ca.gov in your care, custody and
3    control?
4    A. I don't know.
5    Q. Aside from this email to Dean Haakenson, did
6    you send any other emails to Dean Haakenson? I'm not
7    trying to trick you. I'll proffer you this is the only
8    email I have to or from Dean Haakenson, so I don't know
9    if you've sent him any others.
10   A. Yeah, and I'm not trying to be difficult. I
11   don't remember if I did send more or what transpired.
12   Q. You're aware that Dan Galvanoni is a resident
13   of the state of Arizona, aren't you?
14   A. Yes.
15   Q. When Wes was employed at DPG and his
16   affiliates, was he sharing information with you about
17   Dan Galvanoni?
18   A. When Wes was employed by DPG, was he sharing
19   information?
20   Q. About Dan to you?
21   A. When you say sharing information, what do you
22   mean?
23   Q. I mean, was he sending you audio recordings at
24   the time he was still employed at DPG?
25   A. I believe so. I believe. I'm not positive.

Page 190

1    I'm not sure. He might have resigned or he might still
2    have been employed, but I would have to look.
3    Q. Once Anderson was employed at DPG, was he
4    sending you screen shots of Dan Galvanoni's emails?
5    A. From past exhibits it seems that he sent some
6    screen shots, but I really don't remember the screen
7    shots until he produced that.
8    Q. So you don't -- but now that I've produced some
9    of those screen shots, has that jogged your memory that
10   there were others?
11   A. You know, I don't remember those to be honest
12   with you, and I don't remember if there was others. My
13   main concern, again, was to secure up my money and get
14   my money out and --
15   Q. Did Wes Anderson influence your view of what
16   has transpired at DPG?
17   MS. STEUER: Objection. Vague.
18   BY MR. KAUFMAN:
19   Q. Sure. Let's take a step back. So at one point
20   you thought Dan Galvanoni was the greatest I banker
21   ever. Do you remember that email?
22   A. Well, you're kind of exaggerating. I mean, I
23   thought Dan Galvanoni was looking out for my best
24   interests. I felt Dan Galvanoni, the things he was
25   saying to me was true, and he was going to do the things

Page 191

1    he was going to do, and we've had emails with him and
2    his team, and the things that Dan Galvanoni was telling
3    me that, John, you're family to me, John, your money is
4    going to be secure, you're going to be oversecured,
5    you're the only one that's going to be secured, don't
6    worry about it. You know, I've got your back. We can
7    sell the loans. You'll get your money. And I was very
8    concerned. It's a lot of money to me, and I did not
9    want to lose the money.
10   And so, yes, I felt that he was looking out for
11   my best interests. I felt that he was a friend, that he
12   was going to protect my money and think of me first and
13   foremost and that, you know, he said he would secure up
14   the money and that, you know, that he would be
15   protecting me and taking care of me. And I didn't you
16   know -- I had very little background, and I trusted him
17   emphatically.
18   Q. So going from using your words trusting him,
19   when did you change to not trusting him?
20   A. When I started getting information and being
21   told that, you know, that my money wasn't being used to
22   buy loans and that I was being told other things and
23   being sent and showed other things that there was some
24   major issues and major concerns going on.
25   Q. Okay. And that's what I'm trying to get at.

Page 192

1    So was your belief that the money that you put in was
2    not -- using your words, not being used to buy loans,
3    did that belief come from Wes Anderson telling you these
4    things or showing you these things? Is that where the
5    source of this belief came from?
6    A. Yes.
7    Q. Okay. Are you aware that Wes Anderson was
8    never the CEO of DPG Investments?
9    A. No, I was not aware of that.
10   Q. And in Arizona -- let's go back to California
11   before we leave there. Are you aware of the
12   investigation by the State of California or this BDO
13   department -- or DBO department is still ongoing?
14   A. I am not sure.
15   Q. What information did you send to the DBO
16   division, aside from this email in your hand?
17   A. I'm not positive what I sent them.
18   Q. Did you provide them a physical file via mail
19   or did you email them a file or both?
20   A. I just don't recall.
21   Q. Did you meet with anyone in person from the DBO
22   division?
23   A. I don't think I did.
24   Q. Did you meet with anyone in person with the
25   Arizona investigation securities team?



Page 193

1    A. Did I meet in person?  What was the question?
2    Q. With an Arizona investigator.
3    A. I don't think so.
4    Q. Did you have any emails exchanged with the
5  Arizona investigation team?
6    A. I'm not sure.  I don't remember.
7    Q. Do you know if you ever received any emails
8  from the Arizona investigation team?
9    A. I don't.  I don't remember.  I don't think so.
10    Q. Did you provide information to the Arizona
11  investigation team?
12    A. I may have.  I don't recall exactly.
13    Q. You don't keep a copy of the files that you
14  sent to the investigators in your file cabinet or on
15  your computer?
16    A. No, I probably -- I don't think I have copies
17  of it.
18    Q. Are you aware if the State of Arizona's
19  investigation has concluded or if it's still ongoing?
20    A. I'm not aware.
21    Q. Okay.  Who is Benjamin Paulin at the FBI?
22    A. I believe he's an FBI agent.
23    Q. Have you met Mr. Paulin or Agent Paulin?
24    A. Have I met him?
25    Q. Yeah.

Page 194

1    A. No.
2    Q. Have you ever spoken to him on the phone?
3    A. Yes.
4    Q. Okay.  How many times?
5    A. I'm not sure.
6    Q. Have you ever been deposed by the FBI or the
7  Securities and Exchange Commission?
8    MS. STEUER: Objection.  Compound.  You can
9  answer.
10  BY MR. KAUFMAN:
11    Q. Okay.  Let's break it down.  Have you ever been
12  deposed by or interviewed by an FBI agent concerning Dan
13  Galvanoni?
14    A. Concerning Dan have I been deposed?
15    Q. Well, let's break it down.  Let's ask first,
16  have you been interviewed by an FBI agent concerning Dan
17  Galvanoni?
18    A. When you say interview, what does that mean?
19    Q. Okay.  Let's define interview is asked
20  questions about, and we'll define the next question will
21  be have you ever given under oath testimony to the FBI.
22    A. Okay.
23    Q. So interview we'll take sharing information but
24  not under oath versus under oath.  Do you understand?
25    A. (Witness nodded head.)

Page 195

1    Q. Okay.  So have you been interviewed by the FBI
2  concerning Dan Galvanoni?
3    A. I have talked to the FBI about Dan Galvanoni.
4    Q. How many times have you been talking to the FBI
5  about Dan Galvanoni, oral, not written?
6    A. I'm not positive.
7    Q. Have you provided information to the FBI
8  concerning Dan Galvanoni?
9    A. When I talked to them, yes, I supplied
10  information.
11    Q. Have you mailed them any information?
12    A. I may have, yes.
13    Q. And I know you've emailed them information,
14  correct?
15    A. I believe so, yes.
16    Q. In fact, you would send email questions to
17  members of the DPG with the intent of sending those
18  answers to the FBI; isn't that correct?
19    A. I'm not sure what you -- say that question
20  again.
21    Q. Sure.  You would intentionally send questions
22  to DPG representatives, with the intent on once
23  receiving those answers forwarding the question and
24  answer to the FBI; isn't that correct?
25    A. I don't remember exactly.

Page 196

1    (Exhibit 39 was
2    marked for identification.)
3  BY MR. KAUFMAN:
4    Q. So I've handed you Exhibit 39, Bates JM, your
5  production, 8600 through 8606.  Do you have the same
6  thing in front of you, Mr. Marshall?
7    A. Yes.
8    Q. Okay.  So here is an example.  Let's look on
9  the first page, 8600, from John Marshall to Joe Joseph
10  sent Thursday, February 2nd, 2016 at 1:58 p.m.,
11  "Subject: Forward: Repayment and settlement proposal.
12  Importance: High."  Did I read that correctly?
13    A. Yes.
14    Q. Okay.  So this is an email from you to Joe
15  Joseph, right?
16    A. Yes.
17    Q. Concerning a negotiation to settle all your
18  claims and disputes with DPG and any related entities;
19  isn't that correct?  Isn't that pretty much the subject
20  matter of any of those emails?
21    A. It looks like it.
22    Q. In fact, it's the subject matter of all the
23  emails from JM8600 through JM8606, correct?
24    We can just look at the subject.  It's the
25  subject in all of them, correct?



Page 197

1   A. Okay.
2   Q. Doesn't it say, "Repayment and settlement
3   proposal," in every subject line?
4   A. Right, but I was concerned that maybe the body
5   that -- what's going on is that that's not -- was in the
6   body of the email.
7   Q. Have we assuaged your concern now?
8   A. Okay. Yes.
9   Q. So then if we look at the top email dated --
10  it's from you to Benjamin Paulin at ICFBI.gov. Do you
11  see that?
12  A. Yes.
13  Q. And that's dated February 4th, 2017, 12:10 and
14  33 seconds p.m. "Subject: Marshall case string of
15  emails with Joe Joseph, Galvanoni company stating things
16  that have happened." Did I read that correctly?
17  A. Correct.
18  Q. Okay. So then you forwarded all these supposed
19  negotiations about settlement and repayment --
20  settlement and repayment to Mr. Paulin, isn't that
21  correct, as part of your email? Sorry. Agent Paulin.
22  A. Yes.
23  Q. Okay. And you wrote, "Ben," meaning Agent
24  Paulin, "below is string of emails in which I demand my
25  money/payment. Also a lot of the emails reconfirm that

Page 198

1   they are doing to me, not paying any interest and not
2   following our agreements. However, they do not know I
3   have information from Wes Anderson of all the corrupt
4   things they have been doing. Thank you, John Marshall
5   J.D. CIC." Did I read that correctly?
6   A. Yes.
7   Q. Is it your goal to have Dan Galvanoni
8   incarcerated?
9   A. No.
10  Q. Is it your goal to have Dan Galvanoni
11  criminally charged by the Securities and Exchange
12  Commission?
13  A. No.
14  Q. So why did you contact the FBI and the
15  Securities and Exchange Commission?
16  A. Because I wanted to make sure that other people
17  were not going to be ripped off like I was getting
18  ripped off.
19  Q. Exhibit 40.
20  A. And I have a right, I have a right to contact
21  regulatory agencies.
22  Q. So aside from the State of California
23  regulatory agency, the State of Arizona regulatory
24  agency, and the Securities and Exchange Commission and
25  the FBI, now that we've gone through these, do you

Page 199

1   recall contacting any other regulatory or law
2   enforcement agency concerning Dan Galvanoni?
3   A. I think, I'm not sure, I might have contacted
4   somebody else too as well to look into it.
5   Q. Who do you think you may have contacted?
6   A. What were the ones you've named so far?
7   Q. So we've named state of California, the DBO,
8   State of Arizona, I believe it was the Secretary of
9   State Securities Division. You've contacted the Federal
10  Bureau of Investigations and the Securities and Exchange
11  Commission in Washington, D.C. Aside from those four
12  law enforcement and regulatory agencies, are you aware
13  of anyone else you may have contacted?
14  A. I'm not sure. I might have contacted somebody
15  else. I can't remember.
16  Q. Are you aware that there's an open and ongoing
17  Securities and Exchange Commission investigation, which
18  Dan Galvanoni has had to provide information and testify
19  to the FBI and SEC to?
20  A. I'm aware -- wait. Repeat that question.
21      MS. STEUER: Yeah, it's compound.
22  BY MR. KAUFMAN:
23  Q. Are you aware -- well, are you aware that the
24  FBI is the investigative arm of the Securities and
25  Exchange Commission?

Page 200

1       MS. STEUER: Objection. Lacks foundation.
2   BY MR. KAUFMAN:
3   Q. Are you aware of it was the question.
4   A. I wasn't aware they were the arm.
5   Q. Well, you were sending information to Benjamin
6   Paulin of the FBI concerning Dan Galvanoni, weren't you?
7   A. Yes.
8   Q. Why were you sending information to Ben Paulin
9   at the FBI?
10      MS. STEUER: Asked and answered. You can
11  answer again.
12      THE WITNESS: Yeah, that's a regulatory agency
13  that I contacted, with several other agencies.
14  BY MR. KAUFMAN:
15  Q. So did you contact the FBI separate from the
16  Securities and Exchange Commission, or did you contact
17  the SEC and then an FBI agent responded as a result of
18  your contact?
19  A. I think I -- I think I contacted both agencies.
20  Q. And are you aware that Dan Galvanoni has had to
21  produce information and is under investigation by the
22  SEC? Are you aware of that?
23  A. Yes.
24  Q. Do you want that investigation to continue?
25  A. I'd have to think about that question.



Page 201

1    Q.  Well, when you come to the answer, let me know.
2    Okay?
3        I'm going to hand you what we'll mark as
4    Exhibit 40.
5            (Exhibit 40 was
6            marked for identification.)
7    BY MR. KAUFMAN:
8    Q.  Exhibit 40 is Bates stamped JM, meaning your
9    production, 8607 and JM8608.  Is that what you have
10   before you, Mr. Marshall?
11   A.  Yes.
12   Q.  It's an email from you to Agent Paulin at the
13   FBI dated February 4th, 2017 at 12:00 and 57 seconds
14   p.m.  "Subject:  Marshall v Galvanoni/DPG
15   Investments/Spring Tree LLC, etc, String of emails with
16   Dan Galvanoni/DPG."  Did I read that correctly?
17   A.  Yes.
18   Q.  This email is just one long paragraph, correct,
19   pretty much, almost the whole page, one paragraph?
20   A.  Yes.
21   Q.  So it's a little hard for me to try to show you
22   where I want to get to.  I don't want to read the whole
23   thing.  If you go about midway through, do you see the
24   sentence starts in the middle, it says, "Dan Galvanoni
25   is also using the companies as his own personal piggy

Page 202

1    bank."  We can count the number of lines.  It's one,
2    two, three, four --
3    A.  Do you just want to put a dot on it for me?
4    Q.  Well, I don't want to write on evidence.
5    A.  Oh, sorry.
6    Q.  One, two, three, four, five, six, seven, eight,
7    nine, ten, 11 -- 18 lines from the top.
8        MS. STEUER:  Would it be okay if he used my
9    copy and I can circle it?
10   BY MR. KAUFMAN:
11   Q.  I'm happy if he wants to look at it, that's
12   fine.  It's hard to find.
13       You wrote, "Dan Galvanoni" -- this is what you
14   wrote to the FBI agent, "Dan Galvanoni is also using the
15   company as his own personal piggy bank."  Did I read
16   that correctly?
17   A.  Yes.
18   Q.  Did you believe that at the time you wrote this
19   email?
20   A.  Yes.
21   Q.  Do you believe that today?
22   A.  From the information I was given.
23   Q.  And that's the information that you were given
24   from Westley Anderson, correct, that you're talking
25   about?

Page 203

1    A.  Correct.
2    Q.  And Westley Anderson's information is what you
3    base your allegation to the Federal Bureau of
4    Investigation that Dan Galvanoni was using his company
5    as his own personal piggy bank, correct?
6    A.  Yes.
7    Q.  We come down, it's a little tough, but do you
8    see the sentence, actually, the word starts with other,
9    "other things that Galvanoni was up to and actually
10   did."  It's sort of in the bottom third, Melinda.  If
11   you go to the far left --
12       MS. STEUER:  Oh, okay.  When it's slightly
13   before, is that what you're talking about here?
14   BY MR. KAUFMAN:
15   Q.  It's just tough.  Do you see the sentence that
16   starts, "Wes has forwarded me copies of the company's
17   QuickBooks showing" --
18   A.  Where is he?  I can't read it.
19       MS. STEUER:  It's right here.  So it says, "Wes
20   has forwarded," starts right here.
21   BY MR. KAUFMAN:
22   Q.  Yeah, it's in the middle.  Are we on the same
23   page literally?
24       MS. STEUER:  Yeah.
25   BY MR. KAUFMAN:

Page 204

1    Q.  Okay.  "Wes has forwarded me copies of the
2    companies," plural, "QuickBooks showing Galvanoni
3    pulling huge amounts of money out of the company,
4    showing payments to other investors who invested after
5    me."  Did I read that correctly?
6    A.  Yes.
7    Q.  Now, are you aware that other investors may
8    have had separate arrangements with the companies as to
9    their payback terms that are different than yours?
10   A.  That's not what I was told.
11   Q.  Are you aware that that's possible?
12   A.  Anything is possible.
13   Q.  Okay.  So what you were told was based upon
14   information from Wes Anderson; is that correct?
15   A.  Also Dan Galvanoni.
16   Q.  Okay.
17   A.  When I first invested, Danny said, he goes,
18   hey, you're one of the first investors, you're going to
19   get paid back first, and you're going to be secured.
20   I'm not going to secure up myself or family members.
21   And again, as Danny said to me, he said, John, look,
22   worse comes to worse, we'll sell the loans, you're going
23   to get your money and get the interest, you're going to
24   be fine, and you know, I'm going to handle that, and I'm
25   going to secure up your loans, or I'll have my team



JOHN MARSHALL
JOHN MARSHALL vs DANIEL GALVANONI

March 14, 2019
205–208

Page 205

1 secure up the loans.

2    Q. And are you aware that DPG Investments, LLC is

3 a separate entity from Spring Tree, LLC?

4       It's not in the agreement. I'm just asking,

5 are you aware these are separate companies?

6    A. It's like a shell game. There's so many

7 different companies. There's DPG Golden Eagle, DPG

8 this, DPG, Spring Tree, all these different things. To

9 be honest with you, it's hard to follow the ball under

10 the different shells.

11    Q. Okay. So you would agree with me, and I'm not

12 agreeing that they are shells, but you would agree with

13 me that they were multiple different companies that

14 were --

15    A. There were different multiple companies,

16 correct.

17    Q. And it sounds from your testimony that you're

18 unsure of the interrelationship between those companies;

19 is that a fair assessment?

20    A. Yes.

21    Q. And you're not quite sure which entity you

22 actually invested in, are you, or entities plural?

23    A. The entity that I was supposed to invest in or

24 invest in the several ones or whatever else was the

25 entity that -- were the entities that had the loans and

Page 206

1 that were getting more money to invest in loans, and I

2 would also get a percentage, 13 percent of the profit of

3 those.

4    Q. Exhibit 41.

5       (Exhibit 41 was

6       marked for identification.)

7 BY MR. KAUFMAN:

8    Q. So this is Bates stamped number JM, your

9 production, 6594 and 6595. Is that what you have in

10 front of you, Mr. Marshall?

11    A. Yes.

12    Q. So let's look at the first email, which is

13 really the one on JM6595.

14       MS. STEUER: That's the second page.

15       THE WITNESS: 6595?

16       MS. STEUER: Yeah.

17 BY MR. KAUFMAN:

18    Q. This is an email from you to Ben Paulin, Agent

19 Paulin at the FBI, correct?

20    A. Yes.

21    Q. All right. And you wrote subject, and this

22 is dated -- sorry -- dated February 4th, 2017 at

23 12:05:07 p.m., correct?

24    A. Correct.

25    Q. And this one you wrote, "Subject: Marshall

Page 207

1 case Wes Anderson email and copies of bank statements

2 and QuickBooks showing Dan Galvanoni using company as

3 personal piggy bank." Did I read that correctly?

4    A. Yes.

5    Q. Then you sent an attachment PDF, correct?

6    A. Yes.

7    Q. And I don't have that attachment PDF. Is that

8 something you have in your email? Not the exhibit one,

9 but your actual emails, Mr. Marshall?

10    A. I don't know.

11    Q. Have you received emails back from Agent Paulin

12 or anyone else at the FBI responsive emails to your

13 emails?

14    A. I'm not sure.

15    Q. Because I'll represent to you that I have not

16 seen an email from the FBI to you. I've only seen ones

17 from you to them. So did you have to communicate with

18 them through like a portal or something else other than

19 your regular email, a secure email?

20    A. I don't think so.

21    Q. So the best of your understanding and

22 recollection, if Agent Paulin sent you an email, it

23 would be in your Armstrong Professional email account;

24 is that correct?

25    A. I would believe so, yes.

Page 208

1    Q. Have you deleted any emails from Agent Paulin?

2    A. I don't think so.

3    Q. Have you deleted any emails from anyone else at

4 the FBI?

5    A. No, I don't believe so.

6    Q. Do you believe you produced those emails to

7 your counsel from Agent Paulin?

8    A. Reading and writing is just not my forte. It's

9 a struggle for me and computers and IT and all those

10 things are just not -- are not real strong in those

11 arenas. But I believe -- I believe that, you know, I

12 copied and produced and gave those documents to my

13 attorney.

14       MS. STEUER: And just so the record -- we're

15 going to do another search for them.

16       MR. KAUFMAN: And for the record, we don't have

17 a single email from anyone at law enforcement.

18       MS. STEUER: No, I've been actually making a

19 list and we're going to be doing another search. We'll

20 see if there's anything.

21 BY MR. KAUFMAN:

22    Q. Thank you. I see that you've said that you had

23 trouble with sending emails, but we've seen that you've

24 seen -- you do use email, you've sent 30 plus today.

25    A. I do use emails, but I just -- I have a



Page 209

1  difficult time with reading and writing and --
2      Q. So was one of the pieces of information that
3  you shared to the FBI concerning that Dan Galvanoni used
4  $300 at an ATM to pay for hookers and drugs?
5      A. It wasn't Dan's $300.
6      Q. That wasn't the question. I just asked, is
7  it -- you told the FBI that Dan Galvanoni went to an ATM
8  to get $300 to pay for hookers and drugs. That's what
9  you told the FBI, correct?
10     A. Dan didn't go to the ATM by himself alone. I
11 was told that he woke Wes Anderson up at 3:00 a.m. when
12 they were in Atlanta and had him go down and get him
13 $300 from the ATM in order to pay for hookers and drugs,
14 and this is what I was told from Wes Anderson.
15     Q. Okay. So but for what Wes Anderson told you,
16 you have no independent knowledge of that allegation, do
17 you?
18     A. When you say -- what is your definition of
19 independent knowledge? You mean that I personally was
20 not there?
21     Q. Right, or you haven't seen a bank statement
22 that shows that withdrawal, you haven't --
23     A. That is correct.
24     Q. So other than Wes telling you this, you have no
25 other information to corroborate the veracity of that

Page 210

1  allegation one way or the other, do you?
2      A. I personally do not.
3      Q. You wrote in the last sentence, "I will speak
4  with Wes and get everything recorded with my attorney."
5  Did I read that correctly?
6      A. Yes.
7      Q. Okay. Has Wes Anderson, to the best of your
8  knowledge, contacted and spoken with your attorney?
9      A. I don't know if I have a recorded -- if we've
10 recorded Wes Anderson with myself or attorney. I don't
11 believe I have recordings with him and my attorney.
12     Q. So let's look at JM6594, the first page. I'll
13 represent to you this is an email from you to Agent
14 Paulin at the FBI on February 6th, 2017, at 9:50 in the
15 morning, correct; is that accurate?
16     A. Correct.
17     Q. "Subject: FW: Jerry Hudspeth resignation CEO
18 of Spring Tree LLC," correct?
19     A. Where were you? Where are you looking at?
20     Q. That's the subject of the header.
21     A. Yes.
22     Q. And then there's an attachment, correct, a PDF
23 attachment?
24     A. Yes.
25     Q. So this email was -- you thought you should

Page 211

1  share Jerry Hudspeth resignation with Agent Paulin, was
2  that accurate?
3      A. Yes.
4      Q. And even though Jerry ultimately decided not to
5  resign; isn't that correct?
6      A. Yes.
7      Q. Aside from these emails that you've seen, have
8  you sent any other emails to Agent Paulin or anyone else
9  at the FBI?
10     A. I'm not sure. I don't think so.
11     Q. One of your allegations in your complaint
12 concerns Dan Galvanoni committing waste, are you
13 familiar with that, wasting company assets on personal
14 things?
15     A. I would have to go back and look and see. I'm
16 trying to think of what you're referring to.
17     Q. Do you believe that Dan Galvanoni wasted
18 company resources?
19     A. Yes.
20     Q. Do you base that allegation off of the
21 information Wes Anderson told you about or anything else
22 or both?
23     A. Yes, information from Wes Anderson.
24     Q. Is it your contention that you were defrauded,
25 is that based upon what Wes Anderson has told you or

Page 212

1  other factors?
2      A. Yes, things that Wes Anderson has told me, and
3  you know, all the other things.
4      Q. Okay. Are you aware that Dan Galvanoni has
5  lost money in these ventures?
6      A. No, I have not seen if he has lost money in
7  these.
8      Q. Are you aware that Dan's brother, Phil
9  Galvanoni, has lost money in these ventures?
10         MS. STEUER: Objection. Lacks foundation. You
11 can answer.
12         MR. KAUFMAN: I'm just asking if he's aware.
13         THE WITNESS: I'm not sure if they have or
14 haven't.
15 BY MR. KAUFMAN:
16     Q. Are you aware that trusts or Dan's mother have
17 lost money in these ventures? These ventures meaning
18 these subprime DPG affiliated ventures.
19     A. I'm not sure.
20     Q. Why aren't you sure?
21     A. I've never been given that information.
22     Q. What information would, if provided to you,
23 make you sure?
24     A. The things that would be provided to me would
25 be financial information, that's credible financial



Page 209

1  difficult time with reading and writing and --
2      Q.  So was one of the pieces of information that
3  you shared to the FBI concerning that Dan Galvanoni used
4  $300 at an ATM to pay for hookers and drugs?
5      A.  It wasn't Dan's $300.
6      Q.  That wasn't the question.  I just asked, is
7  it -- you told the FBI that Dan Galvanoni went to an ATM
8  to get $300 to pay for hookers and drugs.  That's what
9  you told the FBI, correct?
10     A.  Dan didn't go to the ATM by himself alone.  I
11  was told that he woke Wes Anderson up at 3:00 a.m. when
12  they were in Atlanta and had him go down and get him
13  $300 from the ATM in order to pay for hookers and drugs,
14  and this is what I was told from Wes Anderson.
15     Q.  Okay.  So but for what Wes Anderson told you,
16  you have no independent knowledge of that allegation, do
17  you?
18     A.  When you say -- what is your definition of
19  independent knowledge?  You mean that I personally was
20  not there?
21     Q.  Right, or you haven't seen a bank statement
22  that shows that withdrawal, you haven't --
23     A.  That is correct.
24     Q.  So other than Wes telling you this, you have no
25  other information to corroborate the veracity of that

Page 210

1  allegation one way or the other, do you?
2      A.  I personally do not.
3      Q.  You wrote in the last sentence, "I will speak
4  with Wes and get everything recorded with my attorney."
5  Did I read that correctly?
6      A.  Yes.
7      Q.  Okay.  Has Wes Anderson, to the best of your
8  knowledge, contacted and spoken with your attorney?
9      A.  I don't know if I have a recorded -- if we've
10  recorded Wes Anderson with myself or attorney.  I don't
11  believe I have recordings with him and my attorney.
12     Q.  So let's look at JM6594, the first page.  I'll
13  represent to you this is an email from you to Agent
14  Paulin at the FBI on February 6th, 2017, at 9:50 in the
15  morning, correct; is that accurate?
16     A.  Correct.
17     Q.  "Subject:  FW:  Jerry Hudspeth resignation CEO
18  of Spring Tree LLC," correct?
19     A.  Where were you?  Where are you looking at?
20     Q.  That's the subject of the header.
21     A.  Yes.
22     Q.  And then there's an attachment, correct, a PDF
23  attachment?
24     A.  Yes.
25     Q.  So this email was -- you thought you should

Page 211

1  share Jerry Hudspeth resignation with Agent Paulin, was
2  that accurate?
3      A.  Yes.
4      Q.  And even though Jerry ultimately decided not to
5  resign; isn't that correct?
6      A.  Yes.
7      Q.  Aside from these emails that you've seen, have
8  you sent any other emails to Agent Paulin or anyone else
9  at the FBI?
10     A.  I'm not sure.  I don't think so.
11     Q.  One of your allegations in your complaint
12  concerns Dan Galvanoni committing waste, are you
13  familiar with that, wasting company assets on personal
14  things?
15     A.  I would have to go back and look and see.  I'm
16  trying to think of what you're referring to.
17     Q.  Do you believe that Dan Galvanoni wasted
18  company resources?
19     A.  Yes.
20     Q.  Do you base that allegation off of the
21  information Wes Anderson told you about or anything else
22  or both?
23     A.  Yes, information from Wes Anderson.
24     Q.  Is it your contention that you were defrauded,
25  is that based upon what Wes Anderson has told you or

Page 212

1  other factors?
2      A.  Yes, things that Wes Anderson has told me, and
3  you know, all the other things.
4      Q.  Okay.  Are you aware that Dan Galvanoni has
5  lost money in these ventures?
6      A.  No, I have not seen if he has lost money in
7  these.
8      Q.  Are you aware that Dan's brother, Phil
9  Galvanoni, has lost money in these ventures?
10         MS. STEUER:  Objection.  Lacks foundation.  You
11  can answer.
12         MR. KAUFMAN:  I'm just asking if he's aware.
13         THE WITNESS:  I'm not sure if they have or
14  haven't.
15  BY MR. KAUFMAN:
16     Q.  Are you aware that trusts or Dan's mother have
17  lost money in these ventures?  These ventures meaning
18  these subprime DPG affiliated ventures.
19     A.  I'm not sure.
20     Q.  Why aren't you sure?
21     A.  I've never been given that information.
22     Q.  What information would, if provided to you,
23  make you sure?
24     A.  The things that would be provided to me would
25  be financial information, that's credible financial



Page 213

1  showing that.
2      Q. But you received the company's QuickBooks from
3  Wes Anderson; isn't that correct?
4      A. I only received a small little portion of the
5  QuickBooks.
6      Q. You've seen the bank statements for all the
7  companies in discovery, haven't you?
8      MS. STEUER: Objection. Lacks foundation.
9  BY MR. KAUFMAN:
10     Q. Have you seen any bank statements for DPG
11 Investments, LLC?
12     A. I may have.
13     Q. And you have seen bank statements for DPG
14 Golden Eagle, LLC, correct?
15     A. Again, I don't recall if we got all the bank
16 statements, and if we've got -- we received all those.
17     Q. Have you seen bank statements for Spring Tree
18 Lending, LLC?
19     A. I don't recall. I do recall seeing a small
20 portion that was sent from Wes Anderson on the
21 QuickBooks. That is definitely something that I
22 remember seeing. But with all the other financials, I
23 don't remember getting those or receiving those, unless
24 it was at a later date.
25     Q. You said I don't recall and I don't remember a

Page 214

1  lot today. Do you have trouble with your memory?
2      A. No, but I want to -- at times I have -- yes,
3  there's sometimes I have difficulty remembering things
4  but --
5      Q. Have you ever been diagnosed by a doctor or
6  seen a doctor on that matter?
7      A. Yes, I have.
8      Q. How recent was that? And I'm not trying to
9  pry, but it does -- I'm trying to, you know, find out
10 what's going on.
11     A. Yesterday.
12     Q. Yesterday. Okay. And have you been diagnosed
13 with anything yet?
14     A. We're working through some things, and that's
15 kind of personal. But my mom has Alzheimer's, so.
16     Q. I'll tell you what, why don't we take a quick
17 break, and we'll get back, and if you can get us an
18 update on how much time we have used, I appreciate that.
19     VIDEO OPERATOR: Off the record at 3:43 p.m.
20     (Break.)
21     VIDEO OPERATOR: Back on the record at 3:57
22 p.m.
23              EXAMINATION
24 BY MR. HUGHES:
25     Q. Good afternoon, Mr. Marshall. I'm Brad Hughes.

Page 215

1  I'm one of the defendant's counsel. We have about two
2  hours roughly left, I believe, on the time here. Don't
3  worry, these stacks of documents, I'm not going to go
4  through all of this with you, I just -- hard for me to
5  pull things one at a time. I have some questions for
6  you. Do you understand you're still under oath?
7      A. Yes.
8      Q. Do you have any questions about -- well, strike
9  that.
10     Do you have any aspect of your testimony you
11 wish to change at this time?
12     A. I guess what I'd like to add to is --
13     Q. Not add. I just want to know if you want to
14 change any of your testimony.
15     A. Well, the last question with Alex, I just --
16 I'm just trying to be as accurate as possible and that's
17 why sometimes, you know, I -- you know, I feel like I do
18 remember stuff, but I want to be as accurate as I
19 possibly can.
20     Q. You understand we get one bite at this apple
21 with you. We don't get to depose you repeatedly as we
22 get closer to trial. So to the extent that there's
23 anything that refreshes your recollection that you'd
24 want to take a look from some of the things you said you
25 don't know to, let us know right now because effectively

Page 216

1  if you don't know now, then our position at trial is
2  going to be that you didn't know. And if you suddenly
3  know something you didn't know then, then we would ask
4  how it is that you had your recollection refreshed
5  without us having an opportunity to ask you about it.
6  Do you understand?
7      A. Yes.
8      Q. All right. You talked about -- I wrote down a
9  quote from what you said earlier, talking about
10 involving the FBI. And you said, quote, my main concern
11 was to secure up my money and get my money out. Do you
12 remember saying that?
13     A. Maybe I misstated it. My contact in the FBI
14 and the SEC was not for them to be involved to get my
15 money or anything else. I wanted to make sure that I
16 felt that there were things that were -- with the
17 regulatory, I felt that there were some things that I
18 felt were -- I guess I'm not quite sure how to put it,
19 maybe criminal in nature or -- or things that I just
20 felt I wanted to go to them. It wasn't for them to get
21 my money or anything. That's a civil matter, and that's
22 what we're pursuing.
23     Q. You went to them in order to try and punish
24 Mr. Galvanoni for allegedly losing your money, right?
25     A. No.



Page 217

1    Q. Okay. Then what was the purpose of going to
2  the FBI, sir?
3        MS. STEUER: Asked and answered. You can
4  answer again.
5        THE WITNESS: I just didn't want anybody else
6  being ripped off by them.
7  BY MR. HUGHES:
8    Q. You were involved in part of the group of
9  individuals that went out to try and find other people
10  to get involved in this subprime auto loan business,
11  weren't you?
12        MS. STEUER: Objection. Lacks foundation. You
13  can answer.
14  BY MR. HUGHES:
15    Q. Do you understand my question?
16    A. Yes. You're stating that I was involved --
17    Q. Well, let me just try and restate what I was
18  stating to be clear. There was around 10,000 pages of
19  documents that were produced in this case, okay, almost
20  70 percent of which are duplicates of the same emails
21  over and over and over again. Throughout those emails,
22  you would agree with me, that there are statements that
23  you make regarding wanting to bring other people into
24  this and that it's an amazing opportunity. Is that a
25  fair assessment of what your position was on this deal

Page 218

1  before the money was gone?
2    A. What happened in the beginning, Dan Galvanoni
3  suggested that if I knew of potential people that would
4  like to be involved and invest their money in it, that
5  I -- you know, I should, you know, turn them to him or
6  his team. So there were some people, once in a while
7  someone would bring something up or we would be talking,
8  and if that person had some interest or showed some
9  interest, I would refer them to Dan Galvanoni or his
10  team.
11    Q. So is the answer to my question yes?
12    A. Yes, that I did --
13    Q. Okay. That's good.
14    A. -- return --
15    Q. I don't want to come across as rude to you, but
16  I know it's been a long day, and so I'm going to ask you
17  questions that are going to be yes/no questions for your
18  benefit. If you want to give me an explanation, you're
19  welcome to. But I am truly going to try and save time
20  here by just asking you as many yes/no questions as I
21  can. Okay?
22    A. Yeah.
23    Q. All right. Did you tell the FBI about your
24  involvement in soliciting other individuals to be a part
25  of the Spring Tree DPG business?

Page 219

1        MS. STEUER: Objection. That lacks foundation.
2  It misstates testimony.
3  BY MR. HUGHES:
4    Q. Neither of those are proper objections for a
5  Federal Court case, but go ahead?
6    A. Like I said before, I wasn't actively trying to
7  solicit people or anything else. If somebody brought up
8  that, you know, oh, you know, hey, John, what have you
9  invested in, or we are talking about that, you know, I
10  shared what I was involved in from the information Dan
11  shared with me about my money being secured and
12  diversified and --
13    Q. Okay. Let's talk about those words. Okay? At
14  the very beginning of the day --
15        MS. STEUER: Oh, by the way, were you finished
16  with your answer, or are you going to keep interrupting
17  him?
18  BY MR. HUGHES:
19    Q. Were you finished with your answer?
20    A. Well, I was just going to say that, you know, I
21  wanted to share the information that Galvanoni, Dan
22  Galvanoni shared with me about, you know, as we have
23  talked about before and from the beginning, the risk
24  being diversified and that it's actually better than
25  real estate and people would pay, you know, on their car

Page 220

1  before they pay on their mortgage, was all those things
2  made sense, which sounded as a -- you know, a good
3  opportunity.
4    Q. Okay. Prior to this, how many investments had
5  you done with Dan Galvanoni? Just give me a number.
6        MS. STEUER: Objection. Asked and answered.
7  You can answer again.
8        THE WITNESS: Yeah, like I said, I think we did
9  the Costa Rica.
10  BY MR. HUGHES:
11    Q. How much money did you make on that deal?
12        MS. STEUER: Objection. Lacks foundation. You
13  can answer.
14        THE WITNESS: Oh, I didn't.
15  BY MR. HUGHES:
16    Q. No money at all on that?
17    A. I have not made any money.
18    Q. Okay. Did you do a deal in Atlanta?
19        MS. STEUER: Asked and answered. You can
20  answer again.
21        THE WITNESS: Did I do a deal in Atlanta? What
22  do you mean a deal? Before this stuff?
23  BY MR. HUGHES:
24    Q. Correct. Do you recall a transaction you did
25  with Mr. Galvanoni's businesses in Atlanta where you had



Page 221

1  received approximately $75,000 within, I believe it was
2  30 days or 60 days of your investment? You don't have
3  any recollection of that?
4       MS. STEUER: Objection. That lacks foundation.
5       MR. HUGHES: I don't know why you keep
6  objecting as lacks foundation. I'm in a deposition
7  trying to get foundation. Please.
8       MS. STEUER: Because the question presumes it
9  happened and we have no evidence it happened.
10      MR. HUGHES: Counsel, it's a discovery
11  proceeding.
12      MS. STEUER: So I can make that objection. You
13  can answer.
14      THE WITNESS: Could you tell me the deal or
15  remind me of the recollection?
16  BY MR. HUGHES:
17   Q. No, I'm asking you, sir. Do you have any
18  recollection of doing a transaction with Mr. Galvanoni
19  prior to the subprime auto loans that was taking place
20  in Atlanta? Yes or no?
21   A. If you can give me a moment, let me try to
22  remember.
23   Q. Sure.
24   A. It was something where I made -- was it a real
25  estate transaction or --

Page 222

1   Q. I'm asking if you recall there being a
2  transaction in Atlanta. If you don't recall, it's
3  perfectly within your prudence to say you don't recall.
4       MS. STEUER: So he's not going to help you
5  remember.
6       THE WITNESS: So not involving the Costa Rica
7  and not involving this stuff, and there was a deal in
8  Atlanta where -- was it a real estate deal, or was it
9  a -- I'm drawing a blank. I can't remember what the
10  deal was.
11  BY MR. HUGHES:
12   Q. Fair enough. Let me ask you a question, start
13  a little broader. How many investments do you currently
14  have, other than stocks and bonds?
15      MR. KAUFMAN: Publicly traded bonds.
16  BY MR. HUGHES:
17   Q. Yeah, publicly traded stocks and bonds. Excuse
18  me.
19   A. So I'm -- I'm invested in -- I'm invested in
20  two real estate deals.
21   Q. Okay. What kind of real estate deals are
22  those?
23   A. It's a commercial building.
24   Q. So are you the landlord?
25   A. I'm an owner with another partner.

Page 223

1   Q. That's an LLC that holds the property?
2   A. That's correct.
3   Q. All right. And the other property you have,
4  the same thing?
5   A. Yes.
6   Q. What other investments do you have? Do you
7  have any investments in any businesses, for example?
8   A. No, I don't -- yeah, I'm not -- you know, I
9  have my book of business that I am owner as a commercial
10  real estate -- excuse me -- commercial insurance broker.
11  But no, I'm not involved in owning businesses with
12  somebody else.
13   Q. Do you loan money to people?
14      MS. STEUER: Objection. Vague. You can
15  answer.
16      THE WITNESS: I have loaned money to people,
17  yes.
18  BY MR. HUGHES:
19   Q. Okay. And what is the interest rate you charge
20  the people you loan money to?
21      MS. STEUER: Objection. Overbroad. Vague as
22  to time. You can answer.
23      THE WITNESS: I would -- I'd have to go back
24  and look.
25  BY MR. HUGHES:

Page 224

1   Q. Is it ever higher than 20 percent?
2   A. I don't think so, but I'm not positive.
3   Q. How much money have you loaned in the past 12
4  months to individuals?
5       MS. STEUER: Objection. Lacks foundation.
6       THE WITNESS: I would have to go back and look.
7  BY MR. HUGHES:
8   Q. Where would you have those records at, those
9  loan documents that you would have with other people?
10   A. I would have a file.
11   Q. Let's talk about the document production in
12  this case. What did you do to identify documents that
13  you were going to produce here in this litigation?
14   A. We went and produced emails and documents that
15  were being requested.
16   Q. Okay. Did you go through any of your hard copy
17  files in your home?
18   A. On this particular case, yeah, if there were
19  something there I would go through that.
20   Q. Where are those things stored in your home?
21   A. File cabinet.
22   Q. In like a home office?
23   A. Garage area.
24   Q. How long did it take you to go through those?
25   A. Most of the -- there weren't really any



Page 225

1  documents that I found there. All of them -- you know,
2  most of the documents were emails and stuff on the
3  computer that we did a computer search for.
4      Q. You didn't actually look through your physical
5  file cabinets at all, did you? You just had an email
6  search done of all the email transactions; isn't that
7  right?
8      A. No, I looked -- I went home to see if there's
9  any documents that I had printed out or something at
10 home.
11     Q. You didn't make a photocopy of the contract
12 that you wrote up yourself and allegedly mailed to the
13 defendants? You didn't keep a copy of that at all?
14     A. Yeah, I think I have a copy of that, yes.
15     Q. Okay. Did you mail the original back to the
16 defendants, or did you keep the original yourself and
17 mail them a copy?
18         MS. STEUER: Objection. This has been asked
19 and answered three times. You can answer again.
20         THE WITNESS: Oh, I mailed it to Dan.
21 BY MR. HUGHES:
22     Q. Which did you mail, the original or the copy?
23     A. The original.
24     Q. When you were in law school, did you take any
25 classes regarding contracts?

Page 226

1      A. Yeah, I think first year we're required to have
2  a contracts class.
3      Q. What is your understanding of what happens when
4  you change a contract after it's been sent to you?
5      A. What is my understanding?
6      Q. That's correct, that's my question.
7      A. My understanding is that when -- that Danny and
8  I talked and what was agreed upon I wanted to make sure
9  that that contract was reflective of what was agreed
10 upon.
11     Q. Why do you put J.D. in your email signature
12 block?
13     A. You know, I don't have that anymore, but before
14 I used to have J.D. and CIC because those were degrees
15 and the designation, but I've taken those out.
16     Q. Why did you take them out?
17     A. Because I felt that some of my friends felt
18 that it was trying to be boastful and such, and then a
19 friend of mine, who is also an attorney, when we were
20 talking he felt that that's probably not a good idea to
21 have those because then it would -- might be misleading
22 to somebody that, you know, I have more knowledge than
23 somebody else.
24     Q. You had it in your email signature block
25 because you wanted people to know you had a juris

Page 227

1  doctorate, right?
2      A. Well, I had it in there to show my education
3  level, correct.
4      Q. Which is a juris doctorate, correct?
5      A. Correct.
6      Q. At the time that you initiated this litigation,
7  what was your understanding of the status of the
8  portfolio of loans?
9          MS. STEUER: Objection. Vague. You can
10 answer.
11         THE WITNESS: Yeah. Going back, I think, from
12 my understanding we had $1,200,000 worth of loans.
13 BY MR. HUGHES:
14     Q. What did you think was going to happen after
15 you initiated a lawsuit against the companies that own
16 the portfolios alleging that their entire process was
17 fraudulent? What did you think was going to be the
18 result of that lawsuit? Strike that.
19         What did you think was going to be the impact
20 of your lawsuit on those portfolios?
21     A. I really didn't think about that. What I was
22 concerned about in trying to do is to go back, again,
23 and making sure my money was secure and that I could get
24 my money out.
25     Q. You've used the word secure a lot today with

Page 228

1  talking about the portfolios. So let me ask you, what
2  does the word secure mean to you?
3      A. Well, what that means to me is what Dan
4  Galvanoni has expressed to me over and over. I wanted
5  to always have a situation where, you know, basically I
6  was not going to be hung out to dry, that, you know, in
7  a period of time, in a year or so or two years or
8  whatever, that if things weren't going well that there
9  were loans there, loans that I purchased, that they
10 could easily sell and I could get my money out and the
11 interest. So with the money that I was investing in
12 that they would be buying into these loans and that they
13 had a real large loan portfolio and they would be able
14 to sell those loans in order to pay me back.
15     Q. How -- sorry.
16     A. It's okay. And I apologize, but I just want
17 to -- and from my understanding that there is well over
18 a million of those loans, and so I would be oversecured
19 on those.
20     Q. How long have you been investing money?
21     A. When you say investing money, are you talking
22 about putting money in, like, 401(k) or putting money in
23 stocks and bonds, or are you talking about --
24     Q. How long have you been putting money into
25 stocks and bonds and a 401(k)?



Page 229

1   A. For a while, whenever --
2   Q. What is a while, 40 years?
3   A. Whenever I could put money in and I had the --
4   I didn't have -- where I could invest for -- towards
5   retirement, I would try to put money in.
6   Q. How about how long have you been investing
7   money into what we'll call private capital deals similar
8   to the subprime auto loans here?
9   A. I've never invested in -- really in, like,
10  businesses or subprime auto loans. I've never -- this
11  is the first that I was ever involved in something like
12  that.
13  Q. But you've invested in real estate, right?
14  A. Yes, I have.
15  Q. What happens when you invest money into real
16  estate, is it secured by anything?
17  A. Yeah, the property.
18  Q. And what happens if the property burns down?
19  A. You go to the insurance carrier and build it
20  back up.
21  Q. Well, you go to the insurance carrier and you
22  ask for your money back, right?
23  A. Right.
24  Q. What happens if the amount of the insurance
25  claim is less than the amount of money that you've put

Page 230

1   in?
2   A. Lots of things could happen.
3   Q. Right. All of a sudden your secured loan is
4   now not so secured, right?
5   A. Well --
6   Q. It's a yes/no.
7   A. It depends if, you know, you -- and I'm not
8   trying to be difficult, but if there was an issue that
9   the building was insured incorrectly, then, you know,
10  you could go to carriers or the insurance broker who did
11  it or something like that and see if there's ways to
12  offset that so you could be made whole.
13  Q. You can file a lawsuit against your insurance
14  company and try and figure out why they didn't
15  sufficiently insure the product, right?
16  A. You know, there's just options for people.
17  Q. Kind of like filing a lawsuit here. Let me ask
18  a question about your understanding of what secured
19  meant on this auto portfolio. You indicated that you
20  understood that your money was going to be secured by
21  the loans, correct?
22  A. Yes.
23  Q. What happened if all of the loans went into
24  default? Would you still be secured on those loans?
25  A. What happens if all the loans went into

Page 231

1   default?
2   Q. Correct.
3   A. So if the million two, every single one of
4   those, those people stopped paying on those loans, then
5   my understanding what Dan told me was, that they would
6   have GPS devices on them, and they would take back the
7   vehicles. And the loans, if they were done right to
8   Wells Fargo standards or higher, as they said they were
9   doing all those loans, that they could sell those
10  vehicles or they could get other people to buy and redo
11  loans on them. But the loans would be lower than the
12  value of the vehicle because they would have put
13  deposits on and such, and the money for the loan would
14  be paid back, and we would get our money.
15  Q. Okay. You have as a basic understanding as a
16  well-educated person, you went to Cal, got an
17  undergraduate degree there, went to BYU, got a law
18  degree there. You understand that there's no such thing
19  as an investment without risk, correct?
20  A. I would say that, you know, investments do have
21  risks, but I would -- for me, I'm a very conservative
22  guy, and I would -- I want to get into investments with
23  a low amount of risk.
24  Q. Okay. Fair enough. At the time that you
25  invested $25,000, that was the first investment you made

Page 232

1   right, 25,000?
2   MS. STEUER: Objection. Misstates evidence.
3   THE WITNESS: Yeah, I don't think so.
4   BY MR. HUGHES:
5   Q. How much was the amount of the first investment
6   you made?
7   A. I think the first investment that I made with
8   Mr. Galvanoni was 100,000.
9   Q. Okay. And that was an investment you made
10  while the loan portfolio was under the SkiBo Holdings or
11  the SkiBo umbrella, is that your understanding?
12  A. Yes, I believe so.
13  Q. Okay.
14  A. Those were the loans, and I was putting 100,000
15  in that would be buying and purchasing those loans, and
16  100,000 would be used to buy those loans and secured on
17  those loans.
18  Q. So we have some roughly 10,000-or-so documents,
19  most of which involve a guy by the name of Jim Duryea
20  that has to do with what happens with the SkiBo
21  portfolio. Do you recall Jim?
22  A. Yes.
23  Q. Do you recall being copied on numerous emails
24  going into the discussion of what was wrong with SkiBo?
25  A. Yes.



Page 233

1  Q.  Do you recall being involved in numerous emails
2  with Mr. Galvanoni and other members of his team wherein
3  there's a communication about how Mr. Duryea and the
4  individuals of SkiBo had defrauded everybody involved?
5  A.  Yes.
6  Q.  Okay.  Why, sir, after being told by third
7  parties that the loan portfolio was a nonexistent thing
8  because of SkiBo, did you decide to then put more money
9  into the product and more money into the company after
10  that, another $200,000?
11  MS. STEUER:  Objection.  That lacks foundation.
12  That misstates the evidence.  You can answer.
13  THE WITNESS:  Okay.  Well, one reason is -- and
14  I mean, one, because Dan Galvanoni was a very good
15  friend, and I very much trusted him, and I had a lot of
16  faith and trust in him.  And I felt that, you know, all
17  the things that he said and all the things that he
18  stated, you know, were true and that he was looking out
19  for my best interests and had my best interests at
20  heart.
21  And when I was told about a lot of issues about
22  Jim Duryea and those companies, Brad, I was in a panic.
23  I just really was very upset because, as you could
24  imagine, you putting in $100,000 and then later getting
25  this news and being told what was going on that these --

Page 234

1  you know, all the other issues without going into all
2  the details of it.  But Dan came, he calmed me down, he
3  talked with me, and not just Dan, also, you know, Jerry
4  Hudspeth and such, but mainly Dan.  And Dan said to me,
5  he said, John, look, this is still going to be great,
6  and what you have to understand is this, you know, we've
7  got the loans.  We will again go through those loans,
8  and we're getting the loans for a really good deal for
9  the amount of money we're paying for it.  And again,
10  we'll diversify, you know, we will continue to diversify
11  with the vehicles, not just in one area, so if there's a
12  disaster.  We'll make sure that the loans are at Wells
13  Fargo standard or better and that, you know, if
14  something happens to the vehicles, if they are stolen or
15  damaged, we've got insurance coverage on it, so we'll
16  get the money back on those things --
17  BY MR. HUGHES:
18  Q.  Were you ever --
19  A.  -- and --
20  Q.  I'm sorry.  Go ahead.
21  MS. STEUER:  I'm sorry.  Are you going to let
22  him finish his testimony?
23  THE WITNESS:  Yeah, I'm sorry.  I just want --
24  MR. HUGHES:  Hang on a second.  I don't know
25  why you think that I have the ability to mind read your

Page 235

1  client when he's done.  He's pausing naturally, and I'm
2  trying to make the best of my time --
3  MS. STEUER:  You're continuously interrupting
4  him.  You can finish.
5  THE WITNESS:  Okay.  Sorry.  I lost a little
6  bit of a train of thought there.  And so Dan, again, you
7  know, confirmed with me that my money would be secured
8  on these loans, so I'm not going to lose my $100,000,
9  we'll just liquidate the loans -- not liquidate.  Excuse
10  me.  I think that's the wrong termination [sic] but he
11  says we would turn and sell those loans, and we'll sell
12  a block of those loans, and you'll get your $100,000
13  back, John.  And you know, I'm not going to -- you know,
14  you've trusted in me and you've put your money up, and
15  I'm not -- you know, I'm not -- I've got your back, I'm
16  not going to leave you hung out to dry.
17  And he said that in this he was dealing with
18  Jim Duryea and Jim had some interest and a stake in it
19  and because of all this his stake in the company, that
20  this is actually the way he presented it to me, which
21  made a lot of sense, and I believed him, that this was
22  actually a good situation because now we were -- he was
23  going to have Jim Duryea out of this, completely out.
24  He was not going to get any interest or have any
25  interest or get any percentage of the profits or

Page 236

1  anything on it, and that everything that was going on
2  was not going to be an issue, that he was going to have
3  Jerry and Wes go through the loans and make sure the
4  loans were all good and that -- that, you know, my money
5  still would be secure.
6  And he said going forward, you know, he was
7  going to continue to get more investors and have more
8  money, and he personally would be putting up a lot of
9  his money and you, know, there would be a lot more loans
10  and a lot more money put in.  And the money I put in,
11  not only would my money be invested in the loans and
12  secured, I would be oversecured because there's going to
13  be even more loans and more money and a lot easier to
14  liquidate than if we went and invested into real estate.
15  BY MR. HUGHES:
16  Q.  Are you done?
17  A.  Yeah.
18  Q.  Where did the money come from that you provided
19  to the defendants?
20  A.  Where did the money come from?
21  Q.  Right.
22  A.  You mean which bank account?
23  Q.  Was it your money?
24  A.  Yes.
25  Q.  Okay.  So if you made a representation in



Page 237

1 emails to other individuals that you borrowed money from
2 family and friends, relatives, that would be incorrect?
3     A.  Well, I was talking to different relatives and
4 family members, and I also -- there was other money that
5 I was going to use to help out and that I was committed
6 to help with my mom.  But rather than using that, I was
7 going to take that money and try to create more money to
8 help.
9     Q.  Okay.  Let me just do some yes/no questions
10 with you.  Okay?  Was 100 percent of the money that you
11 invested in these companies money that was yours that
12 you controlled?
13     A.  Yes.
14     Q.  Okay.  Did you borrow any money from any
15 relative or family member that was part of what was
16 given to the investments here?
17     A.  I don't recall if I borrowed some money for
18 short term and paid them back, or if I was able to --
19 I'm not sure.
20     Q.  Your personal financial statement that we
21 discussed at the very beginning of the deposition, was
22 that an accurate statement of your finances at the time
23 that you submitted it?
24        MS. STEUER:  Objection.  Asked and answered.
25 You can answer again.

Page 238

1        THE WITNESS:  Yeah, I believe so.
2 BY MR. HUGHES:
3     Q.  Do you have any reason to believe why it would
4 not be accurate?
5        MS. STEUER:  Asked and answered.  You can
6 answer again.
7        THE WITNESS:  No.
8 BY MR. HUGHES:
9     Q.  Your personal balance sheet, I thought,
10 indicated you had a net worth of a little over $7
11 million; is that correct?
12     A.  I think that might be correct.
13     Q.  If you had a net worth of $7 million with
14 approximately $1.6 million in liquidity, why were you
15 borrowing money to then loan for this investment
16 opportunity?
17     A.  Well, I was concerned that I wasn't going to
18 have money to pay for my mom because I was checking out
19 the costs to take care of Alzheimer's people.  I also
20 had costs for my children that were in school.  I also
21 had some other life insurance policies that I had to pay
22 on myself and others, and I didn't want those policies
23 to lapse because I put in, you know, money before.
24        And some of my accounts, I've had accounts for
25 a period of time, and I was concerned about losing some

Page 239

1 of those accounts because a lot of the owners were --
2 they had been with me for 20-plus years, and the
3 businesses were either closing out or selling to a huge
4 company, and you know, it would be huge hits to my
5 income, and then I wouldn't have the revenue to pay for
6 that.  And so I was very concerned, and I was talking to
7 some people that, you know, instead of paying for some
8 of this stuff, if I could use this money, and I felt it
9 was a good opportunity, I trusted Dan, that I would have
10 that.  But then I was concerned, too, that I was going
11 to need the money to pay these ongoing -- these ongoing
12 debts as well.
13 BY MR. HUGHES:
14     Q.  Which relatives or family members did you
15 borrow money from?
16     A.  People that --
17     Q.  No, names, actual name of the individual from
18 whom you borrowed the money.
19     A.  Oh, if -- the person that I would discuss that
20 with borrowing money would be most likely my brother.
21     Q.  Okay.  So did your brother give you money to
22 invest into these dealings?  It's a yes/no.
23     A.  Yeah, I don't believe so.  I don't think I had
24 to -- that I didn't borrow from him.  But I used money
25 to go into these that I was earmarking to help with my

Page 240

1 mom and help the family.
2     Q.  And for your kids, right?
3     A.  And for the family.
4     Q.  And for your daughter's college fund, right?
5     A.  Pardon me?
6     Q.  For your daughter's college fund to pay for
7 your daughter's school?
8     A.  My daughter was at St. Francis.  She wasn't in
9 college.
10     Q.  But that money that you took from her account
11 was for her to go to school, right?
12        MS. STEUER:  Objection.  Lacks foundation.
13 BY MR. HUGHES:
14     Q.  It's just a question.  It's yes/no.
15        MS. STEUER:  Well, no, it's a question with a
16 false thing in it.  That's why it lacks foundation.
17        MR. HUGHES:  Okay.  I --
18        MS. STEUER:  It's the
19 have-you-stopped-beating-your-dog question.  It cannot
20 be answered with a yes or no.
21        THE WITNESS:  Yeah, it was money that I was
22 using to invest in this, and I was concerned because I
23 wasn't using it to pay towards my son's college and
24 towards my daughter's schooling.
25 BY MR. HUGHES:



Page 241

1    Q.  The wire transfer that was the first -- it was
2   a $50,000 transfer that came from your daughter's
3   account, that was an account for her for money to be set
4   aside for her to use for schooling or whatever in the
5   future, correct?
6    A.  You know, I'm not positive.  I mean, any money
7   that I was taking to invest would be money that I
8   wouldn't be able to immediately, you know, use to help
9   for their schooling.
10   Q.  Did you tell your ex-wife that you were going
11  to be taking money out of Madison's account to do this?
12   A.  I don't believe that was Madison's account.  I
13  believe the money that was taken out -- or I don't know
14  I don't remember.  But the money that is my money, I can
15  invest my money, and I didn't discuss with others.
16   Q.  Sir, I'm going to read a portion of email that
17  is JM883, and I'll mark it next in order, which is
18  probably what, 200?
19       THE REPORTER:  42.
20       (Exhibit 42 was
21        marked for identification.)
22  BY MR. HUGHES:
23   Q.  I'm going to read it to you, sir, because I'm
24  going to ask you a question.  I don't have copies, but
25  I'm going to hand this to you after I read it to you.

Page 242

1   It's an email dated August 10th, 2015, and it's to a
2   number of individuals, including Dan Galvanoni, Phil
3   Galvanoni, Brian DeLucia, Todd Owen, Matthew Camden,
4   Clinton Polk, Joshua Boles, Ed Hartwell.  And in it you
5   say, quote, as you know, Dan and I are fully committed
6   to this venture and these businesses.  I've personally
7   borrowed money from my relatives and have personally put
8   up a sizable amount of my money.  I'm in my 50s with
9   children in the expensive ages, in college.  So I've
10  sacrificed everything because as we know this is an
11  incredible opportunity.  Don't miss out on it.  It
12  really is simple.  Let's line up committed investors
13  that are actually putting up money or don't waste your
14  time and find another investor, and let's move forward.
15  It's time to get large sums of our investment money.
16       Is the statement with respect to relatives and
17  the status of your children in college an accurate one?
18   A.  Yeah, I don't think that I ended up borrowing
19  money.
20   Q.  You told the people in that email that because
21  you wanted them to believe that you had actually put
22  your own family's money on the line, correct?
23   A.  Well, I have put my own money on the line and
24  my family's money or as far as I'm concerned I did.
25   Q.  How much money has Dan Galvanoni, to the best

Page 243

1   of your knowledge, invested into these businesses?
2    A.  I'm not sure.
3        MS. STEUER:  Objection.  Asked and answered.
4   And calls for speculation.  You can answer.
5   BY MR. HUGHES:
6    Q.  Give me your best estimate.
7    A.  I am not sure.
8    Q.  Out of the 10,000 pages of documents you don't
9   recall a single email where Dan Galvanoni talks about
10  how much money he's actually personally invested in
11  this?
12   A.  I'm not sure -- after things that he has told
13  me seeming not to be true, I'm not sure what to believe
14  what he has said that he's put in.
15   Q.  Why didn't you report anybody else to the FBI?
16       MS. STEUER:  Objection.  Vague.  Overbroad.
17  You can answer, if you understand the question.
18       THE WITNESS:  From the information I was given
19  and had knowledge of, Dan Galvanoni was the person that
20  I felt should be reported.
21  BY MR. HUGHES:
22   Q.  During the course of your -- you can put 42
23  away if you want.
24       During the course of your involvement with
25  these entities, did you explore other investment

Page 244

1   opportunities with anybody else?
2        MS. STEUER:  Objection.  Vague.  Overbroad.
3   You can answer.
4        THE WITNESS:  Yeah, I would look for -- people
5   would talk to me about maybe other opportunities.
6   BY MR. HUGHES:
7    Q.  You brought other opportunities to Dan
8   Galvanoni and his team, didn't you?
9    A.  I think I talked about a real estate
10  opportunity that they might be interested in.
11   Q.  What about a thing involving the Marriott?  Do
12  you recall trying to get in on a Marriott deal that DPG
13  was doing?
14   A.  Was it something Dan brought to me?
15   Q.  No, sir.  My question is whether you recall
16  trying to get involved in a Marriott deal that involved
17  these companies and DPG?
18   A.  Was Marriott in Palm Springs or Palm Desert or
19  down in Southern California?
20   Q.  Does that refresh your recollection of that?
21   A.  Yeah.
22   Q.  So you recall that correctly?
23   A.  Is that the one you're talking about?
24   Q.  Are there any other Marriott deals you've been
25  aware of?



Page 245

1    A.  I don't remember if it was the Marriott, but I
2  remember that he was talking about a real estate deal
3  down in Palm Springs.
4    Q.  Yeah, listen, I'm not trying to make this
5  difficult.  I really am not.  But if there's other
6  Marriott deals that you could think of, that's why I
7  would ask if there's anything else that comes to mind.
8    A.  Yeah.
9    Q.  You were provided with the financial
10 information regarding SkiBo and all of these loan
11 portfolios, weren't you?
12       MS. STEUER:  Objection.  Vague.  You can
13 answer.
14       THE WITNESS:  Again, not to be difficult, I
15 don't remember them giving me the loans or going through
16 the loans or anything else.  My main concern was, again,
17 that these were good, real loans that the people that
18 had the expertise, the Dan Galvanonis the Jerry
19 Hudspeths, the Wes Andersons, that they went through
20 these loans and confirming that those were really good
21 loans.
22 BY MR. HUGHES:
23    Q.  So have you gone through your document
24 production, ever?  Have you ever looked at what you've
25 provided to the defendants as part of your case?

Page 246

1    A.  I've gone through emails and have gone through
2  the stuff, but I haven't -- I mean, I don't have the
3  stuff memorized.
4    Q.  Okay.  Do you know whether or not you were
5  given all of the customer and client information for
6  every loan that was done?
7    A.  I think I may have, but I don't think -- I
8  don't think I went through it, you know.
9    Q.  It was provided to you, right?
10       MS. STEUER:  Objection.  Lacks foundation.
11 Calls for speculation.
12       THE WITNESS:  It could have been.
13 BY MR. HUGHES:
14    Q.  It's in your document production.
15       MS. STEUER:  Oh, yeah, really?
16       MR. HUGHES:  So you guys know.  So it's in your
17 document production.
18       MS. STEUER:  Yeah, that's argumentative, and
19 it's also not accurate, and I don't appreciate your
20 questions that have false premises in them.
21 BY MR. HUGHES:
22    Q.  Okay.  Well, sir, do you have any recollection
23 during your efforts to collect all the documents you're
24 producing to us, copies of the full client portfolio
25 list, including names, addresses, phone numbers,

Page 247

1  information regarding their creditworthiness,
2  information regarding everything about them, do you have
3  any recollection of doing that?  I'll withdraw the
4  question.  Let me ask it a different way.
5        If those materials were presented by you in
6  your document production, would it be accurate to say
7  that that came from somebody that had been provided to
8  you by the defendants at some point in the case before
9  it was filed?
10       MS. STEUER:  Objection.  Incomplete
11 hypothetical.  Lacks foundation.  You can answer.
12 BY MR. HUGHES:
13    Q.  I'll withdraw the question and ask you a
14 different way.
15       Did you personally undertake any efforts to go
16 and find all of the portfolio information from anybody?
17    A.  No.
18    Q.  Do you recall that information being provided
19 to you?
20    A.  Yes, if it was provided, it would come from --
21 that information would obviously come from Dan and his
22 team.
23    Q.  I'm going to mark as 43 a document that's
24 JM1434.
25       (Exhibit 43 was

Page 248

1        marked for identification.)
2  BY MR. HUGHES:
3    Q.  This is an email dated September 14, 2015.  You
4  wrote this email, states, what time is conference call,
5  conf call?  Can I get conf call info?  You say, "I've
6  been talking to Jerry and Wes extensively on all the
7  issues, however I'd like to be on the call."
8        There's a quick look at it.  You can verify
9  that I've read it correctly.
10   A.  Okay.
11   Q.  Is that accurate, sir, at the time in 2015,
12 were you communicating continuously and extensively with
13 Wes and John -- excuse me -- Wes and Jerry?
14   A.  I did have communication with Jerry and Wes.
15   Q.  Was there ever a time where you picked up the
16 phone to call Jerry Hudspeth or anybody from Dan's team
17 in 2015 or 2016 to have a discussion about what was
18 going on and they wouldn't answer your call or take your
19 call?
20   A.  No.
21   Q.  What is your cell phone number?
22   A.  (916) 960-9196.
23   Q.  Who is the provider?
24   A.  AT&T.
25   Q.  Is that the same number you've had for the



Page 249

1  last -- since 2015?
2      A. Yes.
3      Q. You can put that one aside. Thanks.
4          (Exhibit 44 was
5          marked for identification.)
6  BY MR. HUGHES:
7      All right. I'm going to show you JM6010
8  through JM6013. And if you want to read through all
9  these, that's fine, we can go off the record, so I don't
10  burn time. I'm just going to ask you whether or not you
11  recall preparing these materials. They are all
12  identified from you, and I think you should be able to
13  see pretty quick what they are. They are not that old.
14      So let me hand these to you. If you want to
15  take a minute -- if you want to take time to look at
16  them, you're welcome to, but we'll go off the record so
17  you can do that.
18      VIDEO OPERATOR: Counsel, did you want to go
19  off the record?
20  BY MR. HUGHES:
21      Q. Can you --
22      MS. STEUER: Yeah, I don't think you have the
23  unilateral right to have us go off the record. If you
24  want him to review this stuff, he's going to review it.
25      THE WITNESS: Yeah, I can review it. Do you

Page 250

1  want me to review it?
2  BY MR. HUGHES:
3      Q. Are you able to look at that document and tell
4  whether or not that's a letter that you wrote?
5      A. It appears to be.
6      Q. Okay. You can hand it back to me. Do you
7  recall why you wrote that letter?
8      A. Can I read the letter? I think the reason why
9  I wrote that letter, I think I was trying to again
10  confirm what was going to be going on.
11      Q. I'll read the letter to you. It says, "Summary
12  of our agreement." It's dated 8/3/16. "In order for me
13  to not get my money returned plus interest due and for
14  me to keep my money invested and to go forward, it is
15  agreed that my money will always," all caps, "be in
16  first position and over secured on auto loans as you
17  have guaranteed me. I will reserve the right to sell
18  the loans to get my money back plus interest owed to me
19  at 10 percent. I can require you to sell the loans at
20  any time. This will always be the agreement. If you do
21  not agree, please return all my money plus interest due
22  to me immediately. Thank you, John Marshall."
23      Do you recall writing that?
24      A. Yeah, I think -- I believe so. Again, these
25  were conversations --

Page 251

1      MS. STEUER: It's just -- you've answered the
2  question.
3      THE WITNESS: Oh, well.
4      MR. HUGHES: Now he doesn't get to give his
5  whole answer?
6      MS. STEUER: Yeah, you can expand if you want
7  it.
8      THE WITNESS: Okay. I was just going to say,
9  again, I was very concerned about my investments, and I
10  wanted to make sure my money was just secure, and as Dan
11  told me, you know, that if worse comes to worse, not to
12  be worried, that he could sell a portion of the
13  portfolio and get my money back and the interest.
14  BY MR. HUGHES:
15      Q. Do you recall during the course of this case
16  there was a time when Mr. Galvanoni had secured lending
17  from a bank that would potentially save the portfolio,
18  if you will? Do you recall that?
19      MS. STEUER: Objection. Lacks foundation. You
20  can answer.
21      THE WITNESS: What are you referring to? Are
22  you referring to Spartan Financial?
23  BY MR. HUGHES:
24      Q. Correct. Do you recall that?
25      A. Yes.

Page 252

1      Q. Okay. Do you recall or do you know why Spartan
2  declined to provide the company with the loans that it
3  needed?
4      A. I do not.
5      Q. Okay. If I were to represent to you that
6  Spartan declined to loan the company the funds it needed
7  to stay afloat because of your lawsuit, what would be
8  your reaction to that?
9      A. This is the first I've heard of it.
10      Q. Did you put together the letter we marked as
11  Exhibit 44 on your work computer or home computer?
12      A. I think my work computer.
13      Q. Is that the same computer you have today?
14      A. Yes.
15      Q. I'm going to mark as Exhibits 45 and 46. I
16  know that Exhibit 46 has already been identified as
17  another exhibit, but I'm going to mark it again simply
18  because it will be much easier in our use in trial to
19  flip between them. So Exhibit 45 is titled JM8116, and
20  you've already seen that already. That's the wire
21  transfer form, right?
22          (Exhibit 45 was
23          marked for identification.)
24      THE WITNESS: Yes.
25          (Exhibit 46 was



Page 253

1          marked for identification.)
2    BY MR. HUGHES:
3        Q. And I'm going to show you Exhibit 46. Exhibit
4    46 is the same document, except that's got your
5    handwriting all over it, doesn't it, sir?
6        A. Yes.
7        Q. Why did you add all your handwriting to that
8    wire transfer document after it had been created?
9        A. I would think just -- you know, at the time I
10   would think that the reason why I did that was to just
11   clarify that.
12       Q. Clarify that to who?
13       A. To myself, probably.
14       Q. Do you do that frequently, do you write on
15   documents after they have been finalized with crossing
16   things out and adding things?
17       A. I would to try to remind myself to make it
18   accurate.
19       Q. Okay. You could put those two aside.
20          Do you recall when you marked up Exhibit 46
21   with your handwriting?
22          MS. STEUER: Asked and answered. You can
23   answer again.
24          THE WITNESS: I don't recall.
25   BY MR. HUGHES:

Page 254

1        Q. Okay. Why did you --
2        A. I don't recall why I did that.
3        Q. Why did you cross out your daughter's name?
4        A. Because I put -- I wanted to put my name. It
5    wasn't my daughter's account. This was my account.
6        Q. I'm going to show you Exhibit 47, which is a
7    part of an email chain between you and Dean Haakenson,
8    H-a-a-k-e-n-s-o-n, he's the individual at the department
9    of business organization or whatever the State of
10   California calls it.
11          (Exhibit 47 was
12          marked for identification.)
13   BY MR. HUGHES:
14       Q. As part of the email discussion, Dean asks you
15   on March 6th, 2017, "Also, John, if you did have any
16   list of other California investors, send that please."
17   Did you ever send Mr. Haakenson a copy of a list of
18   other investors? Yes or no is fine or I don't remember.
19       A. I'm not sure if I did.
20       Q. And then he says, "Also, John, if you have any
21   investment offering materials from the company?" And
22   you respond as follows on March 6th, 2017 at 11:39 a.m.,
23   "Dean, that's part of the problem and their fraud, they
24   really did not provide any investment material,
25   prospectus or investment information. I really don't

Page 255

1    have anything, which my attorney has said is illegal and
2    part of the fraud."
3          Now, I don't want to know anything that your
4    attorney has told you. Is everything that you've
5    represented to the State of California investigator true
6    and correct? It's the truth?
7        A. In my opinion, yes.
8        Q. Well, I know right now in today's state of
9    affairs, truth seems to be something that is based on
10   opinion as opposed to fact. But the fact is what you've
11   represented here to Mr. Haakenson is not accurate, is
12   it?
13       A. I think it is.
14       Q. You were provided information about the
15   investment, weren't you?
16          MS. STEUER: Objection. That misstates the
17   document.
18   BY MR. HUGHES:
19       Q. I'm not asking about the document. I'm asking,
20   you were provided investment information?
21       A. No, I didn't feel I was provided detailed
22   information on the investment. And I feel that, no, I
23   don't. And what we were agreed upon and how it was
24   supposed to be done, I felt that wasn't done correctly.
25       Q. Okay. You don't feel like you were provided an

Page 256

1    investment -- documents regarding the investment before
2    you invested at all?
3          MS. STEUER: Objection. That misstates his
4    testimony. You can answer.
5          THE WITNESS: Yeah, I don't feel that I was
6    provided --
7    BY MR. HUGHES:
8        Q. You don't feel that you were provided the
9    financials of the company at all points in time as it
10   was operating?
11          MS. STEUER: Which question do you want him to
12   answer? That's compound.
13   BY MR. HUGHES:
14       Q. Were you provided the financials of the company
15   at any time?
16          MS. STEUER: Also, objection as to vague as to
17   what is meant by financials. But you can answer.
18          THE WITNESS: Yeah, I would have to go look
19   back and see what was provided.
20   BY MR. HUGHES:
21       Q. You told the -- you told the investigator,
22   quote, I don't have anything. Do you still stand by
23   that statement that you didn't have any investment
24   material, prospectus or investment information to
25   provide him?



Page 257

1    A. I would have to go back and look.

2    Q. Okay. We talked a little while ago about the

3    document production. You can put that aside. I'm not

4    going to ask you any more questions about that. Thank

5    you, sir.

6        The document production, the process by which

7    you obtained all the documents, you went to your file

8    cabinet at home, and you searched through that, right?

9    A. I looked at that.

10   Q. And at your office did you go through a file

11   cabinet there and go through anything?

12   A. We went and did a search on documents in emails

13   and those things.

14   Q. Okay. Who did the search?

15   A. I did.

16   Q. You personally, yourself, did the search?

17   A. Well, I had help from my IT person.

18   Q. All right. I'm going to mark Exhibit 48. This

19   is JM8093.

20       (Exhibit 48 was

21       marked for identification.)

22   BY MR. HUGHES:

23   Q. This is an email that you've written dated

24   March 3rd, 2017 to an EJohnson@Armstrongprofessional.com

25   and Bash@Armstrongprofessional.com, and it says titled,

Page 258

1    "I need your help for double deleted emails. Urgent."

2    Description says, "Brian, can you pull up double deleted

3    emails from 2015 with the names Galvanoni, DPG, Wes

4    Anderson, Brooksbank, DPG, SkiBo or can you pull all the

5    emails from 2015 to present on a disk. This is for a

6    court case. Thank you, John Marshall."

7        Why did you need to pull up double deleted

8    emails?

9        Let me ask the question differently because

10   it's a little confusing. What is a double deleted

11   email?

12   A. I thought that was terminology that IT people

13   refer to when you delete and delete off into your

14   delete --

15   Q. It's a way to remove things from the deleted

16   box, right?

17   A. Well, not remove from the deleted box, but

18   everything should be still on the computer, and they

19   could bring up anything that was done.

20   Q. Why did you only go back to 2015?

21   A. Because I think that's -- that was the document

22   request.

23   Q. Is there any reason you didn't search for the

24   word Hudspeth?

25   A. No particular reason.

Page 259

1    Q. Any reason you didn't search for the word

2    investment or invest?

3    A. No reason.

4    Q. I'm going to show you Exhibit 49, which, again,

5    has already been marked once, but for the sake of

6    brevity, I'm going to mark it again.

7        (Exhibit 49 was

8        marked for identification.)

9    BY MR. HUGHES:

10   Q. This is your February 4th, 2017 email to FBI

11   Agent Paulin, P-a-u-l-i-n, it's JM7982, and now that's

12   Exhibit 49.

13       Who wrote the email that's here on the cover,

14   the first page, who wrote it?

15   A. The email says from John Marshall.

16   Q. Who wrote -- who actually drafted the contents

17   of it?

18   A. What do you mean, who wrote this email?

19   Q. Yeah, who came up with the content of the

20   email.

21   A. I believe it was me. It was coming from me.

22   Q. With help from whom?

23       MS. STEUER: Objection. Lacks foundation.

24   BY MR. HUGHES:

25   Q. Did anybody give you any input or help in

Page 260

1    drafting that?

2    A. I don't understand what you're asking.

3    Q. I'm asking if you sat down on your own and just

4    started typing at the computer or whether you had

5    somebody help you write that?

6        Do you recall, sir, if somebody helped you

7    write that?

8    A. I don't -- I think I wrote that, but I'm not --

9    Q. You can put it aside. If you don't recall,

10   that's fine.

11       MS. STEUER: That's not what he said.

12       THE WITNESS: No. Yeah, I think I -- that I

13   wrote this.

14   BY MR. HUGHES:

15   Q. Okay. Is there a reason why you -- well,

16   strike that.

17       I think you've testified previously today that

18   you believe that you've produced all of your

19   communications with investigators and that perhaps the

20   only things that hasn't been produced is the

21   investigator's communications back to you. Is that a

22   fair summary of where we are with that document issue?

23   A. Yeah, I believe so.

24   Q. Is there a reason why you didn't inform the FBI

25   investigators about anything that Mr. Galvanoni was



Page 261

1  doing that was positive to try and save the investments?
2      MS. STEUER: Objection. That lacks foundation.
3      MR. HUGHES: I don't know how that's a possible
4  objection.
5      MR. KAUFMAN: He's aware.
6      MR. HUGHES: I'm asking the witness about his
7  personal knowledge regarding he didn't send an --
8      MS. STEUER: Why he didn't send an email about
9  something that didn't happen. That's why it lacks
10  foundation.
11      MR. HUGHES: In a discovery proceeding you
12  really think that's an appropriate objection?
13      MS. STEUER: It's used in depos all the time.
14  BY MR. HUGHES:
15      Q. Did you ever send a positive email to the FBI
16  about Mr. Galvanoni?
17      A. I think the information that I was given from
18  others and such and the knowledge that I have, that's
19  what I was -- given to the FBI.
20      Q. I want to give you a fair opportunity. Is it
21  still your testimony, as you sit here right now, sir,
22  under oath, that your involvement in the Spring Tree
23  Washington entity was solely to help it obtain
24  insurance?
25      A. To what?

Page 262

1      Q. Help it obtain insurance?
2      A. The entity in Washington?
3      Q. Correct. That was your only involvement in
4  that entity?
5      A. Well --
6      MS. STEUER: Objection. That misstates his
7  testimony. You can answer.
8      THE WITNESS: Yeah. Not just to get insurance,
9  but I was also -- was involved with the situation
10  because I had investments in the other companies, I was
11  concerned of another Jim Duryea situation, where you
12  know, if that investment money was taken or used and
13  commingled with the other money, it could taint all of
14  our money. And I was concerned about some other issues,
15  too, that if we didn't do that, and it was set up and
16  not part of that, that wouldn't be a fair situation
17  either. So I think ultimately, that's why Wes and the
18  rest of the group decided not to go forward and try to
19  do that with money -- for people that had cannabis money
20  that were trying to invest.
21  BY MR. HUGHES:
22      Q. You were heavily involved in the Spring Tree
23  Washington entity, weren't you?
24      MS. STEUER: Objection. Misstates testimony.
25  You can answer.

Page 263

1      THE WITNESS: Yeah, when you say heavily --
2      MS. STEUER: And vague.
3      THE WITNESS: When you say heavily, I was very
4  concerned. I wanted to make sure that my investment and
5  those things weren't a situation where it would
6  jeopardize my money and then also that it was going to
7  be done fair and correct.
8  BY MR. HUGHES:
9      Q. Do you recall sending an email to Mr. Snow
10  regarding the inability to find people interested in
11  getting an 11 and a half percent rate of return on your
12  Washington Spring Tree entity?
13      MS. STEUER: Objection. Lacks foundation.
14  Misstates testimony. Vague as to what's meant by your.
15  You can answer.
16      THE WITNESS: Would it be attorney-client
17  privilege, too?
18      MR. HUGHES: No. Wes --
19      MS. STEUER: With you and Mr. Snow or you and
20  Mr. Anderson, I don't think so.
21      MR. HUGHES: I'm looking at an email where you
22  wrote him, so I don't think it would be attorney-client
23  privilege.
24      THE WITNESS: That was --
25      (Interruption by the reporter.)

Page 264

1      MS. STEUER: Maybe you can show him the email
2  so he can answer instead of just trying to trick him.
3      MR. HUGHES: I'm not trying to trick him.
4      MS. STEUER: Yeah, sure you're not. Okay. Do
5  you want him to see the email and see what you're
6  talking about or do you want to just continue to have
7  vague testimony? It's up to you.
8      MR. HUGHES: Counsel, I think that's an
9  inappropriate statement that I'm trying to attempt to
10  trick the witness. I only have a certain period of time
11  left because you've made it clear you're not going to
12  allow your client to be deposed for more than the seven
13  hours, despite the clear need to get a court order to do
14  so. So I'm not going to go through and show him every
15  one of the 10,000 pages of documents that you've
16  produced here for him to refresh his recollection in
17  perpetuity. It's a discovery proceeding.
18      THE WITNESS: Okay.
19  BY MR. HUGHES:
20      Q. So as a discovery proceeding, I asked you a
21  question. It's not an attorney-client communication
22  because Westley Anderson is on the email. So I'm asking
23  you, do you recall having any conversations with Hal
24  Snow about an inability to find people interested in
25  your Spring Tree Washington entity?



Page 265

1    MS. STEUER: And objection. Vague as to what's
2  meant by your Spring Tree Washington entity because
3  you're implying that it's his entity.
4    THE WITNESS: Yeah. My whole concern about the
5  Washington thing was that it would taint all of our
6  money, and that if it was going to be long armed, that
7  wouldn't work either because then we wouldn't get
8  percentages of the investment.
9  BY MR. HUGHES:
10   Q. How many real estate projects do you have an
11 investment in?
12   MS. STEUER: Objection. That was asked and
13 answered. You can answer again.
14   THE WITNESS: Oh, currently?
15 BY MR. HUGHES:
16   Q. At the time that you submitted your personal
17 financial statement in 2015.
18   MS. STEUER: Okay. That's a different
19 question.
20   THE WITNESS: Okay. Several real estate
21 investments.
22 BY MR. HUGHES:
23   Q. How many?
24   A. You know, without looking at the sheet and
25 knowing how many is listed, I would say ten.

Page 266

1    Q. Do you recall approximately what the total
2  value is of the real estate you had an investment
3  interest in at the time?
4    MS. STEUER: Objection. Asked and answered.
5  You can answer again.
6    THE WITNESS: Yeah, I'm not sure there was an
7  estimate of what it was worth. I'm not sure.
8        (Exhibit 50 was
9          marked for identification.)
10 BY MR. HUGHES:
11   Q. Showing you Exhibit 50, which is JM1031. That
12 indicates $35 million in real estate investments that
13 you have. Did I read that correctly, sir?
14   MS. STEUER: Objection. That misstates the
15 document. You can answer.
16 BY MR. HUGHES:
17   Q. Sir, do you see at the bottom for total value
18 it says 35 million?
19   A. It says total value at the bottom for 35.
20   Q. Okay. So am I correct?
21   A. Yes, that's what that says.
22   Q. All right. You can hand it back to me.
23   Mr. Marshall, are you telling the ladies and
24 gentlemen of the jury today that investments of -- in
25 real estate of $35 million does not make you a

Page 267

1  sophisticated investor?
2    A. Well, Brad, first of all, the 35 million,
3  that's not my 35 million. I have only percentages in
4  ownership in some of those buildings that I invested
5  with people. And to be very, very clear, I would invest
6  money and -- on the real estate, and again, I was
7  trusting the expertise of the real estate agents that
8  were investing in that. But I had percentages ownership
9  in those buildings, and unfortunately, as I talked
10 today, we lost a lot of money on those buildings.
11   Q. The Exhibit 50 that we've discussed here
12 identifies percentage owned, the total amount being
13 $16.6 million. So sir, at the time that you submitted a
14 personal financial statement to the defendants so that
15 you could qualify to be able to invest with them, is it
16 your position that you were not a sophisticated
17 investor?
18   A. What is your definition of sophisticated?
19   Q. Set Exhibit 50 to the side.
20   In approximately September of 2015, do you
21 recall Jerry Hudspeth preparing a lengthy email, which
22 I'll show you a copy of here in a second, but a lengthy
23 email talking about what he believes should be the new
24 business directive for SkiBo Holdings. And I'll show
25 you the document marked as 51. I'm not going to ask you

Page 268

1  anything specifically about who said what here. I'm
2  going to refresh your recollection about it because it
3  was several years ago.
4    A. And I appreciate that.
5        (Exhibit 51 was
6          marked for identification.)
7  BY MR. HUGHES:
8    Q. And the real content is on the second page of
9  what I'm handing you.
10   A. Do you remember this?
11   MS. STEUER: Well, it's been produced.
12   THE WITNESS: Right. But do you remember this?
13   MS. STEUER: I'm not the one that's being
14 asked.
15   THE WITNESS: Okay. Sorry.
16   MS. STEUER: But the answer is yes.
17 BY MR. HUGHES:
18   Q. Does that refresh your recollection, sir, you
19 recall receiving that email?
20   A. Yes.
21   Q. What was your reaction to Mr. Hudspeth's email
22 there?
23   A. That it gives you confidence that things are
24 going to be done well and right.
25       (Clarification by the reporter.)



Page 269

1     THE WITNESS: And right. Correctly.
2 BY MR. HUGHES:
3     Q. Do you think that anybody on Mr. Galvanoni's
4 team, so in other words, anybody other than
5 Mr. Galvanoni, did anything wrong with respect to any
6 transactions which you've been involved?
7     A. Yes, I do have concerns.
8     Q. Okay. What are those concerns?
9     A. I just have some concerns that maybe some other
10 people were not doing the right thing.
11     Q. Other than Jim Duryea and anybody involved with
12 SkiBo before its acquisition and your involvement,
13 anybody else you think did anything wrong?
14     MS. STEUER: Objection. Vague. You can
15 answer.
16     THE WITNESS: So I'm not sure what you're --
17 are you asking --
18 BY MR. HUGHES:
19     Q. I'll withdraw the question.
20     A. Okay.
21     Q. Withdraw the question. Do you recall there
22 being a point in time in which the tenor of the emails
23 with all of the individuals that were involved in these
24 transactions, changed from being incredibly optimistic
25 to being far less optimistic about the prospects of the

Page 270

1 investments?
2     MS. STEUER: Objection. Vague. You can
3 answer.
4 BY MR. HUGHES:
5     Q. I'm asking you a specific date.
6     A. It's when I was getting -- yeah, when I was
7 getting emails from Wes Anderson and some of those
8 concerns, yeah, that's when I had some major concerns.
9     Q. But you had -- there were emails way before Wes
10 Anderson was just sending you emails that you were on
11 with all of the other people who had invested money
12 talking about the significant change in status with
13 respect to the investments, right?
14     MS. STEUER: Objection. Vague. You can
15 answer.
16     THE WITNESS: Okay. Are you referring to the
17 Jim Duryea and Rob Smith?
18 BY MR. HUGHES:
19     Q. Correct.
20     A. Yes, there was major issues there, too.
21     Q. At that point in time did you find it necessary
22 to re-evaluate whether or not you were going to move
23 forward with these companies?
24     A. Correct, yeah. I was very upset and concerned.
25     Q. Other than talking to Dan Galvanoni, as you've

Page 271

1 testified earlier, did you talk to anybody else about
2 your concerns?
3     A. Yeah, it was mainly Dan. But also I talked
4 with Jerry and -- Jerry Hudspeth, also with Wes Anderson
5 as well.
6     Q. As you sit here today, what is your knowledge
7 personally of what Jerry's history is in banking and
8 finance, if you have any?
9     A. I'm still not sure. I'm not absolutely
10 positive what his history is with banking and finance.
11     Q. So I'm going to show you -- why did you
12 recommend to all of your partners in the investment that
13 corporate bankruptcy attorneys be involved going forward
14 after SkiBo?
15     MS. STEUER: Objection. Vague. Lacks
16 foundation. You can answer.
17     THE WITNESS: I'm not sure. I don't recall
18 exactly what went on. I would think when you're
19 doing -- when we're involved in something like that, I
20 think it's a good idea to have attorneys involved.
21 BY MR. HUGHES:
22     Q. Okay. When you say I think, it makes me worry
23 that you're guessing. So let me ask specifically from
24 an actual document. In an email of September 26th, 2015
25 to Dan and Jerry copying Wes Anderson, you say, "Wes,

Page 272

1 we'll talk with a top attorney to cover us on corp and
2 bankruptcy issues. We don't want to incur attorneys'
3 fees to fight creditors of Jim BKs companies. Thank
4 you, John Marshall."
5     Does that refresh your recollection of talking
6 to these individuals about a corporate bankruptcy
7 attorney?
8     A. Yeah, I'm always an advocate that you should
9 have -- getting an attorney involved and having legal
10 advice.
11     Q. What would have happened if SkiBo would have
12 gone into bankruptcy?
13     MS. STEUER: Objection. Calls for speculation.
14 You can answer, if you know.
15 BY MR. HUGHES:
16     Q. Let me ask it this way. What is your
17 understanding of what would happen, what would have
18 happened to your interest in SkiBo if the company went
19 into bankruptcy?
20     MS. STEUER: Objection. Vague. Calls for a
21 legal conclusion. Expert opinion. You can answer, if
22 you have an understanding.
23     THE WITNESS: Well, my understanding was when I
24 talked with Dan Galvanoni that if it did go into
25 bankruptcy, my money was used to -- you know, the money

Page 273

1  that we used that I put up was to purchase the loans,
2  and that, you know, I would want to try to recover my
3  money and hopefully be able to sell the loans so I can
4  get my money back.
5  BY MR. HUGHES:
6      Q.  I just want to make sure I understood your
7  testimony from earlier today.  To the best of your
8  recollection, you only attempted to solicit other
9  investors for this company on a single occasion?  Am I
10  understanding that correct?
11      MS. STEUER:  Objection.  That misstates his
12  testimony.  Vague.  And lacks foundation.  You can
13  answer.
14      THE WITNESS:  Well, I wasn't actively going out
15  and trying to get people, but being out and about, if
16  somebody talked to me about investments or said, hey,
17  John, do you do annuities or life insurance or what kind
18  of investments do you invest in, or something like that,
19  I wanted to -- I shared with them that I invested, you
20  know, in these auto loans.  And I shared the information
21  that Dan Galvanoni shared with me and told me that, you
22  know, these are -- I think this is a pretty good
23  investment at the time.  I thought they were fantastic
24  because it was diversified.  It was a lot better than
25  real estate.  You know, real estate takes a long time to

Page 274

1  liquify, and then if the real estate market goes
2  crashing down, you know, your real estate that's worth,
3  you know, $16 million, all of a sudden you wake up
4  tomorrow and the buildings aren't worth what they are,
5  and you've got high loans, and you can't pay them back,
6  and you've got nothing.  But with the auto loans, people
7  are going to continue to pay on those auto loans more
8  than they pay their rent because they need their auto to
9  get to work, and if they don't pay on the auto loans,
10  they have the GPS devices where they can shut down,
11  collect the auto, and on the auto loans the vehicles are
12  worth, you know, with the Blue Book and the values, and
13  the loans are less than that, you have a very good
14  chance of getting your money back.
15          (Exhibit 52 was
16          marked for identification.)
17  BY MR. HUGHES:
18      Q.  I'm going to show you Exhibit 52, which is
19  JM1755.  And in the middle of the document is an email
20  you wrote September 26th, 2015.  It states, quote, I'm
21  with you.  I'm sick of these losers.  I've been raising
22  money getting comments, put my money in, backing
23  everything.  I'm just pissed off.  Every day I get
24  angrier and -- angrier and angrier -- sorry -- we will
25  succeed.  Nothing will stop us.

Page 275

1      Is the statement here that you're making in
2  this email, which is an email to Mr. Galvanoni, is that
3  inaccurate that you've been raising money?
4      A.  Are you done with this document?
5      Q.  Yeah.
6      A.  Okay.  Which one was he reading?
7      MS. STEUER:  This one.
8      THE WITNESS:  Oh, this one.  Okay.
9  BY MR. HUGHES:
10      Q.  Yes or no, was that an inaccurate
11  representation?
12      A.  You know, I would like -- I'm not a very good
13  writer and --
14      Q.  Why do you think you're not a very good writer?
15      MR. GALVANONI:  You sure write a lot.
16      MS. STEUER:  Do you want him to finish his
17  answer or not?  Because you just asked a different
18  question.  So do you want him to answer the question
19  previously asked or do want him to just answer your new
20  question?
21  BY MR. HUGHES:
22      Q.  No, you can answer the new question first.  Why
23  do you think you're not a very good writer?
24      A.  Well, I struggle with my learning disability
25  with reading and writing.

Page 276

1      Q.  Have you been given -- has a doctor diagnosed
2  you with learning disabilities, dyslexia, or anything
3  like that?
4      A.  Uh-huh.
5      Q.  Yes?  Sorry.  You have to speak for the court
6  reporter.
7      A.  Yes.
8      Q.  When did that occur?
9      A.  Well, I've had it my whole life, and when I was
10  at Berkeley.
11      Q.  Were you given extra time to take exams?
12      A.  At --
13      Q.  At Berkeley?
14      A.  If need be, yes.  But when I was diagnosed it
15  was before the American Disabilities Act, and so a lot
16  of that stuff was not recognized.
17      Q.  When you were at BYU did you get extra time to
18  take tests?
19      A.  If needed, correct.
20      Q.  Did you elect to use that opportunity to take
21  more time for the tests?
22      A.  Yes.
23      Q.  Did you ever tell anybody, any of the
24  defendants or any of the entities at any point in time
25  in this proceeding before you invested the money that



Page 277

1  you had a learning disability, that you struggled with
2  understanding, reading and writing?
3      A.  Yes.
4      Q.  Who did you tell that to?
5      A.  Dan Galvanoni, Wes Anderson.  It's not
6  something that I like to discuss.  Jerry.
7      Q.  Why did you tell them that?
8      A.  Because with the contracts that they would send
9  and a lot of the written material and a lot of the stuff
10 that I was getting, it's very difficult for me to get
11 through all the stuff.  It takes a long time.  And I had
12 my job where I was trying to make money, and it's just
13 difficult to get through a lot of the stuff.  And
14 sometimes, you know, when I write, I don't write very
15 well.  I don't think I communicate as a good writer.
16       And you know, one of the things that I've, you
17 know, wanted to do is I've tried to help, you know, kids
18 with learning disabilities to go on, and that was one of
19 the main reasons, too, that, you know, I wanted to
20 graduate from law school to be able to say that I've got
21 a learning disability, you guys can go on to law school
22 or med school.  You know, it's very difficult, and it's
23 very frustrating, and it's just been -- it's just been
24 extremely difficult and frustrating my entire life.
25      Q.  How many times did you email anybody involving

Page 278

1  any of the transactions that are at issue in this
2  lawsuit, email them and ask them a question about what
3  anything they were talking about meant?
4      A.  I'm not sure.
5      Q.  Is there a reason that you didn't ever email
6  anybody and say what is a mezzanine loan?
7      A.  Quite honestly, I guess growing up with a
8  disability and being called dumb and stupid your whole
9  life, you have a tendency to be concerned that if you
10 ask things or say things that people look at you, like,
11 you know, how stupid is this guy, this guy is really
12 stupid, it's just amazing how stupid this guy is.
13      Q.  Was there -- did you ever Google it?  Did you
14 ever Google what is a mezzanine loan?
15      A.  You know, I didn't do it.  And Brad, I trusted
16 in the people, especially Dan Galvanoni, that my money
17 would be secured.
18       (Clarification by the reporter.)
19      MR. HUGHES:  Nothing.  We're waiting for -- did
20 you finish your answer?
21      MS. STEUER:  Yeah, it's a little distracting
22 when other people keep talking.  But are you done with
23 your answer?
24      THE WITNESS:  Dan was saying I wiped everything
25 out.

Page 279

1      MR. GALVANONI:  I lost a million and a half, no
2  biggy, just my family, no biggy.  Wes Anderson put no
3  money in.  Zero in.
4      MR. HUGHES:  Let me ask a little separate
5  question.
6      THE WITNESS:  I thought you said Wes Anderson
7  did put money in.
8      MS. STEUER:  Well, let's not get into an
9  argument with him.
10      MR. GALVANONI:  Wes played you like a fiddle.
11      MS. STEUER:  Who is asking -- who is conducting
12 the deposition here?
13      MR. HUGHES:  Well, we have both sets of clients
14 talking to each other, and they shouldn't be doing that.
15 Both of you need to stop.
16      MS. STEUER:  Yeah.
17      MR. HUGHES:  Both of you need to stop.
18      MS. STEUER:  All right.
19 BY MR. HUGHES:
20      Q.  I think the indication you have was that you
21 didn't Google it, right, you didn't Google what a
22 mezzanine loan was?
23      MS. STEUER:  Right, and you had asked him why.
24      (Interruption by the reporter.)
25 BY MR. HUGHES:

Page 280

1      Q.  My prior question to you was whether or not you
2  Googled what a mezzanine loan was, and you said you did
3  not.
4      A.  I believe I did not.
5      Q.  Okay.  At the time that you were going through
6  this investment process, and I'm talking about the time
7  on which you're onboarding, if you will, in the
8  investment, was there anything else that was more
9  important in your life of investments than this one?
10      A.  All my investments are very important to me
11 because it's for my retirement and to help my children
12 and my mom and my family.
13      Q.  So you would agree with me that this is an
14 incredibly important process to you when you're
15 investing this much money into this potential business,
16 right?
17      A.  Well --
18      Q.  You didn't take it lackadaisical.  It was a
19 serious thing, right?
20      A.  Well, I don't know your definition of
21 lackadaisical.  But that's why I wanted over and over,
22 to confirm with Dan Galvanoni that my money is going to
23 be secure, that if worse comes to worse, I have an exit
24 plan, a way to get out, so I can get my money, so I'm
25 not going to be hung out to dry and lose my money,



Page 281

1 $300,000. And I trusted in good faith, and I believed
2 in him, and I believed what he was telling me, and he
3 always continued to tell me. And a lot of the stuff I
4 did verbally, too. And sometimes Dan, when he speaks,
5 he speaks very fast, and then sometimes when he would
6 write things, it just didn't quite understand.
7      But he continued to confirm, and I continued
8 with like emails with everybody confirming, hey, guys,
9 don't leave me hung out to dry here. You said you would
10 secure my money. How do you secure my money? I don't
11 know how you secure my money. And that's when Jerry and
12 Wes said we know how to secure your money. We do this.
13 And we'll do the UCC filing for you. And Dan said,
14 yeah, do the UCC filing. Secure his money.
15     Q. And that was in 2017?
16        MS. STEUER: Objection. Misstates testimony.
17 BY MR. HUGHES:
18     Q. It was a question. We've talked about a UCC
19 filing today.
20     A. Right, right, right. And the UCC filing was
21 done when we discussed when it was done. But from the
22 get-go, from the day one, I didn't want to put, like,
23 you know, I thank God that the first $100,000 I put in,
24 that, you know, that money was put in the loans. And so
25 when this stuff came out about Jim Duryea and Rob doing

Page 282

1 all this stuff and not being forthright with us and
2 lying, you know, I panicked. I thought, okay, great, I
3 trusted you guys. You guys said you did the due
4 diligence. I put in my $100,000. I was flipping out.
5 And Dan called me, and he said, John, you're not going
6 to lose your 100,000, it's in the loans. We'll go
7 liquidate the loans. We'll be done. You know, you'll
8 get your money as much or more back, and you're okay.
9      And that's why like when you asked me, too, you
10 said, well, why would you come back after the fiasco
11 with the emails of the stuff that went on with Jim
12 Duryea, why would you be committed to Dan Galvanoni, and
13 why would you still put money in is because with all --
14 I don't know about all the high finance and all the
15 different things he was doing and all these other
16 things. For me what was most important is my money
17 would be secure and if anything happened, I'd get my
18 money back, the interest and stuff. And then all the
19 other promises and the things that Dan said that was
20 going to happen, you know, I would get 13 percent of
21 that, and I was very impressed and, I was very excited
22 about it. And you know, I trusted him and I believed in
23 him.
24     (Clarification by the reporter.)
25     MS. STEUER: I think you've answered the

Page 283

1 question.
2     MR. HUGHES: Let's go ahead and take a break
3 and figure out where we are in time because I know the
4 court reporter needs a stretch of the paws.
5     VIDEO OPERATOR: Off the record at 5:38 p.m.
6     (Break.)
7     VIDEO OPERATOR: We're back on the record at
8 5:48 p.m.
9 BY MR. HUGHES:
10    Q. Okay. Mr. Marshall, you understand we're back
11 on the record and you're under oath?
12    A. Yes.
13    Q. I just want to make sure I understand the
14 foundational aspect of the whole lawsuit. All right?
15 You made loans to the defendant entities, is that your
16 understanding of what occurred here?
17    A. I don't know if it's a loan or an investment.
18 It was money that I put in that would be secured by the
19 loans that I was going to get paid back and money on top
20 of the money I put in, plus I would also receive 13 and
21 a half percent in profits.
22    Q. Okay. The first tranche of money you gave was
23 how much?
24    MS. STEUER: Asked and answered. You can
25 answer again.

Page 284

1     THE WITNESS: Yeah, going through the
2 documents, the first was 100,000.
3 BY MR. HUGHES:
4     Q. Okay. The first $100,000 was a loan that was
5 to be secured by the portfolio; is that your
6 understanding of what it was?
7     MS. STEUER: Objection. Misstates testimony.
8 You can answer, again. Or you can answer.
9     THE WITNESS: I thought it was money that was
10 buying the loans, and it was secured by those loans.
11 BY MR. HUGHES:
12    Q. Well, right. It was a loan that was secured,
13 to your knowledge, by a portfolio of loans, right?
14    A. Invested in those auto loans, correct.
15    Q. Well, your money -- I'm trying to follow the
16 dollar, right. Your money was loaned to, let's just say
17 DPG?
18    A. Right.
19    Q. Okay. And then that money was taken to buy
20 loans, a loan portfolio, right?
21    A. Probably.
22    MS. STEUER: Objection. That misstates his
23 testimony. You can answer again.
24    MR. HUGHES: He's answered.
25    MS. STEUER: No, you completely -- you continue



Page 285

1  to misstate his testimony. So that's what's creating
2  the issue.
3      THE WITNESS: I invested money into Dan
4  Galvanoni's companies, and that money was to be invested
5  to purchase auto loans.
6  BY MR. HUGHES:
7      Q. Okay. So we have a clear record, you invested
8  money -- sorry. Strike that.
9      You gave money and a loan to DPG that DPG was
10 going to take your money and go and buy loans,
11 business -- excuse me -- automobile loans, correct?
12     MS. STEUER: Objection. Again, that misstates
13 his testimony. You can answer for what's now a fifth
14 time.
15     MR. HUGHES: I don't know why you have a hard
16 time understanding --
17     MS. STEUER: Well, you keep misstating and
18 saying it's a loan --
19     MR. HUGHES: Excuse me, excuse me, excuse me --
20     MS. STEUER: You keep misstating his testimony
21 and then saying he's --
22     MR. HUGHES: Excuse me, Counsel.
23     MS. STEUER: -- testified to it.
24     MR. HUGHES: Excuse me, Counsel.
25     MS. STEUER: So that's what's creating the

Page 286

1  issue.
2      MR. HUGHES: Excuse me, Counsel. You don't
3  need to yell at me when we're sitting across a very
4  small table.
5      MS. STEUER: Well, it's very frustrating when
6  you continuously misstate the witness's testimony then
7  claim that you don't understand what he's saying. You
8  just don't like what he's saying.
9      MR. HUGHES: Well, perhaps I'm not as bright as
10 everybody else in the room is. You've used the word
11 loan for approximately the last six hours and 45
12 minutes.
13     MS. STEUER: That, again, misstates testimony.
14 BY MR. HUGHES:
15     Q. My question, sir, is you took your money, you
16 then loaned it to DPG, DPG was to take that money and
17 then go purchase automobile loans, and you were going to
18 be paid back on the money you had loaned DPG; is that
19 accurate or not? Yes or no?
20     A. My understanding is that I invested in Dan
21 Galvanoni and his companies, and Dan Galvanoni would
22 take that money to buy auto loans. The money would be
23 secured on the auto loans. And I'd be paid back the
24 money that I invested plus interest on top of that, as
25 well as I would get 13 and a half percent profits of the

Page 287

1  other companies.
2      Q. And what would happen if the company just
3  failed? You wouldn't get 13 and a half percent of the
4  profits if there weren't any profits, right?
5      A. Yes.
6      Q. You wouldn't get back any money if there was no
7  portfolio of loans that existed because SkiBo actually
8  didn't have any loans ultimately, correct?
9      MS. STEUER: Objection. That misstates the
10 evidence. It also misstates the testimony. And it's
11 been asked and answered. You can answer again.
12     THE WITNESS: Yes, if there were no loans,
13 there would be no money to pay me back.
14 BY MR. HUGHES:
15     Q. Right. So after what you saw with SkiBo and
16 what Jim Duryea had done, at that point in time did you
17 have any recognition to yourself of I've invested in
18 something that it turns out we all relied to that never
19 existed?
20     MS. STEUER: Well, that misstates the evidence,
21 and it misstates his testimony.
22     THE WITNESS: Yeah, just to try to answer it as
23 quickly as I can, the money that I invested in, they
24 used that to buy the loans or have the ownership. So
25 there were loans there. The issue was we were concerned

Page 288

1  that maybe the loans weren't very good or there were
2  fraudulent ones, and Wes Anderson and Jerry went through
3  and validated it. Everybody can take a deep breath, the
4  loans are good.
5  BY MR. HUGHES:
6      Q. So that money was all for SkiBo. In other
7  words, your investment was into SkiBo Holdings, correct?
8      A. My investment was to go in to buy loans. If
9  the loans were with SkiBo or wherever the loans were,
10 that's where it should have been purchased.
11     Q. And you and Wes have had plenty of time to
12 speak, obviously, and you've confirmed with Wes then at
13 some point that the money that you invested, that first
14 $100,000 all was in SkiBo loans, right?
15     A. The only -- the discussions that I've had with
16 Wes, Dan or anybody wasn't about which company, the
17 different shell companies. It was always that the money
18 was to be secured and invested in the loans because I
19 was concerned, well, what if they take the loans and
20 move it to this company, or what if they take the loans
21 and move it to that company. I don't care about the
22 companies. The value is the loans.
23     Q. But if the company that owns the loans goes
24 under, the loans go with it.
25     MS. STEUER: Objection.



Page 289

1   MR. HUGHES: Let me finish my question before
2  you give one of your objections. Okay? And at this
3  point for purposes of speed, I may just be agreeing to
4  give you certain objections as standing objections.
5  BY MR. HUGHES:
6   Q. But the question I'm trying to ask you is you
7  gave $100,000 for the purposes of purchasing a loan, a
8  portfolio of loans, and that $100,000 would have gone to
9  SkiBo at that time, right?
10   MS. STEUER: Objection. Calls for speculation.
11  You can answer.
12   THE WITNESS: If the loans were with SkiBo,
13  yes.
14  BY MR. HUGHES:
15   Q. So if the loans are at SkiBo, the money went to
16  SkiBo, and if SkiBo no longer has any operating
17  abilities because it turns out that SkiBo was
18  underfunded before it ever was acquired, what would that
19  do in your mind to your $100,000 portfolio or $100,000
20  investment?
21   MS. STEUER: It's an incomplete hypothetical.
22  Lacks foundation. But you can answer, if you understand
23  the question.
24   THE WITNESS: What would have happened is what
25  Dan Galvanoni explained, and he said, don't worry, we'll

Page 290

1  liquidate the loans and pay you back your $100,000. I
2  don't know if liquidate is the right way, but sell the
3  loans.
4  BY MR. HUGHES:
5   Q. And you subsequently had 200,000 more dollars
6  that you put into the business, correct?
7   A. Correct.
8   Q. And at that point SkiBo was not the name of the
9  business, correct?
10   A. Correct.
11   Q. What was the name of the business that you gave
12  the $200,000 to?
13   MS. STEUER: Objection. Calls for speculation.
14  You can answer. Also asked and answered.
15   THE WITNESS: I gave the future investments,
16  the money that I was giving, was going to the company
17  that had the loans and the money was to purchase loans.
18  BY MR. HUGHES:
19   Q. Okay. And so what company did you give that
20  money to?
21   MS. STEUER: Objection. Calls for speculation.
22   MR. HUGHES: No, no, no. It can't call for
23  call for speculation. Okay. Let's try and rationalize
24  this a little bit. I'm asking the witness, what is the
25  name of the company to whom you gave $100,000 twice.

Page 291

1   MS. STEUER: Objection. Calls for speculation.
2  You can answer.
3   THE WITNESS: Well, I gave money in intervals,
4  so I didn't give 100,000, 100,000. There's another
5  200,000 on top of 300,000. And again, I was told that
6  money went in to purchase the loans. And the loans at
7  that time, and again, I say this because I'm concerned
8  that people weren't telling me the truth, but I thought
9  the loans were with DPG Golden Eagle, that the loans
10  were all within DPG Golden Eagle. But for me, what I
11  was told is it doesn't matter which company the loans
12  are with, my money was used to purchase the loans, and
13  were secured with the loans. Whether it was ABC
14  Corporation, XYZ, it did not matter, that's where the
15  value was to secure my money.
16  BY MR. HUGHES:
17   Q. Would you agree with me that you're not quite
18  certain to whom you loaned the money; is that fair?
19   A. I was under the impression that I was investing
20  the money with Dan Galvanoni and his companies to
21  purchase loans.
22   Q. Okay. But you don't know the exact name of the
23  company to whom you gave each $25,000 or $50,000
24  tranche, correct?
25   A. I am not positive, no.

Page 292

1   Q. Okay. The second $200,000 that you -- we've
2  discussed so far, that was all loans, though, correct?
3  None of that was investment, all of that was loaned
4  dollars that you be paid back as a loan, right?
5   A. I don't know whether to call it a loan,
6  investment, or whatever else, Brad, what it was is that
7  that money was going to purchase auto loans and my money
8  was secure with auto loans. And that's what I was most
9  concerned with to make sure that my money was secure.
10   (Discussion off the record.)
11  BY MR. HUGHES:
12   Q. Done? Okay. I'm going to mark as Exhibit 53.
13   (Exhibit 53 was
14   marked for identification.)
15  BY MR. HUGHES:
16   Q. Mr. Marshall, this is a document 53, which is
17  JM2069. This is an email from Dan to what appears to be
18  all the investors and individuals involved in this deal
19  dated October 28th, 2015. Take a second just to tell me
20  whether you recall getting this email. I'm not going to
21  ask you details about the contents, but just whether you
22  recall this email and what is in there.
23   MS. STEUER: The question is just whether you
24  recall.
25   THE WITNESS: Yes.



Page 293

1  BY MR. HUGHES:
2      Q.  In that email -- excuse me.
3          Exhibit 53 is an email that's providing you
4  with a financial breakdown of how the business is doing
5  as of that point in time, correct?
6      A.  Yes.
7      Q.  Did you ever ask any questions of anybody with
8  Dan or Dan's team about the contents of that email?
9      A.  I did ask questions about -- you know, about
10  the loans being good, and they were good loans, they
11  were underwritten.  Jerry and Wes went through those.
12  And that, you know, the company was profitable.
13      Q.  So you understood the financials that were
14  being provided to you there, correct?
15      A.  Not really.
16      Q.  Do you have a -- the insurance you sell, you
17  deal with a lot of spreadsheets and financials that show
18  risk, premiums, deductibles, rates you could pay to
19  manage the risk, you deal with financial spreadsheets
20  every day, don't you?
21      A.  Not really in insurance.  What I deal with is
22  we get quotes for property limits, general liability and
23  auto quotes, and we go to the client and say, here's the
24  price to pay for these limits and stuff.  But I don't
25  deal with financials or spreadsheets or any of that.

Page 294

1      Q.  On your real estate investments, do you ever
2  look at spreadsheets?  When I say spreadsheets, I know
3  that sounds more daunting than it is, so let me say the
4  words, do you look at financial statements?
5          MS. STEUER:  Objection.  Vague.  You can
6  answer.
7          THE WITNESS:  No, not really.
8  BY MR. HUGHES:
9      Q.  So did you ever talk to anybody, whether it was
10  somebody with DPG or Dan or anybody about the fact that
11  you didn't understand what that financial statement that
12  you're looking at in Exhibit 53 meant?
13          MS. STEUER:  Objection.  That mischaracterizes
14  the document.  But you can answer.
15          THE WITNESS:  I don't believe I went through
16  this with anybody explaining what was going on.  The
17  conversations I did have was that the loans were really
18  good, we've got great loans on the books, my money is
19  secured on those loans, and that, again, you know, if
20  worse comes to worse, we can sell the loans, and we can
21  get your money back for you.
22  BY MR. HUGHES:
23      Q.  Right, I get that part.
24      A.  But I don't remember going through this.
25      Q.  The concept that I'm asking you about here,

Page 295

1  sir, is if you had something that was given to you that
2  you didn't understand at any point in time through this
3  process, did you ever ask anybody any questions about
4  what everything meant?
5          MS. STEUER:  Objection.  Overbroad and vague.
6  Calls for a narrative.  You can answer.
7          THE WITNESS:  Not really.  I trusted Dan
8  Galvanoni and what I was being told.
9          MS. STEUER:  How are we doing on time?
10          VIDEO OPERATOR:  Five minutes over, six minutes
11  over.
12          MS. STEUER:  Okay.  We're six minutes over.
13  How long do you anticipate going?
14          MR. HUGHES:  Not very much longer.  I'm just
15  going to look through my notes real quickly.  You can
16  put that aside.
17          (Discussion off the record.)
18  BY MR. HUGHES:
19      Q.  How many times have you spoken to Jason Litao
20  with the SEC?  Just give me your best estimate.
21      A.  Again, I'm not trying to be difficult.  I want
22  to try to be accurate.  I've spoken to him -- I'm not
23  sure how many times.
24      Q.  Have you ever given a statement under oath or
25  been under oath when you've talked to Jason Litao?

Page 296

1      A.  Yes.
2      Q.  How many times?
3      A.  They took one deposition of me.
4      Q.  When was that?
5      A.  I don't remember the exact date.  I'm sorry.
6      Q.  Summertime last year, fall last year?
7      A.  I really -- I think it was -- trying to
8  remember what the weather was like.
9      Q.  Where was it?
10      A.  It was back East.
11      Q.  In New York, Washington, D.C.?
12      A.  I think it was in the D.C. area.
13      Q.  How long were you there for?
14      A.  I think two days.
15      Q.  I think you had asked -- or you had testified
16  earlier that you weren't interested in having
17  Mr. Galvanoni put in jail, right, as a result of this
18  process?  Is that a fair statement of what you testified
19  to earlier?  Or am I wrong and you do, in fact, want to
20  see him taken into custody and put in jail?
21      A.  I didn't go to the SEC to have him -- my goal
22  was not to put him in jail.
23      Q.  Did you have an attorney with you at that
24  deposition with the SEC?
25      A.  I didn't have my attorney with me at the SEC.



Page 297

1    Q. Who was with you?
2    A. I was -- there were the attorneys with the SEC.
3    Q. Okay. You previously testified about having
4  not hired anybody to investigate Mr. Galvanoni. Have
5  you asked anybody other than the authorities we've
6  talked about to investigate Mr. Galvanoni?
7    A. No.
8    Q. The individual that you caused or participated
9  in causing to be incarcerated for some sort of a loan or
10  financial fraud issue, do you recall talking about that
11  earlier?
12    A. Yes.
13    Q. Okay. What is that individual's name again?
14    A. James Burkhise and --
15    Q. Okay. I'm going to call him James, so I don't
16  mess up his last name.
17    A. And Dan Chartraw.
18    Q. There were two individuals you did that for?
19    A. Yeah.
20      MS. STEUER: Asked and answered.
21  BY MR. HUGHES:
22    Q. Were those two individuals from the same
23  transaction?
24    A. No.
25    Q. So on two other occasions you've invested money

Page 298

1  with people and you've lost money, right, with those two
2  individuals?
3    A. Yes.
4    Q. And you've gone to the Securities and Exchange
5  Commission and/or the FBI as a result of both of those
6  people?
7    A. Yes.
8    Q. How many people have you lost money with that
9  you haven't taken to the SEC or the FBI?
10    A. Several others.
11    Q. Who else? What are their names?
12    A. Let's see. I have lost -- I've lost money on
13  the Costa Rica. I have not made money, lost money
14  there.
15    Q. That's with Mr. Galvanoni, right?
16    A. That was Mr. Galvanoni, but there were other
17  people involved with that.
18    Q. So that's part of the SEC/FBI. So who else
19  have you lost money with but you haven't taken to the
20  SEC or FBI?
21    A. Let's see, Vuya Jovic.
22      (Clarification by the reporter.)
23  BY MR. HUGHES:
24    Q. J-o-v-i-c?
25    A. Yes.

Page 299

1    Q. And he's an individual that you wanted to come
2  in and be an investor in this transaction, right?
3    A. Well, I told him -- he was asking about
4  investments that I was in, and I told him about the auto
5  loans.
6    Q. Okay. How much money did you lose with him?
7    A. Several hundred thousand.
8    Q. How many hundred thousand?
9    A. Well, it depends. I still have some that are
10  invested, so I'm not sure, you know, the total yet.
11    Q. How many investments do you still have with
12  Mr. Jovic?
13    A. Currently, we're pretty much done.
14    Q. Was it real estate investments you had with
15  him?
16    A. Yes.
17    Q. So properties you invested into lost value?
18    A. Yes.
19    Q. And so you said it's several hundred thousand
20  dollars. Can you give me an estimation for how many
21  several hundred thousand dollars is? Is it 900,000 or
22  is it 200,000?
23    A. Let's see, currently, right now, best -- good
24  estimate would be around 4- or $500,000.
25    Q. Okay. Who else have you lost money with that

Page 300

1  you haven't taken to the SEC or FBI?
2    A. I lost money with Chris Morrow.
3    Q. C-h-r-i-s?
4    A. C-h-r-i-s.
5    Q. M-o-r-a?
6    A. M-o-r-r-o.
7    Q. M-o-r-r-o. Thank you. And how much money did
8  you lose with Chris?
9    A. O-w. Around 75,000.
10    Q. And what was the nature of that investment?
11    A. He had me invest in some stocks.
12    Q. Publicly traded stocks?
13    A. I have the certificates other than -- they are
14  of supposedly no value.
15    Q. Did you threaten to take Chris to jail for the
16  stock losses you incurred there?
17    A. Threaten to put him in jail?
18    Q. Did you threaten to have him investigated by
19  authorities?
20    A. I asked -- I wanted to find out if he has
21  defrauded me and everything else.
22    Q. So is that a yes or a no to my question?
23    A. I didn't -- I don't feel I threatened him.
24    Q. Okay. Who else?
25    A. I lost money with Eric Soldahl.



Page 301

1    Q. Can you spell that last name?
2    A. S-o-l-d-a-h-l.
3    Q. Okay. And how much did you lose with Eric?
4    A. Around 100,000.
5    Q. When did you lose that?
6    A. It's been a while. It's been over ten years.
7    Q. When were the transactions with the two
8    individuals that you did go to the SEC and FBI about?
9    A. When were those?
10   Q. Yeah. Are these investments from five years
11   ago, 20 years ago?
12   A. No, they were much older than five years. I'd
13   have to go back and look. I think they were over ten
14   years.
15   Q. Anybody else other than Jovic, Chris and Eric?
16   A. Dan, I forget his last name, and that was
17   around 60,000, and that was over ten years ago.
18   Q. What about a guy named Todd Owen?
19   A. I invested -- this was a while back. I think
20   there was money invested with Todd on some stock.
21   Q. And you went to the SEC and the FBI over Todd
22   Owens, didn't you?
23   A. No.
24   Q. Are you sure?
25   A. I'm pretty sure, no.

Page 302

1    Q. To the best of your recollection, there are
2    only three individuals that you invested money with or
3    lost money with that you've then taken to the SEC or
4    FBI?
5    A. Yes.
6    Q. And you've done that out of a sense of
7    benevolent protection for the rest of the public?
8    A. There were very high concerns.
9    Q. How much money did you get back on the other
10   transactions when you took those folks to the FBI or the
11   SEC?
12   A. Chartraw, I didn't receive any money, and James
13   Burkhise I did not receive any money from him either.
14   Q. Let me go through --
15   MS. STEUER: We're way over here. So I think
16   we're over by, what, how many minutes?
17   VIDEO OPERATOR: You're at 7:18.
18   MR. HUGHES: I'm just going through my notes
19   here.
20   BY MR. HUGHES:
21   Q. Who is Mike Sotello?
22   A. Mike Sotello?
23   Q. That's my question to you.
24   A. Yeah, Mike Sotello, I don't know if you can
25   give me some reference.

Page 303

1    Q. Do you believe that you had a fiduciary duty to
2    the other investors in these entities?
3    MS. STEUER: Objection. Vague. And calls for
4    a legal conclusion. You can answer.
5    BY MR. HUGHES:
6    Q. Do you believe that you had a fiduciary duty to
7    Dan Galvanoni?
8    A. What is your definition of fiduciary duty?
9    Q. You went to law school and you don't remember
10   what fiduciary duty means?
11   A. No.
12   Q. Did you have --
13   A. If you could give me the definition of what it
14   is.
15   Q. Don't you have to know what a fiduciary duty is
16   to be an insurance broker in the state of California;
17   isn't that part of your licensing requirements, sir?
18   MS. STEUER: No. I mean, sorry, objection. It
19   calls for a legal conclusion. And lacks foundation.
20   THE WITNESS: Yeah, when you say fiduciary
21   duty, to me what that means is to do the right thing.
22   BY MR. HUGHES:
23   Q. Do you think it's a higher duty than to just do
24   the right thing? Did you owe somebody an extra
25   heightened duty of care because you're in a financial

Page 304

1    relationship with them?
2    A. Well --
3    MS. STEUER: Objection. That calls for a legal
4    conclusion.
5    THE WITNESS: I'm not sure if I had a fiduciary
6    duty or not.
7    BY MR. HUGHES:
8    Q. Okay. That's fair. Do you believe that you
9    had a duty to maintain confidentiality with
10   Mr. Galvanoni or his team?
11   MS. STEUER: Objection. That calls for a legal
12   conclusion. But you can answer if you have a belief.
13   THE WITNESS: I'm not aware of that.
14   BY MR. HUGHES:
15   Q. The name of the doctor that you recently went
16   and saw with respect to your memory issues, what is his
17   or her name?
18   A. Dr. Cohen.
19   Q. C-o-h-e-n?
20   A. Yes.
21   Q. And where is Dr. Cohen at?
22   A. Sacramento.
23   Q. Where in Sacramento, what hospital or --
24   A. He's on Fair Oaks Boulevard.
25   Q. And is he with a particular medical group or



Page 305

1  hospital?
2     A. Kaiser.
3     Q. Have you seen any doctors other than Dr. Cohen
4  with respect to memory difficulty you've had?
5     A. Dr. Cohen is the main doctor I've been talking
6  with.
7     Q. Have you undergone testing with Dr. Cohen?
8     A. No, not with him.
9     Q. With other people at Kaiser?
10    A. There was some tests done a while back.
11    Q. Where?
12    A. With Kaiser.
13    Q. Have you had testing outside of Kaiser?
14    A. No.
15    Q. You included in your email to the FBI, a
16 discussion about what Wes Anderson told you about
17 Mr. Galvanoni's getting $300 to pay for hookers and
18 drugs. Do you remember talking about that?
19    A. Yes.
20    Q. Why was that relevant to your communication to
21 the FBI?
22    A. I was concerned. I didn't have access to the
23 books. I wasn't seeing what was with the books. But
24 Mr. Anderson said that Dan was taking business expenses
25 and taking write-offs, and it was a concern that you,

Page 306

1  know, money was being used for illegal reasons.
2     Q. Did you tell the FBI about your communications
3  with Dan when you and he had discussed him setting you
4  up with women?
5     A. Did I discuss communications with Dan setting
6  me up with women?
7     Q. Well, since you find it relevant to the FBI to
8  tell them that the $300 he was allegedly using was for
9  something as salacious as hookers and drugs, did you
10 happen to tell the FBI that Mr. Galvanoni tried to set
11 you up with women from time to time?
12    A. He's never set me up with women.
13    Q. Mr. Galvanoni has never put you in direct
14 communication with a female to go out on a date or have
15 dinner?
16    A. Are you talking about a hooker?
17    Q. I don't know what the girl is or what she
18 isn't. I'm not suggesting --
19    A. I've never -- yeah, I don't solicit or do
20 anything illegal or anything with hookers.
21    Q. I'm not suggesting you do, sir.
22    A. Okay.
23    Q. My question is whether you informed the FBI of
24 the relationship you and Dan had with respect to Dan
25 introducing you to ladies here in Sacramento?

Page 307

1     A. I don't recall him introducing me to a woman in
2  Sacramento.
3     MS. STEUER: Okay. I've allowed you to go way
4  over the time.
5     MR. HUGHES: Anywhere in California?
6     MS. STEUER: I've allowed you to go way over
7  the time. You said it would be a few minutes.
8     MR. HUGHES: You allowed me to go seven minutes
9  over the time, so --
10    MS. STEUER: No, it's actually now 20 minutes
11 over the time.
12    MR. HUGHES: Okay. Well, here's what we're
13 going to do. I'm going to go ahead and suspend the
14 deposition. There's documents that weren't produced to
15 us that should have been produced to us, as you've
16 acknowledged. I have a right to ask you questions about
17 those documents. So I'm going to suspend the
18 deposition. We're most likely going to move to -- yeah,
19 with great respect to you, sir, to the extent that there
20 are memory issues at play here, and some of the issues
21 with reading things and the time it took, I think that
22 there's good cause to go to the magistrate judge and the
23 district judge and ask for us to be given a little bit
24 more time. I'm not asking -- I'm not going to ask for a
25 lot more time, but a little bit more time.

Page 308

1     MS. STEUER: Well, I don't know what you mean
2  by a little bit more time. But we're certainly going to
3  object because you've had all day, you've asked
4  repetitive questions, you've asked questions about a
5  number of things that aren't relevant. Even though
6  relevance objections are reserved, the fact that you've
7  chosen to spend quite a bit of time on things that have
8  no relevance in this case is not our problem. So we are
9  definitely going to object to your using more time and
10 it's an abuse of the discovery process, and you can
11 expect a vigorous opposition. I've given you way more
12 than seven hours, and we're going to stop. Since you're
13 not going to finish anyway, I think the deposition is
14 over and we're going to leave.
15    MR. HUGHES: Well, the record is going to
16 continue unless I say that we're off the record. So --
17    MS. STEUER: Then you can continue talking
18 without Mr. Marshall and I present.
19    MR. HUGHES: Well, it's a violation of the
20 rules if you leave without -- for the witness to leave
21 without the deposition being concluded by all counsel
22 going off the record.
23    MS. STEUER: Well, it's been --
24    MR. HUGHES: So --
25    (Interruption by the reporter.)



Page 309

1    MS. STEUER: It's been going for more than
2    seven hours. You just said you were going to suspend
3    it, after saying that you would finish today if we gave
4    you a little bit more time. It's now clear that you
5    have no intention of finishing today, so I don't see why
6    Mr. Marshall and I should waste any more time here.
7        MR. HUGHES: I'm not going to be concluded with
8    the deposition when the witness told me there are
9    documents he has that he hasn't produced to us that were
10   responsive.
11       With respect to the notion that what we've gone
12   over today isn't relevant, let me make a couple
13   pointers. They are very important and critical for the
14   record.
15       Number one, the discussion about Tyler Marshall
16   is derived completely, sir, from your document
17   production, which includes all of the documents we've
18   marked as exhibits regarding the manipulation of Tyler's
19   résumé and Tyler's letter of recommendation and how it
20   corresponds with what you did with Spring Tree
21   Washington.
22       Number two, the discussion I've asked you with
23   respect to hookers and drugs comes directly from your
24   communications with the FBI. The discussion we've had
25   today about your involvement with the FBI and the SEC on

Page 310

1    all the other investigations you've done comes from your
2    testimony about what you do and what you've done to
3    Mr. Galvanoni.
4        The third thing, the questions we've asked you
5    about what your knowledge was of the transaction itself
6    and your communications comes entirely from your almost
7    11,000 pages of documents that were produced. So I
8    don't think that we've gone into anything that is
9    irrelevant today.
10       What I said and what I want to make very clear
11   for the record is that I don't know how much longer I
12   would want to depose you for because I don't know how
13   many records you're going to produce of communications
14   with the FBI or the SEC that you haven't produced today.
15   If it's one or two pages, then perhaps we wouldn't need
16   to depose us at all. But right now I'm reserving the
17   right to file a motion to the Court to ask that you come
18   back for us to have additional time in some capacity.
19       I trust that pursuant to the local rules you
20   and I, Counsel, will meet and confer appropriately as to
21   whether or not there is a way to avoid law and motion
22   practice. If there isn't, so be it.
23       MS. STEUER: Right. And I would point out that
24   I don't actually think there are any other additional
25   responsive documents, but we will do a search, and if

Page 311

1    the search turns up anything that hasn't been produced,
2    it will be produced. We'll do another search because
3    there's already been one done, but we'll do another one
4    just in case something got missed.
5        MR. HUGHES: We're off the record. Thank you.
6        VIDEO OPERATOR: This concludes today's
7    deposition of John Marshall consisting of two SD cards.
8    We're off the record at 6:26 p.m.
9        MS. STEUER: I don't want the video right now.
10   I would like to get a copy just on routine turn-around
11   time, but not expedited.
12       (The deposition concluded at 6:27 p.m.)
13                        * * *
14
15
16
17
18
19
20
21
22
23
24
25

Page 312

1                REPORTER'S CERTIFICATION
2
3        I, JENNIFER SCHUMACHER, a Certified Shorthand
4    Reporter in and for the State of California, do hereby
5    certify:
6
7        That the foregoing witness was by me duly sworn;
8    that the deposition was then taken before me at the time
9    and place herein set forth; that the testimony and
10   proceedings were reported stenographically by me and
11   later transcribed into typewriting under my direction;
12   that the foregoing is a true record of the testimony and
13   proceedings taken at that time.
14
15       IN WITNESS WHEREOF, I have subscribed my name this
16   March 26, 2019.
17
18
19
20       JENNIFER SCHUMACHER, CSR No. 9763
21
22
23
24
25



Page 313

1    DECLARATION UNDER PENALTY OF PERJURY

2

3        I, JOHN MARSHALL, do hereby certify under penalty

4    of perjury that I have read the foregoing transcript of

5    my deposition taken on March 14, 2019; that I have made

6    such corrections as appear noted herein in ink,

7    initialed by me; that my testimony as contained herein,

8    as corrected, is true and correct.

9

10       DATED this _____ day of _____, 2019,

11   at _____ , California.

12

13

14

                        _____

15

                        JOHN MARSHALL

16

17

18

19

20

21

22

23

24

25

Page 314

1         DEPOSITION ERRATA SHEET

2    Our Assignment No. 3714685

     Case Caption: JOHN MARSHALL vs. DANIEL P. GALVANONI

3    Witness: JOHN MARSHALL

     Date of Deposition: March 14, 2019

4

5         DEPOSITION ERRATA SHEET

6

7    Page No._____Line No._____Change to:_____

8    _____

9    Reason for change:_____

10   Page No._____Line No._____Change to:_____

11   _____

12   Reason for change:_____

13   Page No._____Line No._____Change to:_____

14   _____

15   Reason for change:_____

16   Page No._____Line No._____Change to:_____

17   _____

18   Reason for change:_____

19   Page No._____Line No._____Change to:_____

20   _____

21   Reason for change:_____

22   Page No._____Line No._____Change to:_____

23   _____

24   Reason for change:_____

25   Page No._____Line No._____Change to:_____

Page 315

1    _____

2    Reason for change:_____

3    Page No._____Line No._____Change to:_____

4    _____

5    Reason for change:_____

6    Page No._____Line No._____Change to:_____

7    _____

8    Reason for change:_____

9    Page No._____Line No._____Change to:_____

10   _____

11   Reason for change:_____

12   Page No._____Line No._____Change to:_____

13   _____

14   Reason for change:_____

15   Page No._____Line No._____Change to:_____

16   _____

17   Reason for change:_____

18   Page No._____Line No._____Change to:_____

19   _____

20   Reason for change:_____

21   Page No._____Line No._____Change to:_____

22   _____

23   Reason for change:_____

24   SIGNATURE:_____DATE:_____

25       JOHN MARSHALL


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com